**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| *In re Kentucky Grilled Chicken Coupon Marketing & Sales Practices Litigation,* | MDL 2103 |
| | Case No. 1:09-cv-7670 |
| THIS DOCUMENT RELATES TO ALL CLASS ACTIONS | Hon. James F. Holderman |

**PLAINTIFFS' MOTION & MEMORANDUM IN SUPPORT OF FINAL APPROVAL OF CLASS ACTION SETTLEMENT, AND APPROVAL OF ATTORNEYS' FEES AND INCENTIVE AWARD**

Jay Edelson
Michael J. McMorrow
EDELSON MCGUIRE LLC
350 N. LaSalle St., Ste. 1300
Chicago, Illinois 60654

*Attorneys for Plaintiffs and the Settlement Class*

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

I.     NATURE OF THE LITIGATION .............................................................3

       1.    *Plaintiffs' Allegations & the Litigation History* ................................3

       2.    *The Settlement Conferences and Further Negotiations* .....................4

II.    TERMS OF THE SETTLEMENT ...........................................................5

       1.    *Class Definition* .................................................................................5

       2.    *Payment by Defendants* .....................................................................6

       3.    *Payment of Claims of Class Members* .................................................6

       4.    *Additional Relief* ...............................................................................6

       5.    *The Release* .........................................................................................7

III.   THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS .......8

IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL ........................10

       1.    *The Strength of the Plaintiffs' Case Compared to Settlement Weighs in Favor of Granting Approval* ................................................11

       2.    *The Likelihood of An Increase in the Complexity, Length, And Expense of Continued Litigation Validates the Approval of the Settlement* ........14

       3.    *There Has Been Almost No Opposition to the Settlement* ..................15

       4.    *The Opinion Of Competent Counsel Favors Approval* ......................16

       5.    *The Stage of The Proceedings And The Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement* ........................17

V.     ATTORNEYS' FEES & INCENTIVE AWARDS ....................................18

       1.    *The Requested Attorneys' Fees are Reasonable Whether Calculated Under Either the Percentage of the Benefit Analysis or the Lodestar Method* ............18

             A.    The Requested Fees Represent Under 33% of the Common Benefit Provided to the Class—a Percentage Well Below Market and the Range that has Been Found Reasonable by the courts ......................21

             B.    The Requested Fees are Equally Appropriate Under the Lodestar

        **Method** ...................................................................................................22

      **2.**    *The Incentive Award to the Class Representatives is Reasonable and Should be Approved* .........................................................................26

**VI.**    <u>**THE CANNATA OBJECTION SHOULD BE OVERRULED**</u> ................................26

      **1.**    *The Settlement Agreement Has Been Thoroughly Scrutinized* .........................28

      **2.**    *Certification of the Class for Settlement Purposes Was Appropriate* ................29

      **3.**    *Sufficient Information Exists to Determine the Reasonableness of Fees* ..........32

      **4.**    *The Cy Pres Recipients are Appropriate* ............................................................34

<u>**CONCLUSION**</u> ...............................................................................................................35

# TABLE OF AUTHORITIES

**United States Supreme Court Cases**

*Amchem Products Inc. v. Windsor*, 521 U.S. 591 (1997) .................................................. 30, 31

*Am. Airlines, Inc. v. Wolens*, 513 U.S. 219 (1995) ...................................................30

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .............................................. 19, 20

*Cipollone v. Liggett Group, Inc.,* 505 U.S. 504 (1992) .............................................30

*Eisen v. Carlisle & Jacquelin*, 417 U.S. 156 (1974)....................................................8

*Hensley v. Eckerhart,* 461 U.S. 424 (1983) ................................................................22

*Missouri v. Jenkins*, 491 U.S. 274 (1989) ................................................................19

**United States Circuit Court of Appeals Cases**

*Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305 (7th Cir.1980) ....................................10

*Cook v. Niedert,* 142 F.3d 1004 (7th Cir. 1998) .................................................. 23, 26

*Denius v. Dunlap*, 330 F.3d 919 (7th Cir. 2003) .......................................................22

*E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884 (7th Cir. 1985) .....................10

*Felzen v. Andreas*, 134 F.3d 873 (7th Cir.1998) ......................................................10

*Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 650 (7th Cir. 1994) ..............................19

*Gaskill v. Gordon*, 160 F.3d 361 (7th Cir. 1998) .....................................................21

*Gastineau v. Wright,* 592 F.3d 747 (7th Cir. 2010) ............................................ 22, 23

*Harman v. Lyphomed, Inc.*, 945 F.2d 969 (7th Cir. 1991) ........................................23

*In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002) .............................30

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001) ................................. 18, 26

*In re Trans Union Corp. Privacy Litig.*, 629 F.3d 741 (7th Cir. 2011) .....................18

*In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516 (3d Cir. 2004) ........................31

*Isby v. Bayh*, 75 F.3d 1191 (7th Cir. 1996) ......................................................*passim*

*Jeffboat, LLC v. Director, Office of Workers' Comp. Progs.*, 553 F.3d 487 (7th Cir. 2009) ......22

*Kirchoff v. Flynn*, 786 F.2d 320 (7th Cir. 1986) .......................................................19

*Lemon v. Int'l Union of Operating Eng'g.*, 216 F.3d 577 (7th Cir. 2000) ....................................31

*Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781 (7th Cir. 2004) .......................................... 8, 33, 34

*Montgomery v. Aetna Plywood, Inc.*, 231 F.3d 399 (7th Cir. 2000) ...........................................18

*Skelton v. Gen. Motors Corp.*, 860 F.2d 250 (7th Cir. 1988) ......................................... 19, 20, 23

*Sutton v. Bernard*, 504 F.3d 688 (7th Cir. 2007) .................................................. 18, 19

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646 (7th Cir. 2006) ................. 11, 18

*Taubenfeld v. AON Corp.*, 415 F.3d 597 (7th Cir. 2005) ...........................................................18

*Uhl v. Thoroughbred Tech. & Telecomms., Inc.*, 309 F.3d 978 (7th Cir. 2002) .........................10

**United States District Court Cases**

*Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816
    N.D. Ill. 2002) ..............................................................................................15

*Garner v. State Farm Mut. Auto. Ins. Co.*, CV-08-1365 CW (EMC), 2010 WL 1687832
    (N.D. Cal. Apr. 22, 2010) .............................................................................15

*Hartless v. Clorox Co.*, 273 F.R.D. 630 (S.D. Cal. 2011) ............................................. 27, 31, 33

*Hispanics United of DuPage Co. v. Vill. of Addison*, 988 F. Supp. 1130 (N.D. Ill. 1997) .... 15, 16

*In re AT&T Mobility Wireless Data Services Litig.*, 270 F.R.D. 330 (N.D. Ill. 2010) ....... 8, 11, 17

*In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 789 F. Supp. 2d 935
    (N.D. Ill. 2011) .............................................................................................31

*In re HP Inkjet Printer Litig.*, No. 05-03580 (N.D. Cal. 2011) ..................................................27

*In re JPMorgan Chase & Co. Sec. Litig.*, No. 06 C 4674, 2009 WL 537062 (N.D. Ill.
    Mar. 3, 2009) ...............................................................................................11

*In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d
    997 (E.D. Wis. 2010) ....................................................................................11

*In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350 (E.D. Pa.
    Jun. 2, 2004) ................................................................................................23

*In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002 (N.D. Ill. 2000) ............ 14, 15, 21, 34

*In re Quantcast Adv. Cookie Litig.*, No. 10-5484 (C.D. Cal. 2011) ...........................................27

*In re Trans Union Corp. Privacy Litig.*, MDL 1350, No. 00 C 4279, 2009 WL 4799954
    (N.D. Ill. Dec. 9, 2009) ................................................................................ 18, 19

*Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298 (S.D. Fla. 2005) ............................... 11, 13, 17

*Mangone v. First USA Bank,* 206 F.R.D. 222 (S.D. Ill. 2001) ....................................................17

*Marsikyan v. Mercedes-Benz, USA, LLC,* No. 08-04876 (C.D. Cal. 2010) ...............................27

*Masters v. Lowe's Home Centers, Inc.,* No. 09-0255 (S.D. Ill. 2011) ......................................27

*Meyenburg v. Exxon Mobil Corp.,* No. 05-cv-15 DGW, 2006 WL 2191422 (S.D. Ill. July 31, 2006) ...........................................................................................................21, 32

*McKinnie v. JP Morgan Chase Bank, N.A.,* 678 F. Supp. 2d 806 (E.D. Wis. 2009) . 12, 15, 21, 34

*Retsky Family Ltd. P'ship v. Price Waterhouse LLP,* 97 C 7694, 2001 WL 1568856 (N.D. Ill. Dec. 10, 2001) ...................................................................................................19

*Schulte v. Fifth Third Bank,* No. 09-06655, 2011 WL 3269340 (N.D. Ill. July 29, 2011) ....27, 33

*Spicer v. Chicago Bd. Options Exch., Inc.,* 844 F. Supp. 1226 (N.D. Ill. 1993) .........................21

*Steinberg v. Nationwide Mut. Ins. Co.,* 224 F.R.D. 67 (E.D.N.Y. 2004) ....................................30

*Subedi v. Merch.,* 09 C 4525, 2010 WL 1978693 (N.D. Ill. May 17, 2010) .........................30, 32

*Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.,* 02-cv-1109 DRH, 2004 WL 768658 (S.D. Ill. Mar. 19, 2004) ..............................................................................21

*Williams v. Gen. Elec. Capital Auto Lease,* 94 C 7410, 1995 WL 765266 (N.D. Ill. 1995) ..19, 32

*Will v. Gen. Dynamics Corp.,* CIV. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010) ................................................................................................22

**Illinois Supreme Court Cases**

*Avery v. State Farm Mut. Auto. Ins. Co.,* 216 Ill. 2d 100, 835 N.E.2d 801 (2005) .....................30

*Martin v. Heinold Commodities, Inc.,* 117 Ill. 2d 67, 510 N.E.2d 840 (1987) ...........................30

**Miscellaneous State Court Cases**

*In re Administrative Actions Dated April 30, 2004,* 807 N.E.2d 929 (Ohio 2004) ....................27

**Rules**

Fed. R. Civ. P. 23 ..........................................................................................................*passim*

**Miscellaneous**

2 NEWBERG ON CLASS ACTIONS, § 1.18 (3d Ed.1992).................................................................20

Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements,* 84 St. John's L. Rev. 949, 966 (2010) ............................................31

E. Farnsworth, *Contracts* § 2.1 (1982) ......................................................................12

E. Farnsworth, *Contracts* § 12.1 (1982) ............................................................... 11, 12

Richard Posner, Economic Analysis of Law § 21.9 (3d ed. 1986) ...............................20

Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303 (2006) ..........................................26

Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts:  Final Report to the Advisory Committee on Civil Rules* (Federal Judicial Center 1996) ......................................................................22

# INTRODUCTION

This class action settlement – to which the Court granted Preliminary Approval on August 16, 2011 (Dkt. 102) – resolves and settles allegations made in four separate lawsuits arising out of a promotion by Defendants Yum! Brands, Inc. ("Yum") and its subsidiary KFC Corporation ("KFC") (collectively "Defendants"), televised on the popular Oprah! television program, for a free two-piece meal of their new product, Kentucky Grilled Chicken®. The promotion proved more popular than the Defendants could handle, as millions of coupons were downloaded and consumers found long lines and shortages of product. On May 7, 2009, KFC announced that it would no longer accept the coupons, and instead made a Raincheck Coupon[1] available to consumers. Plaintiffs James Asanuma, Daleen Brown, Christine Doering, Veronica Mora, and Kay Ready (collectively, the "Plaintiffs") filed lawsuits, alleging that the Defendants breached the terms of the offer and defrauded consumers by refusing to honor all coupons validly downloaded, in accordance with their terms.[2] These lawsuits were centralized into this Multi-District Litigation ("MDL").

After considerable litigation and in the midst of discovery, the parties began discussing the prospect of settling this case at the Court's suggestion. The parties engaged in two separate formal settlement conferences with Magistrate Judge Maria Valdez on September 3, 2010, and October 18, 2010, and continued negotiating thereafter as discovery continued. On January 18, 2011, the parties reached agreement in principle on the instant settlement resolving the litigation, and the Court entered a stay of the proceedings to allow the parties to negotiate and execute a

---

[1] Capitalized terms Capitalized terms used herein and otherwise undefined have the same meaning as set forth in the Stipulation of Class Action Settlement, as amended (the "Settlement Agreement"). A true and correct copy of the Settlement Agreement (without exhibits) is attached hereto as Exhibit A.

[2] One of the underlying suits also alleged that KFC failed to disclose that the topical seasoning used on Kentucky Grilled Chicken® contains "beef products."

final settlement agreement. (Dkt. 84.) Through continued additional negotiations over the specific terms of the agreement, and further intervention from this Court, the parties were able to reach a very strong settlement.

On August 16, 2011, the Court granted preliminary approval, finding that the settlement "is fair and has been negotiated at arm's-length, and that its adequacy is such that the settlement falls within the range of possible final approval." (Dkt. 102, ¶ 2.) The Court further approved the multi-prong notice plan set forth in the Settlement Agreement, finding it complied fully with the requirements of Rule 23 and due process, and "constitutes the best notice practicable under the circumstances, and is valid, due, and sufficient notice to all persons entitled thereto." (*Id.*, ¶ 7.) The notice plan has been successfully implemented, and the deadline for the submission of requests for exclusion and objections has expired. There has been an overwhelmingly favorable reaction to the Settlement Agreement by the Settlement Class—there has been only one objection, by a professional objector,[3] and only two requests for exclusion.

The positive reaction from the Settlement Class is not surprising; the settlement has achieved excellent results for the Settlement Class, providing each Settlement Class member who was denied the opportunity to redeem an Original Coupon and submits a valid claim by January 30, 2012 the full face value ($3.99) of the unredeemed coupons – up to $15.96 per household. Class members who possess generic PDF coupons are able to obtain cash relief of $2.00 per PDF coupon, and Settlement Class members who no longer possess the coupons they downloaded are able to obtain $1.00 per coupon. The substantial monetary payments made

---

[3] Sam P. Cannata, the attorney for and an apparent relative of Objector Jill K. Cannata, has filed objections in no fewer than 10 federal class action settlements (including here) in the past two years, none of which was sustained by the court in which it was filed. The Cannata Objection is addressed more fully in Section VI, *infra*.

available to the Settlement Class, their favorable reaction to the settlement, and the inherent risk attendant in continued litigation of a complex class action each favor final approval.

Accordingly, Plaintiffs James Asanuma, Daleen Brown, Christine Doering, Veronica Mora, and Kay Ready respectfully request the Court grant final approval of the Settlement Agreement dismissing the Released Claims, and awarding the agreed-upon attorneys' fees and incentive awards.

## I.    NATURE OF THE LITIGATION

### 1.    *Plaintiffs' Allegations & the Litigation History*

On June 4, 2009, plaintiff Christine Doering brought the first of the four suits comprising this Multi-District Litigation ("MDL") in the Circuit Court of Cook County, Illinois. (*See* Case No. 1:09-cv-04166, Dkt. 1.)  On June 17, 2009, plaintiffs James Asanuma and Veronica Mora brought suit in the Superior Court of Los Angeles, California.  (*See* C.D. Cal. Case No. 2:09-5246, Dkt. 1.)  On June 25, 2009, plaintiff Daleen Brown brought suit in the Superior Court of San Mateo County, California.  (*See* N. D. Cal. Case No. 3:09-3269, Dkt. 1.)  On July 7, 2009, plaintiff Kay Ready brought suit in the Circuit Court of Wayne County, Michigan. (*See* E. D. Mich. Case No. 2:09-12827, Dkt. 1.)  Defendants timely removed these cases to the appropriate federal district courts, and moved to centralize the actions for pretrial proceedings pursuant to 28 U.S.C. § 1407 in front of the United States Judicial Panel on Multidistrict Litigation. (*See* Case No. 1:09-cv-04166, Dkt. 14.)   The four actions were centralized into this MDL and transferred to this Court on December 4, 2009.  (Dkt. 1.)  Plaintiffs filed a Master Consolidated Class Action Complaint on February 4, 2010 ("Master Complaint"). (Dkt. 18.)

In the Master Complaint, Plaintiffs alleged that Defendants breached the terms of the coupons and defrauded consumers by refusing to honor all Original Coupons between May 5 and

May 19, 2009 (excluding Mother's Day). (*Id*.) The Master Complaint also alleged that KFC failed to disclose that the topical seasoning used on Kentucky Grilled Chicken® contained "beef products." Plaintiffs, on behalf of themselves and the putative classes, alleged seven causes of action against Defendants, claiming breach of contract, violations of consumer fraud statutes, common law fraud, and false advertising. (*Id*.)

On March 5, 2010, Defendants filed a motion seeking dismissal of all counts of the Master Complaint. (Dkt. 24.) After complete briefing on the motion to dismiss, the Court issued its opinion in a reported decision denying Defendants' motion in its entirety. (Dkt. 40.)

The parties engaged in significant discovery. Discovery commenced almost immediately upon transfer of the cases to this Court, and helped the parties define the issues, ultimately leading the Parties towards this settlement. The parties conducted an extensive examination and investigation of the facts and law relating to the matters set forth in this litigation regarding the claims and potential defenses of Defendants. Defendants produced over 15,000 pages of documents, the Parties exchanged responses to extensive written discovery requests, and KFC's Chief Operations Officer was deposed in January 2011. (*See* Declaration of Michael J. McMorrow ¶¶ 7-10, a true and accurate copy of which is attached as Exhibit B.)

## 2. *The Settlement Conferences and Further Negotiations*

The Court's order denying Defendants' Motion to Dismiss encouraged the parties to discuss settlement. (Dkt. 40.) While continuing with discovery, the parties agreed to a settlement conference in front of Magistrate Judge Maria Valdez of this District.

Prior to the settlement conference, the parties had already propounded several sets of class and merits based discovery. In addition, the parties agreed to and did informally exchange

documents and other information that would be needed to effectively engage in the mediation process. (*See* McMorrow Decl., ¶¶ 7, 10.)

Two settlement conferences were held: the first occurred on September 3, 2010; after several hours of negotiation, progress was made towards defining the issues and the relative strengths and weaknesses of each side's positions, but the parties were unable to reach an agreement. Despite the impasse, the parties returned for a second settlement conference with Judge Valdez on October 18, 2010. (*Id.*, ¶ 7, 9.) Several settlement proposals were made and discussed at length by the parties, and Judge Valdez assisted the parties in narrowing their differences. Nonetheless, the parties again reached an impasse. (*Id.*, ¶ 9.)

The parties resumed discovery. (*Id.*, ¶ 10.) After another three months of discovery, the parties resumed settlement discussions in January 2011. (*Id.*) After a week of additional arms'-length negotiations, the parties reached an understanding as to the principal terms of an agreement on January 18, 2011. (*Id.*)

## II.    <u>TERMS OF THE SETTLEMENT</u>

The terms of the settlement preliminarily approved by the Court are set forth in the Settlement Agreement attached hereto as Exhibit A and are briefly summarized as follows:

    **1.**    *Class Definition.* The "Settlement Class" is defined as:

> all persons who (a) downloaded an Original or PDF Coupon between May 5, 2009 at 9 a.m. central time and May 6, 2009 at 11:59 p.m. central time from Oprah.com or unthinkfc.com, and (b) did not receive (i) the KGC Free Meal pursuant to the Original Coupon, the PDF Coupon, or the Raincheck Coupon, (ii) a "Chicken Check" or other compensation from KFC in response to a complaint concerning the Oprah Promotion, or (iii) a free meal or other consideration at a restaurant unaffiliated with Defendants that agreed to accept the KGC Coupons.

(Settlement Agreement ¶ 1.)

2.    ***Payment by Defendants.***  Defendants have agreed to provide a fund of $1.575 million ($1,575,000) (the "Available Amount") for (i) Valid Claims submitted by Settlement Class members, (ii) notice to the Settlement Class, (iii) administrative costs of the settlement, (iv) Class Counsel's attorneys' fees and costs; and (v) incentive awards to Plaintiffs.   If the total amount of claims, attorneys' fees, incentive awards and administration costs exceeds the Available Amount, Settlement Class members will receive a *pro rata* amount so that the total payments made shall not exceed $1.575 million.  No part of the fund will revert to the Defendants.

3.    ***Payment of Claims of Class Members.***  Settlement Class members are entitled to submit a claim to recover cash under the following terms:

(a)    Group 1: Settlement Class members who submit a valid claim form attaching the Original Coupon (an Original Coupon is one containing an unique and identifiable bar code) are entitled to receive $3.99 for each Original Coupon submitted, up to a total of $15.96 per household.

(b)    Group 2: Settlement Class members who submit a valid claim form attaching the PDF Coupon (a PDF Coupon is one made from a static image, and contains a generic bar code ending in "1234") are entitled to receive $2.00 for each PDF Coupon submitted, up to a total of $8.00 per household.

(c)    Group 3:  Settlement Class members who no longer have an Original Coupon or PDF Coupon but complete and sign a valid claim form are entitled to receive $1.00 for each Original Coupon or PDF Coupon downloaded, up to a total of $4.00 per household.

If, after deducting the total amount of claims, attorneys' fees, incentive awards and administration costs, the amount of Available Settlement Funds is less than the total amount of all Valid Claims, the funds will be reallocated within the three Groups to ensure a fair apportionment of remaining funds.  (*See* Settlement Agreement ¶5(f).)

4.    ***Additional Relief.***  In addition to the individual relief to the Settlement Class provided above, Defendants have also agreed to provide the following additional relief:

**A.** **Payment of Notice and Administrative Expenses:** Defendants will pay from the Available Amount the cost of providing notice set forth in the Settlement Agreement and any other notice as required by the Court as well as all costs of administration of the settlement. (*See* Settlement Agreement ¶ 4.)

**B.** **Incentive Award for Plaintiffs:** In addition to any award under the Settlement, and in recognition of their efforts on behalf of the Settlement Class, the Plaintiffs in this matter shall, subject to Court approval, receive an award of $25,000 in the aggregate, to be paid from the Available Amount as appropriate compensation for their time and effort serving as the class representatives in this action. (*See* Settlement Agreement ¶ 6.)

**C.** ***Cy Pres***: If any Available Funds remain after all payments have been made pursuant to Paragraphs 5(b)-(f), KFC shall make a cash donation in a total amount equal to the remaining Available Funds, to the following organizations in the percentages listed: Feeding America (50%), the nation's leading domestic hunger-relief charity, the Illinois Bar Foundation (25%), and the Chicago Bar Association (25%). No portion of the $1.575 million Available Amount will revert to the Defendants.

**D.** **Payment of Attorneys' Fees:** Under the Settlement Agreement, Defendants will neither support nor oppose proposed Class Counsel's request, subject to Court approval, for an amount of up to $515,000 for attorneys' fees and reimbursement of expenses to be paid from the Settlement Fund. (*See* Settlement Agreement ¶ 6.)

**5.** ***The Release.*** In exchange for the relief described above, Defendants, and various other individuals and entities, will receive a full release of all claims that arise out of or relate in any way to: (i) claims that were or could have been asserted in the Litigation; (ii) the Oprah Promotion, the KGC Free Meal, or the KGC Coupons, or any representation, misrepresentation,

promise, communication, act, or omission regarding the same; (iii) any matters alleged, argued, raised, or asserted in any pleading or court filing in the Underlying Actions or the Litigation; or (iv) any representation, misrepresentation, promises, communication, act, or omission regarding the topical seasonings for Kentucky Grilled Chicken®. (*See* Settlement Agreement, ¶¶ 8-9 for a description of the complete release language.)

## III. THE IMPLEMENTED NOTICE PLAN COMPORTS WITH DUE PROCESS

The parties, through professional settlement administrator Rust Consulting, Inc., have fully complied with this Court's Order directing notice to the Settlement Class. Rule 23 requires the Settlement Class receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." Fed. R. Civ. P. 23(c)(2)(B); *accord Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 173 (1974); *see also In re AT&T Mobility Wireless Data Services Litig.*, 270 F.R.D. 330, 351 (N.D. Ill. 2010).

What comprises the best notice possible depends on various elements, including the size of the class, whether the class members can be easily identified, and the probability notice will reach the intended audience. *See e.g. Eisen*, 417 U.S. at 166-67. The names and addresses of Settlement Class members were unknown to Defendants in this case, making individual notice impossible in most instances.[4] In instances where the names and addresses of class members are not easily ascertainable, notice by publication alone is sufficient. "When individual notice is infeasible, notice by publication in a newspaper of national circulation ... is an acceptable substitute." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 786 (7th Cir. 2004). Defendants' lack of identifying information as to Settlement Class members required that notice occur through publication.

---

[4] Class Counsel gave direct notice to all potential class members for which counsel had email addresses. (*See* McMorrow Decl., ¶12.)

Here, the Court-approved notice utilized a combination of print newspaper publication, website publication notice, and inventive targeted on-line advertising. (*See* Declaration of Kim Schmidt, Ex. 10 to McMorrow Decl.). Because the parties have fully complied with the approved notice plan, the Court should affirm its finding at preliminary approval that the forms and methods of notice were "best notice practicable under the circumstances, and . . . complies fully with the requirements of the Federal Rules of Civil Procedure . . . and meets the requirements of Due Process." (Dkt. 102.)

The notification plan implemented by Rust and approved by the Court included: (1) publication in a 2/5 page advertisement in *Parade* on September 11, 2011, the largest-circulation magazine in the nation and a weekend newspaper supplement, with a national circulation of 32,400,000 in major newspapers across the nation; (2) internet advertising on the 24/7 Network, which publishes notice to a wide range of popular internet sites and resulted in approximately 18 million additional impressions of the notice on a wide variety of popular websites; (3) Rust launched and continues to administer a website (www.couponmarketinglitigation.com) serving as the "long-form" notice, which contains all relevant Court documents, provides for the downloading of claim forms, and provided the ability of Settlement Class members to opt-out online if they so desired; and (4) Rust supported the effectiveness of the settlement website with targeted on-line advertising and sponsored key word search advertisements. (Schmidt Decl. ¶¶ 4-10.) In addition to the notice contemplated by the parties, the news of the settlement was reported in numerous publications on the Internet. (McMorrow Decl. ¶ 12.)

Finally, on July 5, 2011, in compliance with the Class Action Fairness Act, 28 U.S.C. §1715 (b), Defendants' counsel mailed a letter, as well as other required court documents to the Attorney General or other appropriate official of each state and U.S. territory giving notice of the

Settlement Agreement.  (*See* Dkt. 107.)

In sum, the notice was provided to all those reasonably ascertainable by available information and in the best method practicable to all others and comports with Due Process and Rule 23.

## IV.    THE SETTLEMENT WARRANTS FINAL APPROVAL

Under Federal Rule of Civil Procedure 23(e), "claims, issues, or defenses of a certified class may be settled . . . only with the court's approval."  Fed. R. Civ. P. 23(e).  In cases where the settlement "would bind class members, the court may approve [the settlement] only after a hearing and finding that it is fair, reasonable, and adequate."  Fed R. Civ. P. 23(e)(2).  "Federal courts naturally favor the settlement of class action litigation."  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996) (*citing E.E.O.C. v. Hiram Walker & Sons, Inc.,* 768 F.2d 884, 888-89 (7th Cir. 1985)).  Thus, the Seventh Circuit has found that a District Court's inquiry as to whether to grant approval "is limited to [the consideration of] whether the proposed settlement is lawful, fair, reasonable and adequate."  *Uhl v. Thoroughbred Tech. & Telecomms., Inc.,* 309 F.3d 978, 986 (7th Cir. 2002) (*citing Isby*, 75 F.3d at 1198-99).

In evaluating the fairness of a settlement, the Court views the facts in the light most favorable to the settlement. *Isby*, 75 F.3d at 1199.  Further, the Court must not substitute its own judgment as to optimal settlement terms for the judgment of the litigants and their counsel. *Armstrong v. Bd. of Sch. Dirs.*, 616 F.2d 305, 315 (7th Cir.1980), *overruled on other grounds by Felzen v. Andreas*, 134 F.3d 873, 875 (7th Cir.1998).  To properly evaluate the fairness of a settlement, a district court must consider the following five factors:

> [1] the strength of plaintiffs' case compared to the amount of defendants' settlement offer, [2] an assessment of the likely complexity, length and expense of the litigation, [3] an evaluation of the amount of opposition to settlement among

affected parties, [4] the opinion of competent counsel, and [5] the stage of the proceedings and amount of discovery completed at the time of settlement.

*Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (internal citations omitted) (*citing Isby,* 75 F.3d at 1199); *accord In re JPMorgan Chase & Co. Sec. Litig.*, No. 06 C 4674, 2009 WL 537062, at *4 (N.D. Ill. Mar. 3, 2009). Each factor here militates in favor of final approval.

### 1. *The Strength of the Plaintiff's Case Compared to Settlement Weighs in Favor of Granting Approval.*

"The first and most important consideration is the strength of the plaintiffs' case compared to the value of the settlement." *In re Lawnmower Engine Horsepower Mktg. & Sales Practices Litig.*, 733 F. Supp. 2d 997, 1005 (E.D. Wis. 2010) (*citing Synfuel*, 463 F.3d at 653). In considering the strength of the plaintiff's case, the Court should quantify "the net expected value of continued litigation to the class," by estimating "the range of possible outcomes." *In re AT&T Mobility*, 270 F.R.D. at 346-47 (internal citations omitted); *accord Synfuel,* 463 F.3d at 653. In weighing this factor, the Court "should consider the vagaries of litigation and compare the significance of immediate recovery by way of the compromise to the mere possibility of relief in the future, after protracted and expensive litigation." *Lipuma v. Am. Express Co.*, 406 F. Supp. 2d 1298, 1323 (S.D. Fla. 2005). Finally, "[b]ecause the essence of settlement is compromise courts should not reject a settlement solely because it does not provide a complete victory to the plaintiffs." *In re AT&T Mobility*, 270 F.R.D. at 347 (internal quotations omitted).

The normal calculation of damages in a breach of contract suit is expectation damages.[5] In general, contract law exists to fulfill the expectations of contracting parties. *See* E. Farnsworth, *Contracts* § 12.1 at 812 (1982). Thus, if one party performs and the other party

---

[5] Plaintiffs also sought damages under the unfair competition and consumer protection statutes of California, Illinois and Michigan. These damages largely overlap with the contract damages that form the basis for this settlement, as none of those statutes provides for statutory damages in a class action.

breaches, the law usually grants expectation damages, that is, damages that put the nonbreaching party in the same position it would have been in if the breach had not occurred. *See, id.* § 2.1 at 40; § 12.1 at 812–13. The stated value of the unredeemed coupons in this case is $3.99 per coupon, and the settlement provides that Settlement Class members submitting Original Coupons will receive that amount. Settlements in which "claiming class members will be made whole" have been found "eminently reasonable." *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F. Supp. 2d 806, 811-12 (E.D. Wis. 2009). As such, Plaintiffs and Class Counsel believe the merits of the claims at issue are strong as to the contract damages, as is the likelihood of obtaining a victory. (McMorrow Decl. ¶ 5.) Thus, the recovery of the full amount of expectation damages is appropriate and amply supports the fairness of this settlement.

Additionally, in the absence of settlement, Plaintiffs are cognizant that the "range of possible outcomes" includes a number of highly unfavorable outcomes. Highly skilled counsel represents Defendants, and continued litigation in this case could result in a finding of no liability from this Court or the Seventh Circuit, which would provide no relief to the Settlement Class. Further, Defendants have raised several affirmative defenses and presented several potential factual hurdles during settlement discussions, any of which, if successful, could result in no relief to the Settlement Class. For example, in the event that the settlement had not been reached, Defendants were prepared to advance numerous arguments in their defense of the pending actions. Defendants have represented to Class Counsel that these arguments included:[6]

- All of the defenses and arguments raised in the Motion to Dismiss and Defendants' Answer and Separate and Affirmative Defenses. On the Motion to Dismiss, the Court considered only the factual allegations of the Complaint. Absent the settlement, Defendants contend that they would have moved for

---

[6] These arguments have been supplied by the Defendants to Class Counsel to minimize the need for a separate brief. Plaintiffs do ***not*** agree with these arguments, but merely reiterate them here to underscore some of the risks faced by the Settlement Class.

summary judgment on many of the same arguments but with the significant advantage of a developed factual record. (In all events, the arguments raised in the Motion to Dismiss would eventually have been subject to *de novo* review by the Seventh Circuit.)

- The Raincheck Program, contends Defendants, provides a complete defense to Plaintiffs' claims. Defendants have argued throughout this litigation that any member of the putative class who wanted the free meal obtained one either in connection with the original coupon (4.7 million meals) or with the Raincheck Coupon (2.7 million meals). (Settlement Agreement, Ex. A, at pp. 2-3 (¶¶ C & G); Defendants' Memorandum in Support of Their Motion to Dismiss [Dkt. 26-1, *passim*.)

- Defendants have consistently maintained throughout that there are no facts to support the allegations that they engaged in any false or misleading conduct and that their contention is supported by the 15,000 pages of documents produced to date and the January 6, 2011 deposition of Larry Roberts, who was the Chief Operating Officer of KFC in May 2009.

Again, while Plaintiffs certainly do not agree with any of these arguments, they highlight some of the risks that the Settlement Class would have faced in the event the settlement had not been reached.

The proposed settlement allows Settlement Class members to submit Original Coupons for the full amount of the offer, and allows Settlement Class Members with PDF Coupons or no coupons to submit claims for lesser amounts. The full Available Amount will be distributed with no reverter – all unused funds will be donated to Feeding America, the nation's leading domestic hunger-relief charity, and to the Chicago Bar Foundation and Illinois Bar Foundation, both of which provide assistance with access to the courts to those in need. Although Plaintiffs believe that their claims are strong on the merits, given the potential for unfavorable outcomes in the case, the amount of beneficial relief providing up to $15.96 to each Settlement Class member submitting a claim weighs heavily in favor of granting final approval of the settlement. *See Lipuma*, 406 F. Supp. 2d at 1323 ("[I]t has been held proper to take the bird in hand instead of a prospective flock in the bush."). Weighing the strength of Plaintiffs' claims and potential risks

involved with continued litigation, against the excellent results for the Settlement Class provided by the Settlement Agreement, this first factor strongly supports final approval of the settlement.

### 2. *The Likelihood of An Increase in the Complexity, Length, And Expense of Continued Litigation Validates the Approval of the Settlement.*

Final approval of a settlement is favored where "continued litigation would require resolution of complex issues at considerable expense and would absorb many days of trial time." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1019 (N.D. Ill. 2000) (finding that settlement is favored where further litigation would require additional written discovery, depositions and expert discovery, and where appellate practice is likely to result); *accord Isby,* 75 F.3d at 1199.

Continued litigation in this case would most certainly result in an increase in the complexity of the issues to resolve, the duration of the lawsuit, and an increase in the expenses incurred by both parties. The parties would incur considerable costs if this matter were to proceed to trial, including the costs of further discovery, the retention of expert witnesses and technical consultants, the filing of and defending of further pre-trial motions including heavily contested motions for class certification and summary judgment, and the great expense of conducting a class action trial. (McMorrow Decl., ¶6.) The evidence and witnesses would have to be assembled from across the country, adding additional expense to the litigation. (*Id.*) Moreover, given the complexity of the factual and legal issues, as well as the amount in controversy, the defeated party or parties would likely appeal both the certification decision and the merits. (*Id.*) Thus, simply obtaining a result—good or bad—could be years away if litigation were to continue, which dictates that the immediate benefit provided by the Settlement Agreement is strongly preferred.

### 3. *There Has Been Almost No Opposition to the Settlement.*

The lack of objectors challenging the settlement favors a finding that the settlement is "fair and reasonable." *Am. Civil Liberties Union v. United States Gen. Servs. Admin.*, 235 F. Supp. 2d 816, 819 (N.D. Ill. 2002). The fact that "99.9% of class members have neither opted out nor filed objections to the proposed settlements" is "strong circumstantial evidence favoring settlement." *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1020-21; *Hispanics United of DuPage County v. Vill. of Addison*, 988 F. Supp. 1130, 1169 (N.D. Ill. 1997) (finding settlement fair where a small fraction of class members objected).

Here, there were only two requests for exclusion and only one objection, by a professional objector, which should be overruled as discussed in Section VII, *infra*. This lack of opposition to the settlement strongly supports final approval. *See McKinnie*, 678 F. Supp. 2d at 812 (finding that lack of opposition supports settlement where approximately "1,200 class members filed claims in response to the settlement notice [and] not a single person opted out of the class and only two objections were filed."). The deadline for filing exclusions and objections to the settlement was October 26, 2011. (Schmidt Decl., ¶8.) In addition, Defendant provided proper notice of the Settlement Agreement to the appropriate state and federal officials pursuant to the Class Action Fairness Act of 2005 ("CAFA"), and no negative comments or opposition from those governmental entities was received. (Dkt. 107; McMorrow Decl. ¶ 13.) "Although CAFA does not create an affirmative duty for either the state or federal officials to take any action in response to a class action settlement, CAFA presumes that, once put on notice, state or federal officials will raise any concerns that they may have during the normal course of the class action settlement procedures." *Garner v. State Farm Mut. Auto. Ins. Co.*, CV-08-1365 CW (EMC), 2010 WL 1687832, *14 (N.D. Cal. Apr. 22, 2010).

Additionally, attorneys and staff at Edelson McGuire corresponded with Settlement Class Members about the settlement in exercise of their duties to the Settlement Class. (McMorrow Decl. ¶ 12.) Notably, none of the Settlement Class Members with whom Class Counsel corresponded objected to the terms of the Settlement. (*Id.*) This lack of opposition further supports granting final approval of the settlement.

### 4. *The Opinion of Competent Counsel Favors Approval.*

Courts are entitled to rely on the opinion of competent Class Counsel that the settlement is fair, reasonable and adequate, where Class Counsel are qualified, and where discovery and settlement negotiations are extensive and thorough. *See Isby*, 75 F.3d at 1200; *see also Hispanics United of DuPage County*, 988 F. Supp. at 1150 n. 6 (noting that a "strong initial presumption of fairness attaches" where the settlement is "the result of arm's length negotiations," and where plaintiffs' counsel are "experienced and have engaged in adequate discovery").

Class Counsel have extensive knowledge and experience in litigating consumer class actions, and were pitted against highly experienced defense counsel who promised to continue to mount a formidable defense. (*See* McMorrow Decl. ¶¶ 3, 5-6.) Additionally, counsel in the underlying lawsuits that make up this MDL have also approved of the settlement. Furthermore, the Settlement Agreement was finalized only after extensive arm's length negotiations in two formal settlement conferences with Judge Valdez and additional negotiations thereafter, and after Plaintiffs were given access to sufficient informal discovery to fairly and effectively negotiate a settlement on behalf of the Settlement Class. (McMorrow Decl. ¶¶ 9-11.) Faced with the prospect of receiving nothing should Defendants succeed in any aspect of what assuredly would have been a vigorous defense absent settlement, Class Counsel are confident that payment of up

to $15.96 per household is an excellent result in this litigation.  (*See* McMorrow Decl. ¶¶ 5-6.)

**5.**    ***The Stage of The Proceedings And The Amount of Discovery Completed Weigh in Favor of Final Approval of the Settlement.***

Approval of a settlement is proper where "discovery and investigation conducted by class counsel prior to entering into settlement negotiations was 'extensive and thorough.'"  *Isby*, 75 F.3d at 1200; *accord Mangone v. First USA Bank,* 206 F.R.D. 222, 226 (S.D. Ill. 2001).[7]  "The lack of [formal] discovery prior to settlement, however, does not preclude a court from approving a settlement," especially where "counsel have conducted a significant amount of informal discovery and dedicated a significant amount of time and resources to advancing the underlying lawsuits."  *In re AT&T Mobility*, 270 F.R.D. at 350 (internal citation omitted).

Here, the parties engaged in significant discovery.  Both Plaintiffs and Defendants undertook formal and informal discovery in this matter both prior to, and subsequent to, the two settlement conferences presided over by Magistrate Judge Maria Valdez of this Court on September 3, 2010, and October 18, 2010.  (McMorrow Decl., ¶¶7-10.)  In addition to written responses to discovery by Defendants and all five Plaintiffs, including dozens of written discovery requests, Defendants produced over 15,000 pages of documents, and KFC's Chief Operations Officer, Larry Roberts, was deposed in January 2011.  (*Id.*, ¶7)  Additional depositions of Plaintiffs and other officers of Yum, KFC, and various third parties were contemplated and scheduled until the settlement was reached. (*Id.*)

Prior to engaging in serious settlement discussions, the Parties were initially able to explore the strengths and weaknesses of their respective positions both through discovery and

---

[7] In fact, Courts "have often seen cases which were 'over discovered.'  In addition to wasting the time of [the] Court, the parties and their attorneys, it often adds unnecessarily to the financial burden of litigation and may often serve as a vehicle to harass a party.  Discovery in its most efficient utilization should be totally extra-judicial…. Being an extra judicial process, informality in the discovery of information is desired." *Lipuma*, 406 F. Supp. 2d at 1324.

through briefing on a motion to dismiss.   Further, settlement discussions only commenced after

significant investigation into Plaintiffs' claims and several months of discovery wherein the

parties exchanged documents and other information that allowed the parties to effectively engage

in the negotiation process.  (McMorrow Decl. ¶¶ 7-8.)  Accordingly the final factor weighs in

favor of approval and each of the five *Synfuel* factors support a finding that the settlement is fair,

reasonable, and adequate making final approval of the settlement warranted.

## V.      ATTORNEYS' FEES & INCENTIVE AWARDS

### 1.     *The Requested Attorneys' Fees are Reasonable Whether Calculated Under Either the Percentage of the Benefit Analysis or the Lodestar Method.*

In deciding an appropriate fee in common fund cases, the Seventh Circuit has

"consistently directed district courts to 'do their best to award counsel the market price for legal

services, in light of the risk of nonpayment and the normal rate of compensation in the market at

the time.'"  *Sutton v. Bernard*, 504 F.3d 688, 692 (7th Cir. 2007) (*quoting In re Synthroid Mktg.*

*Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*")); *see also Montgomery v. Aetna*

*Plywood, Inc.*, 231 F.3d 399, 408 (7th Cir. 2000) (finding that in common fund cases, "the

measure of what is reasonable [as an attorney fee] is what an attorney would receive from a

paying client in a similar case"); *In re Trans Union Corp. Privacy Litig.*, MDL 1350, No. 00 C

4279, 2009 WL 4799954, at *9 (N.D. Ill. Dec. 9, 2009) *order modified and remanded*, 629 F.3d

741 (7th Cir. 2011) ("The analysis should be determined from what an arms-length negotiation

between the class and the lawyers at the beginning of the case would have likely produced.");

*Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005) ("Although is it impossible to know

*ex post* exactly what terms would have resulted from arm's-length bargaining *ex ante*, courts

must do their best to recreate the market by considering factors such as actual fee contracts that

were privately negotiated for similar litigation . . . .") (*citing Synthroid I*, 264 F.3d at 719)).

This rule "is based on the equitable notion that those who have benefited from litigation should share in its costs." *Sutton*, 504 F.3d at 691-92, (*citing Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 252 (7th Cir. 1988); *see also Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) (class lawyers who secure fund are entitled to payment from the fund to avoid unjustly enriching those who benefit from class counsel and the class representatives' efforts).

Accordingly, although awarding attorneys' fees based on a percentage of the recovery or Class Counsel's lodestar remains within the discretion of the district court, *In re Trans Union Corp.*, 2009 WL 4799954, at *9 (*citing Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 650, 566 (7th Cir. 1994), "[t]he approach favored in the Seventh Circuit is to compute attorney's fees as a percentage of the benefit conferred upon the class" especially where the percentage accurately reflects the market. *Williams v. Gen. Elec. Capital Auto Lease*, 94 C 7410, 1995 WL 765266, *9 (N.D. Ill. 1995); *see also Sutton*, 504 F.3d at 693 (directing district court on remand to consult the market for legal services so as to arrive at a reasonable percentage) (*citing Missouri v. Jenkins*, 491 U.S. 274, 285 (1989) (stating that in determining attorneys' fees, "we have consistently looked to the marketplace as our guide to what is 'reasonable'")).

The contingent nature of the fees here supports an award based on the common benefit approach. The fee agreements between Class Counsel and the Class Representatives are contingent in nature, and the Plaintiffs agreed *ex ante* that one-third of any settlement fund plus reimbursement of all costs and expenses would represent a fair award of attorneys' fees from a fund recovered for a class. (McMorrow Decl. ¶ 14.) It has been stated that in commercial, non-class litigation, attorneys regularly negotiate contingent fee arrangements, which result in a fee of between 33.3% and 40% of the recovery. *Retsky Family Ltd. P'ship v. Price Waterhouse LLP*, 97 C 7694, 2001 WL 1568856, at *4 (N.D. Ill. Dec. 10, 2001) (*citing Kirchoff v. Flynn*, 786

F.2d 320, 324 (7th Cir. 1986); *see also* Richard Posner, Economic Analysis of Law § 21.9, at

534-35 (3d ed. 1986) (explaining established practice to reward attorneys for taking the risk of

non-payment by paying them a premium over their normal hourly rates for winning[8] contingency

cases).  That is the case here.

Additionally, Class Counsel assumed a substantial risk of non-payment given the

complexity of the action and the Defendants' position that it stood ready at all times to

vigorously defend the lawsuit.  (McMorrow Decl. ¶ 15.)  In light of the significant likelihood that

Class Counsel (and Settlement Class members) could have ultimately recovered nothing, Class

Counsel had every incentive to litigate this matter in the most efficient manner possible.

The magnitude of the recovery for the Settlement Class members is further suggestive of

an award based on the common benefit approach. Members who submit Original Coupons are

entitled to cash payments of $3.99 per coupon (the face value of the coupons), or their *pro rata*

share of the $1,575,000[9] settlement fund in the event the approved claims, attorneys' fees, and

settlement notice and administration costs exceed the total amount of the fund. Settlement Class

members who submit PDF Coupons or ho no longer have coupons are also entitled to make

claims for lesser amounts.

Finally on this point, that only one Settlement Class members has objected to the amount

of the requested fees is testament to the reasonableness of the request.  The lack of objection to

---

[8] That this case settled is irrelevant, as courts have made clear that if, by their skill and determined efforts, plaintiffs' counsel ultimately secure a settlement, that fact does not diminish the risk they assumed at the case's inception.  *See Skelton*, 860 F.2d at 258 ("The point at which plaintiffs settle with defendants . . . is simply not relevant to determining the risks incurred by their counsel in agreeing to represent them.")

[9] Absent extenuating circumstances, fees are based on the benefit made available to the class, as opposed to the amounts actually claimed.  This approach promotes the deterrence goals of class actions. *See, e.g., Boeing*, 444 U.S. at 480; 2 NEWBERG ON CLASS ACTIONS § 1.18 (3d Ed.1992) ("[I]t is now settled that class counsel may seek a fee award based on the total potential benefit to the class, rather than being limited by the total amount of claims actually exercised by class members.")

the fee request is meaningful here because the day has long since passed when class members simply accepted the amount of proposed fees in an otherwise acceptable settlement. The common benefit approach is appropriately applied to the instant settlement and the inquiry turns to what percentage would be appropriate given the market for legal fees.

A.    <u>The Requested Fees Represent Under 33% of the Common Benefit Provided to the Class—a Percentage Well Below Market and the Range that has Been Found Reasonable by the courts.</u>

The fee request in this case equals just under 32.7% of the cash common fund created under the settlement. Such a figure is widely recognized as a reasonable percentage, arguably below the norm. *See Meyenburg v. Exxon Mobil Corp.*, No. 05-cv-15 DGW, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation"). Indeed, using the market percentage method in the courts of the Seventh Circuit, as one court has observed, results in awards of attorney's fees "equal to approximately one-third or more of the recovery." *Teamsters Local Union No. 604 v. Inter-Rail Transport, Inc.*, 02-cv-1109 DRH, 2004 WL 768658, at *1 (S.D. Ill. Mar. 19, 2004) ("In this Circuit, a fee award of thirty-three and one-third (33 1/3%) in a class action in [sic] not uncommon"); *see also In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d at 1033 (recognizing "the established 30% benchmark for an award of fees in class actions."); *Spicer v. Chicago Bd. Options Exch., Inc.*, 844 F. Supp. 1226, 1251-52 (N.D. Ill. 1993) (awarding 29% of a common fund); *Gaskill v. Gordon*, 160 F.3d 361, 362-363 (7th Cir. 1998) (noting that typical contingency fees are between 33% and 40% and that "[s]ome courts have suggested 25% as a benchmark figure for a contingent-fee award in a class action"); *McKinnie*, 678 F. Supp. 2d at 812 (approving a fee request of 30% of the settlement amount as "common among contingency fee arrangements and is not facially unreasonable"). These figures are also in accord with a Federal Judicial Center Study that found that in federal class

actions, median attorney fee awards were in the range of 27% to 30%. Thomas E. Willging, Laural L. Hooper & Robert J. Niemic, *Empirical Study of Class Actions in Four Federal District Courts: Final Report to the Advisory Committee on Civil Rules*, at 69 (Federal Judicial Center 1996). Where the market for legal services in a class action is only for contingency fee agreements, and there is a substantial risk of nonpayment for the attorneys, "the normal rate of compensation in the market" is "33.33% of the common fund recovered." *Will v. Gen. Dynamics Corp.*, CIV. 06-698-GPM, 2010 WL 4818174 (S.D. Ill. Nov. 22, 2010).

The going rate in the market for class action legal fees clearly suggests a fee at or in excess of the fee requested here. Nevertheless, Class Counsel specifically agreed to limit their fee request to $515,000.00, and that in no event would the Defendants be required to pay more than that amount in fees and expenses. Defendants neither support nor oppose the fee request. Given the constraints imposed by the parties' stipulation, then, a fee award of 32.7% is well within the market rate and facially reasonable.

### B. The Requested Fees are Equally Appropriate Under the Lodestar Method.

The attorneys' fees are equally reasonable should the Court apply the lodestar method. To determine the reasonableness of attorneys' fees under the lodestar method, the first step is to "multiply[] a reasonable hourly rate by the number of hours reasonably expended." *Gastineau v. Wright,* 592 F.3d 747, 748 (7th Cir. 2010) (*citing Hensley v. Eckerhart,* 461 U.S. 424, 433-37 (1983)). A reasonable hourly rate should be in line with the prevailing rate in the "community for similar services by lawyers of reasonably comparable skill, experience and reputation." *Jeffboat, LLC v. Director, Office of Workers' Comp. Programs*, 553 F.3d 487, 489 (7th Cir. 2009); *see also Denius v. Dunlap*, 330 F.3d 919, 930 (7th Cir. 2003) (finding the attorney's actual billing rate for comparable work is presumptively appropriate).

Oftentimes, the base lodestar is adjusted using a multiplier to take into account various factors in the litigation that affect the reasonableness of the requested fees. *See, e.g., Cook v. Niedert,* 142 F.3d 1004, 1015 (7th Cir. 1998); *Skelton*, 860 F.2d at 255. These factors include "the complexity of the legal issues involved, the degree of success obtained, and the public interest advanced by the litigation." *Gastineau*, 592 F.3d at 748. When applying a multiplier to the base lodestar amount, courts should also consider the risk plaintiff's counsel assumes in recovering nothing. *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 975-76 (7th Cir. 1991) (remanding case for recalculation of attorneys' fees because the trial court failed to award a risk multiplier) Typical multipliers awarded in comparable class action litigation average around 4, but are often much higher. *In re Linerboard Antitrust Litig.*, No. 98-5055, 2004 WL 1221350, at *14 (E.D. Pa. Jun. 2, 2004) (recognizing that from 2001 to 2003, the average multiplier approved in common fund cases was 4.35). Here, there is no need for a multiplier, since Class Counsel's base lodestar is higher than the fee request. The fees are reasonable and the success obtained for the Settlement Class given the risk taken in prosecuting this case would justify a moderate multiplier, although no multiplier is needed here.

As detailed in the attached declarations, the base lodestar of Class Counsel[10] and the Plaintiff's Steering Committee is **$554,348.50** and is summarized by the following chart:

| LAW FIRM | HOURS | EXPENSES | ADJUSTED LODESTAR* |
|---|---|---|---|
| Edelson McGuire, LLC | 906.3 | $6,202.05 | $428,939.00 |
| Parisi & Havens, LLP | 29.5 | $1,002.49 | $13,261.00 |
| Freedman & Freedman | 39.0 | $399.07 | $13,650 |
| Gutride Safier, P.L.L.P | 118.0 | $1,082.24 | $98,498.50 |
| TOTAL: | | $8,685.85 | $554,348.50 |

(*See* McMorrow Decl. ¶ 19 & Exhs. 6-9. The figure for Gutride Safier's lodestar includes the hours of attorney Craig Borison.)

The hourly rates utilized by Edelson McGuire, LLC attorneys and legal staff are comparable to rates charged by attorneys with similar experience, skill and reputation, for similar services in the Chicago legal market and comparable markets nationwide. (McMorrow Decl. ¶ 18.) The hourly rates listed in the chart above are the actual billing rates for the respective attorneys that they charge to hourly clients, and, therefore, yield a presumption of appropriateness. *See, e.g., Denius,* 330 F.3d at 930. Further, several state and federal courts have approved Edelson McGuire's hourly rates as reasonable. (McMorrow Decl. ¶ 18.)

Before considering the expenses Class Counsel incurred prosecuting this matter, it is apparent that a multiplier to the base lodestar would be warranted in this case, although none is needed here. Class Counsel's willingness to undertake this litigation was risky, and despite such

---

[10] Prior to submission, Class Counsel reviewed the hours expended by the attorneys and staff of Edelson McGuire and reduced any hours deemed even remotely duplicative or excessive. (McMorrow Decl. ¶ 19.)

risk, an excellent result was achieved for the Settlement Class. Plaintiff's claims were largely untested, and Class Counsel agreed to commence this litigation knowing they would assuredly face significant opposition. (McMorrow Decl. ¶ 15.) Indeed, throughout the litigation Defendants' counsel mounted a vigorous opposition. (McMorrow Decl. ¶¶ 6, 15.) As noted above, the rates employed by Class Counsel are their normal billing rates and they would not have brought this action absent the prospect of obtaining a percentage of the fund or a multiplier on their actual fees expended to account for the risk inherent in this type of class action. (McMorrow Decl. ¶15.) Analysis of novel issues, significant investigation, discovery, and careful and extended negotiation of the final Settlement Agreement were required to ensure a substantial benefit to the Settlement Class, and that is in fact what the Settlement Class got. (McMorrow Decl. ¶16.) Accordingly, Class Counsel's base lodestar of $554,348.50, which requires a multiplier of less than 1, is reasonable given the result obtained.

In addition to this amount, or such other amount awarded by Your Honor, Class Counsel have expended $8,685.85 in reimbursable expenses, such as filing fees, appearance fees, expert consulting charges, travel, copying, case administration, and ordering of deposition transcripts, with more expenses yet to come. (McMorrow Decl. ¶¶20-21.) These expenses were significantly minimized by concentration of the class action suits comprising this MDL in this Court, as travel costs were kept to a bare minimum.

Hence, under either the percentage of the fund method or the lodestar method Class Counsel's fee request is reasonable in this case. More importantly, the requested fee award follows binding Seventh Circuit precedent in that it is accurately reflective of and consistent with—indeed, is appreciably below—what the market would award. Accordingly, this Court should award the request for attorneys' fees and expenses of $515,000.

     **2.**      *The Incentive Award to the Class Representatives is Reasonable and Should be Approved.*

Because a named plaintiff is essential to any class action, "[i]ncentive awards are justified when necessary to induce individuals to become named representatives." *Synthroid I,* 264 F.3d at 722-23. In deciding whether an incentive award is warranted, courts look to: (1) "the actions the plaintiff has taken to protect the interests of the class"; (2) "the degree to which the class has benefitted from those actions"; and (3) "the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook*, 142 F.3d at 1016. These factors are readily satisfied, in the instant action, because the Settlement Class benefitted significantly from the Plaintiffs' involvement as the Class Representatives. Were it not for their efforts and contributions to the litigation by assisting Class Counsel with their investigation and filing of the underlying suits in this MDL, their participation in responding to Defendants' discovery, the substantial benefit to the class afforded under this Settlement Agreement would not have resulted. (McMorrow Decl. ¶ 22.) Further, Courts have approved incentive awards in similar class action litigation consistent with and greater than the $25,000.00 award in the aggregate here; an empirical study of incentive awards to class action plaintiffs has determined that the average aggregate incentive award within a consumer class action case is $29,055.20, and that the average individual award is $6,358.80. Theodore Eisenberg & Geoffrey P. Miller, *Incentive Awards to Class Action Plaintiffs: An Empirical Study*, 53 UCLA L. Rev. 1303, 1333 (2006). The incentive award of $25,000.00 in the aggregate for the five Class Representatives is slightly below that average, and no objection has been raised to these incentive awards. Accordingly, the incentive award of $25,000.00 is reasonable and should be approved.

## VI.    THE CANNATA OBJECTION SHOULD BE OVERRULED

On October 24, 2011, attorney Sam P. Cannata, on behalf of Jill K. Cannata, served an

objection to this Settlement on counsel, and also filed the same with the Court.

Mr. Cannata is a frequent objector to class action settlements; he has objected to at least nine other class action settlements in federal court in the past two years, either personally or as the attorney of family member clients. (McMorrow Decl., ¶ 24.)[11] In several of these cases, his objections were later withdrawn. (*Id.*) In at least one case, Mr. Cannata withdrew his objection (on behalf of Sam A. Cannata) after Class Counsel agreed to reduce their request for expenses by $55,000.00 and give that money to Mr. Cannata and his associates. (*Id.*) None of Mr. Cannata's objections in these cases have been sustained, (*id.*) and the courts have explicitly rejected several. *See Hartless v. Clorox Co*., 273 F.R.D. 630, 638 (S.D. Cal. 2011); *Masters v. Lowe's Home Center*, No. 3:09-cv-02555. Dkt. 63 (S.D. Ill. July 14, 2011) (finding objection to be "without merit"); *Schulte v. Fifth Third Bank*, 09-CV-6655, 2011 WL 3269340, at *17 (N.D. Ill. July 29, 2011); *Marsikyan v. Mercedes-Benz, USA, LLC*, No. 08-04876, Dkt. 124 (C.D. Cal. May 17, 2010); *In re HP Inkjet Printer Litig*., No. 05-03580, Dkt. 310 (N.D. Cal. 2011) (denying Cannata fee application). (*See* McMorrow Decl., Gr. Ex. 4.)

The Objection filed with this Court lists "The Law Offices of Sam P. Cannata" as Mr. Cannata's law firm on the letterhead. (*See* Dkt. 104.) It is not. Mr. Cannata is a principal in the law firm Cannata Phillips LPA, which has the same address listed on the letterhead of "Law Offices of Sam P. Cannata." (*See* McMorrow Decl., ¶26.)[12] The "Law Offices of Sam P.

---

[11] Mr. Cannata frequently works with other Cleveland attorneys considered to be professional objectors by Class Counsel, including Edward Cochran and Edward Siegel. (*See* Declaration of Jay Edelson, ¶¶3, 5, attached hereto as Exhibit C) Earlier this year, Mr. Cochran objected to a different class action settlement involving Class Counsel through an intermediary, only to withdraw the objection when advised that Class Counsel would not pay him under any circumstances. (Edelson Decl., ¶5.) Additionally, Mr. Cannata and Ms. Cannata have the same address. (*See* McMorrow Decl., ¶26.)

[12] On the Cannata Phillips website, moreover, Mr. Cannata claims to have "over 16 years of experience in handling various legal matters" (Edelson Decl., ¶7); however, Mr. Cannata has only been licensed as an attorney since 2005. *See In re Quantcast Advertising Cookie Litigation*, No. 10-cv-05484, Dkt. 78, at 7, fn.4 (May 31, 2011) (*citing In re Administrative Actions Dated April 30, 2004, 807 N.E.2d 929 (Ohio 2004)).* Mr. Cannata asked Class Counsel to

Cannata" does not exist.  (*See* McMorrow Decl., ¶¶26-28; Edelson Decl., ¶8.)  When asked, Mr. Cannata did not deny that this firm was nonexistent or that he invented it. (Edelson Decl., ¶8.) Class Counsel informed Mr. Cannata that they considered Mr. Cannata's use of a fake law firm and fake letterhead an attempt to shield his real law firm from liability that might arise in connection with his objections, as well as compelling proof that his actions in this Objection are not in good faith, to which Mr. Cannata could not give a response. (*Id.*)

Substantively, the Cannata Objection in this case raises several issues; it claims: (a) the settlement warrants elevated scrutiny because it was reached before class certification; (b) class certification should be defeated because of differences among the states' consumer protection laws; (c) there is insufficient information to determine the reasonableness of the request for attorneys' fees, and the fees requested are excessive; and (d) the *cy pres* recipients are questionable.  These arguments should be rejected for the reasons below.

1.     ***The Settlement Agreement has Been Thoroughly Scrutinized***

Cannata's first argument is not really an argument; it merely states that pre-certification settlements should be thoroughly scrutinized by the Court, which the Court has done in this case. Settlement was first discussed in depth in two separate settlement conferences with Judge Valdez. (McMorrow Decl., ¶9.)  Moreover, Plaintiffs initially submitted the Motion for Preliminary Approval of Class Action Settlement on June 22, 2011 (Dkt. 91.)  On July 12, 2011, the Court held a hearing on the settlement and questioned counsel for Plaintiffs and Defendants about the Settlement Agreement, then set a further settlement conference with counsel for the parties on July 21, 2011.  (Dkt. 95.)  During the settlement conference, the Court and counsel for the parties discussed the terms of the Settlement in great detail for several hours.  (McMorrow

note that the "extra 1" was a "discrepancy," but he has not attempted to correct this error, which was first pointed out in a previous case in May of this year. (*See* Edelson Decl., ¶7.)

Decl., ¶ 11; *see* Dkt. 97.) Thereafter, the parties made certain changes to the Settlement Agreement in accordance with the Court's direction and executed an amended Settlement Agreement. Plaintiffs submitted additional documentation in support of the Settlement Agreement at the Court's request on August 12, 2011. (*See* Dkt. 99.) The Settlement Agreement has been thoroughly scrutinized by the Court.

        **2.**        *Certification of the Class for Settlement Purposes Was Appropriate*

The Cannata Objection takes issue with the Court's certification of the Settlement Class for settlement purposes, citing both a lack of predominance and an intra-class conflict of interest. (Cannata Obj. at 3-5.) These objections are unfounded and should be overruled.

The Objection argues that there is an intra-class conflict of interest that renders Class Counsel and the Plaintiffs inadequate. (Obj. at 3-4.) The conflict, it argues, is that the Settlement Class includes members from all 50 states, and that the states provide different remedies under their consumer protection statutes, which will "result in different benefits to class members of each state." (*Id.*) The argument is without support, as there is no such conflict. The consumer protection statutes of only three states were pled in this MDL – California, Illinois and Michigan. The Objection makes no attempt to describe any differences in the remedies available under the consumer protection statutes of those states, to show that some claimants would have "more valuable claims" under those statutes than other claimants, or to describe any differences among these state laws that would arguably defeat certification in this case.

More importantly, the Objection overlooks the primary and most substantive claim in this suit - breach of contract. (*See* Compl., Count I.) Classes involving breach of contract claims arising out of a form contract (such as here) are frequently certified. Courts have found that "claims arising from interpretations of a form contract appear to present the classic case for

treatment as a class action, and breach of contract cases are routinely certified as such."
*Steinberg v. Nationwide Mut. Ins. Co.*, 224 F.R.D. 67, 74 (E.D.N.Y. 2004) (collecting authorities); *see also Subedi v. Merch.*, 09 C 4525, 2010 WL 1978693 (N.D. Ill. May 17, 2010) ("Plaintiffs claim that Defendants engaged in standardized conduct that violated specified laws, and the class will therefore be cohesive").[13]

Even if the consumer protection laws of all 50 states were pled and at issue, which they are not, the choice of law issue described by the Cannata Objection would be meritless. The impediment, to a contested class certification, posed by application of innumerable state laws is one of <u>manageability</u>, see *In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012, 1018 (7th Cir. 2002) ("[b]ecause these claims must be adjudicated under the law of so many jurisdictions, a single nationwide class is not manageable"), which is not a concern in certification of a settlement-only class. The Supreme Court has explicitly stated that a District Court need not look into manageability when certifying a class for settlement purposes: "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Products Inc. v. Windsor*, 521 U.S. 591, 620 (1997). This manageability problem is not present when certifying a class for settlement purposes, even if differing state laws[14] are at issue. "The fact that the claims also implicate the laws of different states does not defeat predominance

---

[13] The Supreme Court has noted that contract law is not at its core "diverse, nonuniform, and confusing," *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 233 fn.8 (1995) (citing *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 529 (1992)).

[14] The Objection also assumes that a choice of law analysis would be inevitable under the relevant consumer fraud claims. To the extent that the Court could look to the law of any individual state to resolve some or all of the consumer fraud claims, a nationwide class – even limited to consumer fraud counts – would create no choice of law problems and could be certified. *See, e.g., Avery v. State Farm Mut. Auto. Ins. Co.*, 216 Ill. 2d 100, 187, 835 N.E.2d 801, 853-54 (2005) (holding that a plaintiff may pursue a claim under the Illinois Consumer Fraud Act "if the circumstances that relate to the disputed transaction occur primarily and substantially in Illinois" and rejecting any "single formula or bright-line test"); *Martin v. Heinold Commodities, Inc.,* 117 Ill. 2d 67, 82, 510 N.E.2d 840, 847 (1987) (affirming trial court's certification of nationwide class under Illinois Consumer Fraud Act).

for the purpose of certifying a settlement class." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.,* 789 F. Supp. 2d 935, 974 (N.D. Ill. 2011); *see also In re Warfarin Sodium Antitrust Litig.,* 391 F.3d 516, 529 (3d Cir. 2004) ("the same concerns with regards to case manageability that arise with litigation classes are not present with settlement classes, and thus those variations are irrelevant to certification of a settlement class.")  Mr. Cannata has made and lost this same objection recently in other objections to class action settlements.  *See, e.g., Hartless*, 273 F.R.D. at 638 (rejecting argument by Cannata and other objectors that "Objectors argue that predominance fails because other state's consumer protection laws differ with some providing greater relief to class members" and that "issues of reliance, proof, and limitations periods prevent a finding of predominance," and holding, in approving settlement, that "the settlement does not require the court to make fine distinctions between state-law theories of relief as it does not require class members to show reliance or causation").

The Objection ignores the common elements of the Settlement Class Members' claims in this suit and focuses only upon imagined differences.[15]  The standards of Rule 23(b)(3) are met here.  The focus of the predominance requirement is whether the proposed class is sufficiently cohesive to warrant adjudication by representation.  *Amchem*, 521 U.S. at 623.  To satisfy Rule 23(b)(3), "each class member must share common questions of law or fact with the rest of the class, therefore making class-wide adjudication of the common questions efficient compared to the repetitive individual litigation of the same question."  *Lemon v. Int'l Union of Operating Eng'g.*, 216 F.3d 577, 581 (7th Cir. 2000).

---

[15] A recent critique of professional objectors notes the "outlandish situation" that "occurs when objector counsel, on behalf of a class member who has not filed his or her own case – and therefore could not recover anything absent a classwide resolution – attacks the ability of a class to be certified." Bruce D. Greenberg, *Keeping the Flies Out of the Ointment: Restricting Objectors to Class Action Settlements*, 84 St. John's L. Rev. 949, 966 (2010) (footnote omitted). When this happens, "professional objectors actually act against the interest of their own clients." *Id.* (footnote omitted).

Common legal and factual issues have been found to predominate where the class members' claims allege that "Defendants engaged in standardized conduct that violated specified laws, and the class will therefore be cohesive." *Subedi*, 2010 WL 1978693, at *6. In this case, the central factual and legal issues are whether the Defendants made a common offer of a contract to the class, whether the class members accepted that offer by downloading the coupons offered by the Defendants, and whether the Defendants' refusal to honor the coupons according to their original terms constituted a breach of contract by repudiation. In addition, Defendants' offer and repudiation were communicated to the class in precisely the same manner, and the measure of damages is set forth in the coupons themselves - $3.99. As such, the common questions that result from Defendants' conduct predominate, as the Court found by certifying the Settlement Class for settlement purposes. The Cannata Objection should be overruled.

**3.** ***Sufficient Information Exists to Determine the Reasonableness of Fees***

The Cannata Objection also objects to the attorneys' fees requested by Class Counsel, but raises no credible opposition to the fees in this case. Citing no law or other authority, Cannata states that "the percentage sought seems high" (Obj. at 7), and asks the court to set a separate hearing on the attorney fees. The Cannata Objection wholly ignores the Seventh Circuit's authority on this point. As discussed above, the approach favored in this Circuit is "to compute attorney's fees as a percentage of the benefit conferred upon the class" especially where the percentage accurately reflects the market. *Williams*, 94 C 7410, 1995 WL 765266, at 9. The amount requested for fees and costs - 32.7% (inclusive of costs) - is well within the market rate for consumer class actions. *See Meyenburg*, No. 05-cv-15 DGW, 2006 WL 2191422, at 2 ("33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation").

The Objection improperly deducts the cost of notice from the settlement fund created in order to suggest that the requested fee represents a higher percentage of the common fund. (Obj. at 7.) Deduction of notice costs from the fund is improper, however, as the costs of notice and claims administration are properly considered part of the fund, as are attorney fees. *See, e.g., Schulte*, 09-CV-6655, 2011 WL 3269340, at 17 (including the notice costs borne by defendants as part of the value of settlement to class members in final approval order overruling objection by Mr. Cannata); *Hartless*, 273 F.R.D. at 645 (noting that amount of fund "includes notice and administration costs" in final approval order overruling objection by Mr. Cannata).

The Objection cynically suggests that, once the Motion to Dismiss was denied, Plaintiffs and counsel had no risk of losing either at class certification, at summary judgment or at trial.[16] This suggestion simply is not credible, nor is the suggestion that Settlement Class members who make a claim will receive only $.13 per coupon;[17] To the contrary, claimants will be entitled to up to $3.99 per coupon, which represents full recovery under a breach of contract theory of recovery.

The Cannata Objection further suggests that Class Counsel and defendants will stand to benefit more than the class. In making this argument, the Objector cites only to *Mirfaishi*, 356 F.3d at 785, and suggests that this case is similar to that settlement, in which a subclass was sold "down the river" by a settlement that excluded them from recovery while simultaneously releasing their claims. The Seventh Circuit's opinion in that case demonstrates the difference between that settlement and this one. The unrepresented information sharing class in *Mirfaishi*

---

[16] Even after prevailing on a dispositive motion, a number of inherent risks of continued litigation and delay caution in favor of a reasonable settlement over the possibility of increased recoveries.

[17] The Objection also erroneously states that 5.7 million unredeemed coupons exist. This is simply inaccurate, as described in the Settlement Agreement. See Ex. A, ¶G ("Defendants represent that KFC gave away approximately 7,200,000 free meals [and] approximately 20,000 "Chicken Checks" to customers.") Defendants further noted in their CAFA Notice that at least one major competitor of Defendant KFC redeemed the coupons at its restaurants. (*See* Dkt. 107.)

"received absolutely nothing, while surrendering all its members' claims." 356 F.3d at 782. In addition, all funds unclaimed from the settlement fund by the smaller, telemarketing class in that case would revert to the defendant. *Id*. at 783. Here, on the other hand, all Settlement Class members are entitled to make a claim on the Available Amount, whether they retained the coupons evidencing their membership in the class or not. (*See* Settlement Agreement, at ¶5(d).) In addition, no part of the Available Funds will revert to the Defendant, regardless of the number of claims made. (*Id*., ¶5(f).)

The Objection makes no argument that the overall consideration supporting the Settlement Agreement is unfair to Settlement Class members or the consideration insufficient, but only that it is distributed improperly, based on an unspecified suspicion that Class Counsel did not have the interests of the Settlement Class in mind. The argument fails.

**4.** **_The Cy Pres Recipients are Appropriate_**

Finally, the Cannata Objection argues that the three *cy pres* recipients approved by the Court are "questionable." (Obj. at 9.) Nothing could be further from the truth. Courts of the Seventh Circuit have routinely approved the use of *cy pres* distributions in class action settlements, particularly "when locating and ascertaining the status of all individual class members is prohibitively difficult or expensive." *McKinnie,* 678 F. Supp. 2d at 813; *see In re Mexico Money Transfer Litig.,* 164 F.Supp.2d at 1031. The Cannata Objection improperly and incorrectly ascribes a "self-serving" motivation for the *cy pres* by counsel and the Defendants. (Obj. at 9-10.)

None exists. Feeding America, the primary *cy pres* recipient (50%) is the nation's leading domestic hunger-relief charity. Its mission "is to feed America's hungry through a

nationwide network of member food banks and engage our country in the fight to end hunger."[18] Neither the Plaintiffs nor the Defendants nor their respective counsel have any affiliation with Feeding America.[19] Feeding America was chosen (independently by both Plaintiffs and Defendants) because it is a nationwide organization devoted to combating hunger, and because of its lack of affiliation with the parties and their counsel. The other two *cy pres* recipients – the Illinois Bar Foundation ("IBF") and the Chicago Bar Foundation ("CBF") – were chosen with the assistance of this Court, and were chosen because they both improve access to the Courts for low-income consumers, like many of the Settlement Class members in this case. The IBF and CBF make possible many of the court programs that provide assistance to *pro se* and indigent litigants in state and federal courts, including the District Court Pro Se Program and the Bankruptcy Court Help Desk. The objection to the *pro se* recipients is unwarranted and should be overruled.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully request that the Court grant final approval to the Settlement Agreement, and approve Class Counsel's request for attorneys' fees and costs in the amount of $515,000.00 and incentive awards to the Plaintiffs in the aggregate amount of $25,000.00. A Proposed Order shall be separately submitted by email for the Court's consideration in advance of the November 30, 2011 final fairness hearing.

---

[18] http://feedingamerica.org/how-we-fight-hunger/mission-and-values.aspx.

[19] Feeding America lists 14 companies as "Leadership Partners," 20 "Mission Partners," 11 "Promotional Partners," and well over 100 "Supporting Partners" on its site, none of which include the Plaintiffs, Defendants or their counsel. See http://feedingamerica.org/how-we-fight-hunger/our-partners.aspx

Dated: November 16, 2011                                   Respectfully Submitted,

JAMES ASANUMA, DALEEN BROWN,
CHRISTINE DOERING, VERONICA
MORA, and KAY READY
individually and on behalf of a
class of similarly situated individuals,

  /s/ Michael J. McMorrow_____

Jay Edelson
Michael J. McMorrow
EDELSON MCGUIRE LLC
350 N. LaSalle St.
Ste. 1300
Chicago, Illinois 60654

<u>**CERTIFICATE OF SERVICE**</u>

I, Michael J. McMorrow, an attorney, certify that on November 16, 2011, I served the above and foregoing ***Plaintiff's Motion & Memorandum in Support of Final Approval of Class Action Settlement, Approval of Attorneys' Fees, and Incentive Award*** by causing true and accurate copies of such papers to be filed and transmitted to all attorneys of record in this matter via the Court's CM/ECF electronic filing system.


   /s/  Michael J. McMorrow      
          Michael J. McMorrow