Stephen M. Harris (State Bar No. 110626)
smh@kpclegal.com
KNAPP, PETERSEN & CLARKE
550 North Brand Boulevard, Suite 1500
Glendale, California 91203-1922
Telephone: (818) 547-5000
Facsimile: (818) 547-5329

Robert L. Starr (State Bar No. 183052)
starresq@hotmail.com
THE LAW OFFICES OF ROBERT L. STARR
23277 Ventura Boulevard
Woodland Hills, California 91364-1002
Telephone: (818) 225-9040
Facsimile: (818) 225-9042

Attorneys for Plaintiffs
ARUTYUN MARSIKYAN and PAYAM
SAADAT, individually and on behalf of a class of
similarly situated individuals

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARUTYUN MARSIKYAN and PAYAM SAADAT, individually and on behalf of a class of similarly situated individuals,<br><br>Plaintiffs,<br><br>v.<br><br>MERCEDES-BENZ USA, LLC and DOES 1-500, inclusive,<br><br>Defendants. | NO.   CV08-04876 AHM (FMOx)<br><br>CLASS ACTION<br><br>**ORDER GRANTING PLAINTIFFS' APPLICATION FOR AN AWARD OF ATTORNEY FEES, REIMBURSEMENT OF EXPENSES, AND INCENTIVE AWARD TO THE CLASS REPRESENTATIVE** |

KNAPP,
PETERSEN
& CLARKE

-1-

778057.1  08000/00917

The Court has granted final approval of the proposed class action settlement resolving the above action. Pursuant to Rule 23(h) of the Federal Rules of Civil Procedure, the law firms of Knapp, Petersen & Clarke and the law offices of Robert L. Starr, appointed by this Court as Class Counsel upon preliminary approval of the Settlement, have applied for a total award of $1,500,000 for attorneys' fees, $35,000 for reimbursement of expenses and an incentive award of $10,000 for each of the Class Representative Plaintiffs, payable out of the attorney fee award to counsel for Plaintiffs. Plaintiffs' counsel's fee application is made pursuant to the Settlement Agreement reached with MBUSA and under California Civil Code section 1780(e) of the California Consumers Legal Remedies Act ("CLRA"), one of the claims in this lawsuit, and the private attorney general doctrine, codified at California Code of Civil Procedure section 1021.5. The Court, having considered all papers submitted and oral argument presented, hereby finds and orders as follows:

1.      The Court finds that Plaintiffs are prevailing plaintiffs under Section 1780( e) and are entitled to an award of attorneys' fees and costs. The Court also finds that Plaintiffs meet the requirements set forth in Section 1021.5 for an award of attorneys' fees. Plaintiffs' lawsuit resulted in the enforcement of important public rights affecting the public's interest, including those underlying California's consumer protection statutes, while at the same time conferring significant benefits, both pecuniary and non-pecuniary, on a large class of persons. Further, the financial burden of private enforcement is such as to make it appropriate to award attorneys' fees under Section 1021.5. The necessity of pursuing this lawsuit placed a burden on Plaintiffs out of proportion to their individual stake in the matter.

2.      Pursuant to the declaration of Stephen M. Harris and supporting exhibits attached thereto, Class Counsel has spent approximately 2,900 hours in prosecuting this action. Based on Class Counsel's hourly rates, as presented in the declaration of Stephen M. Harris, Class Counsel's attorney's fees are $1,227,484. The Court finds that these fees are reasonable under the facts and procedural posture of this case.

**KNAPP, PETERSEN & CLARKE**

-2-

3.     In light of the favorable settlement benefits Class Counsel obtained for the settlement class, as set forth in the detail in the Settlement Agreement, and based on the positive responses of class members to the settlement, the Court finds that a multiplier of approximately 1.25 as requested by Class Counsel is reasonable and appropriate. Thus, the Court hereby awards attorney's fees of $1,500,000 to Class Counsel.

4.     The Court also awards Plaintiffs' counsel costs in the amount of $35,000 as contemplated by the parties' agreement.

5.     The Court overrules the objections to the attorney fee of class counsel, as set forth in the objections filed by Sam Cannata and Patrick McKinley.

6.     The Court also finds that an incentive award of $10,000 for each of the Class Representatives and Plaintiffs is appropriate for their efforts in bringing and prosecuting this action and for devoting time and effort to keeping themselves informed of the litigation.

7.     The court orders that the attorney fees award to Plaintiffs' counsel, after deduction of costs, and the incentive fee awards, shall be divided equally between Knapp, Petersen & Clarke, the Law Offices of Robert Starr and attorney Payam Shahian, as set forth in the declaration of Stephen M. Harris, paragraph 42.

IT IS SO ORDERED:

Dated:  May 17, 2010

_____
A. Howard Matz - Courtroom 14
Judge, United States District Court

**KNAPP,
PETERSEN
& CLARKE**

-3-

778057.1  08000/00917

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SHAWNDEE HARTLESS, on Behalf of Herself, All Others Similarly Situated, and the General Public,<br><br>Plaintiff,<br><br>v.<br><br>CLOROX COMPANY,<br><br>Defendant. | Civil No.   06cv2705-CAB<br><br>**ORDER GRANTING: (1) CLASS CERTIFICATION; (2) FINAL APPROVAL OF CLASS ACTION SETTLEMENT; AND (3) MOTION FOR ATTORNEYS' FEES AND COSTS AND CLASS REPRESENTATIVE SERVICE PAYMENT** |

Currently before the Court are the parties' Joint Motion for Final Approval of Class Action Settlement and Certification of Settlement Class (Doc. No. 81) and plaintiff's Application for Attorney Fees and Costs and Plaintiff Service Awards (Doc. No. 88) filed on November 22, 2010 and heard on December 29, 2010 at 1:30 p.m. before the Honorable Cathy Ann Bencivengo. Timothy G. Blood, Patricia Syverson, Elaine Ryan and Leslie Hurst appeared for plaintiff. Sabrina Strong, Adam Levine, and Katherine Edsall appeared for defendant. Janine Menhennet appeared for third party objector Sonia Newman. The Court has considered the documents filed by the respective parties in connection with the proposed class settlement, the presentations of counsel, as well as the comments and materials received from the parties interested in the settlement, and for the reasons set forth below, the Court **GRANTS** the motions.

**I. BACKGROUND**

**A. Procedural Background**

Plaintiff filed this suit on December 13, 2006 alleging violations of the Consumer Legal Remedies Act, California Civil Code section 1750 et seq.; California's Unfair Competition Law, California Business & Professions Code section 17200 et seq.; and for breach of the implied warranty of merchantability. (Docket No. 1.) Defendant filed a Motion to Dismiss on March 19, 2007. (Doc. No. 6.) The Motion to Dismiss was granted in part and denied in part on November 2, 2007. (Doc. No. 11.) Plaintiff then filed a First Amended Complaint for violation of California's Unfair Competition Law and the Consumer Legal Remedies Act on November 28, 2007. (Docket No. 16.) Plaintiff alleges that chemicals from the Clorox Automatic Toilet Bowl Cleaner with Bleach ("CATBC") tablets cause damage to the flush mechanism's flapper and the statement on the CATBC label that the tablet "Does not harm plumbing" is false, misleading and likely to deceive the public. (Docket No. 1 at pp. 2-6.)

On December 17, 2007, Clorox answered the First Amended Complaint. (Doc. No. 17.) The Court then held an Early Neutral Evaluation Conference on February 7, 2008. (Doc. No. 24.) Defendant filed a motion to stay pending resolution of an appeal in a related case on March 24, 2008 which was denied on November 6, 2008. (Doc. No. 25.) The parties received discovery and pre-trial deadlines on December 5, 2008. (Doc. No. 47.) The parties then began to engage in extensive discovery. (*See* Doc. Nos. 50 and 55.) On October 27, 2009, the parties participated in mediation before the Honorable Gary L. Taylor (Ret.) and reached a settlement in principle. (*See* Doc. No. 63.) The parties continued to finalize the settlement and ultimately filed a stipulation of settlement and a joint motion for preliminary approval of the settlement on May 21, 2010. (Doc. Nos. 77 and 78.)

**B. The Proposed Settlement**

Pursuant to the settlement, the class members include any person or entity in the United States who purchased, used, or suffered any property damage from the use of Clorox Automatic Toilet Bowl Cleaner ("CATBC") from December 13, 2002 to September 15, 2010. (Doc. No. 77 at p. 2.) Clorox agreed to stop using the language "Does not harm plumbing" or substantially similar language on future CATBC labels, packages, promotional materials and/or advertisement. (Doc. No. 77 at p. 8.) Clorox also agreed to create a settlement fund of at least $7 million (and up to $8 million) to provide payment to

06cv2705

class members for reimbursement of the purchase price of CATBC or other property damage attributable to the use of CATBC.[1]  (*Id.* at p. 8.)

The settlement requires Clorox to pay out of the claim fund as follows: 1) $750,000 as payment of costs incurred by Claim Administrator (fees in excess of $750,000 will be paid separately by Clorox); 2) distributions to class members who submit approved claims and for class representative service awards; 3) expenses associated with maintaining the class fund (e.g. taxes); 4) distribution of remainder to non-profit approved by court and parties.  If the claims exceed $7 million, Clorox will fund an additional $1 million to pay class member claims.  If the claims exceed $8 million, the approved claims will be reduced pro rata.   (Doc. No. 77 at pp. 8-9.)

Class members must fill out and return a claim form to obtain a cash payment.  For individuals seeking $30 or less in damage, they only need to return a form providing their name and address, the amount of the claim, and an affirmation that they purchased CATBC during the class period.  (Doc. No. 77, Ex. A.)  For class members seeking between $30 and $175 in property damage, they must complete a more detailed claim form that includes the nature of the damage, affirm that the damage occurred during or after use of CATBC, and provide documentation if available.  (*Id.*)  For class members seeking more than $175 in damages, they must provide documentation of the damage sustained (e.g. repair bills, cancelled check or statement from a plumber, contractor or witness).  Pursuant to the settlement, all class members will receive a cash payment for 100 percent of the damage claimed.  (*Id.* at pp. 8-10.)  The amount remaining in the claim fund will be paid through *cy pres* distributions to appropriate organizations.  (*Id.* at p. 9.)

Clorox agreed to not oppose Class Counsel's request for an award of costs and attorneys' fees not to exceed $2,250,000.  (*Id.* at p. 16.)  Class Counsel agreed to allocate and distribute the award amongst themselves.  (*Id.*)  Clorox also agreed to exercise reasonable means to inform class members of the settlement.  (*Id.* at p. 13.)  Beginning 105 days before the final approval hearing, Clorox caused the Publication Notice to be published and an opportunity to be excluded from the settlement class.  (*Id.* at 13-14.)  Class members had 45 days to file objections, notices of intent to attend hearing, or exclusion requests.  (*Id.*)

---

[1]Administration costs of up to $750,000 also are paid out of this fund.  (*Id.*)

06cv2705

In exchange for the above, each final settlement class member will release Clorox from all claims arising out of the Clorox Lawsuits that were or reasonably could have been asserted in the Clorox Lawsuits by the releasing parties. (Doc. No. 77 at p. 10-11.) Additionally, Co-Lead Counsel in related Case No. 37-2009-93810-CU-BT-CTL in San Diego Superior Court and plaintiff's counsel in related Case No. 09cv138 in the Southern District of California agreed to dismiss those actions upon final approval and time for appeal in this matter. (Doc. No. 77 at p. 14-15.)

**C. Preliminary Approval of the Settlement**

On August 13, 2010, the Court preliminarily certified the class for settlement purposes, appointed class counsel, granted preliminary approval of the settlement, and ordered Plaintiff to disseminate notice of the settlement to class members. (Doc. No. 81.) From September 15, 2010 to October 14, 2010, over 155 million impressions of the Publication Notice appeared on internet banner advertising on several websites. (Doc. No. 86 at p. 10.) The Publication Notice also ran in 1,200 newspapers throughout the United States with a circulation of over 64 million and 3 different magazines with a circulation of over 4 million from September 19, 2010 to October 12, 2010. (*Id.* at pp. 12-13.) The Publication Notice contained a general description of the lawsuit and settlement relief, a general description of class members' legal rights, and the settlement website and toll free number for additional forms and information. (Doc. No. 81-1 at p. 6). The Publication Notice also included the claim form for individuals claiming less than $30 in damages. (*Id.*; Doc. No. 86 at pp.12-13.)

A more detailed class notice was available on the website or via mail to callers who requested it. That notice provided more additional information about the lawsuits, settlement benefits, release and exclusion. As of November 14, 2010, the official website had received 113,181 visits and the toll-free telephone line had received 1,733 calls. (Doc. No. 86 at p. 14; Doc. No. 90 at p. 2.)

The class notice was mailed to counsel for plaintiff in any related litigation and to individuals who contacted Clorox concerning CATBC during the class period. Approximately 9,800 notices were mailed to such individuals on September 29, 2010 and as of November 14, 2010, all but 357 of any undeliverable notices were resent. (Doc. No. 90 at pp. 2-3.) Lastly, notice of the settlement was sent to the Attorney General of the United States and the attorneys general of all 50 states. (Doc. No. 90 at p.2.) No attorney general has requested further information regarding the action. (Doc. No. 91-2 at p.

6.)  Ten class members have requested exclusion (Doc. No. 104 at p. 1) and three class members have objected to the class settlement (Doc. Nos. 98, 100 and 102).

## II. DISCUSSION

A class action in federal court on diversity grounds must comply with Federal Rule of Civil Procedure 23.[2]  *Shady Grove Orthopedic Assocs. v. Allstate*, - - - U.S. - - -, 130 S. Ct. 1431, 1437 (2010).  In approving a class action settlement, a district court must ensure fairness to all members of the class presented for certification.  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Courts first determine whether a class exists and then consider whether the "proposed settlement is fundamentally fair, adequate and reasonable" as a whole.  FED. R. CIV. PROC. 23(e)(2); *Staton*, 327 F.3d at 952 (citations omitted).  Thus, the Court now turns to the issue of class certification, followed by the fairness of the settlement agreement, and finally the request for attorneys' fees and class representative service payments.

### A.  Class Certification

"The dominant concern of Rule 23(a) and (b) - that a proposed class have sufficient unity so that absentees can fairly be bound by class representatives' decisions - persists when settlement, rather than trial, is proposed."  *Amchem Products, Inc. v. Windor*, 521 U.S. 591, 593 (1997).  Rule 23(a) establishes four prerequisites for class certification, which are:  (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.  Once these requirements are met, the purported class must meet the requirements of  Rule 23(b)(3).

#### 1.  Rule 23(a)(1) - Numerosity

Rule 23(a)(1) requires the class be so numerous that "joinder of all members is impracticable."  Here, the objectors do not contest numerosity.  The proposed class is a nationwide class with potentially millions of class members residing in 50 states.  Thus, numerosity is met.

---

[2]  Objector Newman argues "[a]pplying California law is appropriate in this matter since the complaint" only asserts state causes of action.  (Doc. No. 98 at p. 1.)  While a federal court sitting in diversity applies the substantive law of the state, it applies federal procedural law.  In fact, the U.S. Supreme Court recently held that Rule 23 is valid under the Rules Enabling Act as it merely enables federal courts to adjudicate multiple claims at once but leaves parties' legal rights and duties intact. *Shady Grove*, - - - U.S. - - -, 130 S. Ct. at 1437-39, 1442-43 (finding Rule 23 "empowers a federal court to certify a class in every case meeting its criteria").  Whether to award attorneys' fees and the calculation of those fees, however, is substantive and governed by California law as discussed *infra* section C.  *Mangold v. Cal. Pub. Util. Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995).

### 2. Rule 23(a)(2) - Commonality

Rule 23(a)(2) requires "questions of fact or law common to the class." Commonality is construed permissively and does not require that all questions of fact and law be in common. *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998). "The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." *Id.* at 1019. The focus of this action - whether CATBC harms plumbing and was mislabeled - is common to all class members. (Doc. No. 16 at p. 8.) Thus, the proposed class shares sufficient commonality.

### 3. Rule 23(a)(3) - Typicality

Typicality is satisfied if "the claims or defenses of the representative parties are typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3). "Under the rules permissive standards, representative claims are 'typical' if they are reasonably co-extensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020. Plaintiff and the class members were all exposed to the same product and the same alleged misrepresentations. The focus of the proposed class is to correct the misrepresentations and/or receive adequate compensatory damages due to the mislabeling. Thus, typicality is met.

### 4. Rule 23(a)(4) - Adequacy of Representation

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." This factor addressed whether: (1) the representative plaintiffs have conflicts of interest with the proposed class; and (2) the plaintiffs are represented by qualified and competent counsel. *Hanlon*, 150 F.3d at 1020.

As to the first prong, the Court is not aware of any conflict of interest between Plaintiff Hartless and the proposed class members. Her interests in proving Clorox's alleged misrepresentation aligns with those of other class members. Objector Newman argues that "there is an intra-class conflict of interest that renders Class Counsel, as well as the class representatives, inadequate, because it fails to differentiate between residents of various states. . . ." (Doc. No. 98 at p. 4.) This class is different than the class in *Oritz v. Fibreboard Corp.*, 527 U.S. 815 (1999) referenced by objector Newman. In that case, the class "divided between holders of present and future claims (some of the latter involving no

physical injury and attributable to claimants not yet born)" and persons with asbestos exposure before and after the expiration of the defendant's insurance policy with an insurer providing the bulk of the settlement funds. Therefore, the class required division to eliminate conflicting interests of counsel.

This case does not involve contested insurance funds or present and future claimants. Each potential class member has the same issue: an allegedly false representation on CATBC packaging and damages in the form of the purchase price or consequent property damage. The differences in severity of personal injury present in *Oritz* and similar cases are not present here. Moreover, the differences in state remedies and damages are not sufficiently substantial to cause a conflict and warrant the creation of subclasses. Thus, an improper conflict of interest does not exist that would deny absent class members adequate representation. *See Hanlon*, 150 F.3d at 1021.

As to the second prong, the objectors do not challenge the competency of class counsel. The record shows that Class Counsel has significant experience litigating consumer fraud class actions in federal and state courts. (*See, e.g.*, Doc. No. 82 at pp. 1-2, ¶¶ 4-5 and Ex. 1; Doc. No. 81-3 at p. 2, ¶¶ 2-5 and Ex. A.) Thus, plaintiff is are represented by qualified and competent counsel and the Court finds adequacy met.

**5.    Rule 23(b)(3) - Predominance and Superiority**

Rule 23(b)(3) requires that a court find "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The following factors are relevant to that finding: (1) class members' interests in individually prosecuting or defending separate actions; (2) the extent and nature of litigation already commenced by or against class members; (3) the desirability of concentrating the litigation in a certain forum; and (4) the difficulties in managing the class action. FED. R. CIV. PROC. 23(b)(3). "Settlement benefits cannot form part of a Rule 23(b)(3) analysis, the issue must rest on 'legal or factual questions that qualify each class member's case as a genuine controversy, questions that preexist settlement." *Hanlon*, 150 F.3d at 1022 (citing *Amchem*, 521 U.S. at 623). However, settlement is relevant to a class certification. *Id.* at 619. Moreover, a district court does not need to determine whether the class action would be manageable under Rule 23(b)(3)(D) as the proposal is that there be no trial. *Amchem*, 521 U.S. at 620.

7

Objectors argue that predominance fails because other state's consumer protection laws differ with some providing greater relief to class members. (*See* Doc. No. 98 at p. 5). Additionally, objectors argue that issues of reliance, proof, and limitations periods prevent a finding of predominance. *(Id.* at pp. 5-10.) Objector Newman relies heavily on a case from the Southern District of New York. *(Id.*)

Predominance tests whether proposed classes are cohesive enough to warrant representative adjudication. *Amchem*, 521 U.S. at 623. As explained by the advisory committee, predominance may be found in cases of fraud perpetrated on multiple persons by a similar representation even though separate damages were suffered by the class members. FED. R. CIV. PROC. 23, advisory committee notes (1966). In contrast, the advisory committee noted that cases in which there are material differences in the misrepresentations or various degrees of reliance by the persons to whom they are addressed may lack predominance and be unsuitable class actions. *Id.* Likewise, the Ninth Circuit has held that variations in state law do not preclude a Rule 23(b)(3) action. *Hanlon*, 150 F.3d at 1022. "Although some class members may possess slightly differing remedies based on state statute or common law, the actions asserted by the class representatives are not sufficiently anomalous to deny class certification. . . . [T]o the extent distinct remedies exist, they are local variants of a generally homogenous collection of causes. . . ." Therefore, the idiosyncratic differences between state consumer protection laws are not sufficiently substantive to predominate over shared claims." *Id.*

Here, sufficient common issues exist to warrant a class action. For instance, all class members were exposed to the same alleged misrepresentation, all class members need to show CATBC harms plumbing when used as directed, and issues regarding Clorox's knowledge of harm or inaccuracies in its representations are common to all. Moreover, this case is distinguishable from other consumer fraud cases. In many cases, like those cited by Objector Newman, reliance is particularly relevant due to the facts of the case. Here, each class member most likely purchased CATBC believing it does not harm plumbing. Thus, the degree of reliance by the class members is the same. Additionally, the settlement does not require the court to make fine distinctions between state-law theories of relief as it does not require class members to show reliance or causation.

The superiority component of Rule(23)(b)(3) "requires determination of whether the objectives of the particular class action procedure will be achieved in the particular case." *Hanlon*, 150 F.3d at

1023. In this case, the alternative is individual lawsuits for injunctive relief or a small amount of monetary damages. Most people would not bring an individual claim as the cost of litigation would likely exceed the modest recovery. Among other costs, individuals would be required to provide expert testimony regarding whether CATBC actually harmed plumbing. Moreover, individuals would not have an incentive to bring an action solely to get Clorox to change its label and packaging, relief that is at the heart of a misrepresentation case. Additionally, multiple individual claims could overburden the judiciary and lead to different orders regarding appropriate labeling and packaging. Thus, an examination of the alternatives shows that a class action is the best method of adjudicating this dispute.

Lastly, the factors cited in Rule 23(b)(3) as relevant to these findings weigh in favor of certification. As discussed above, the judiciary and class members' have little interest in prosecuting individual actions. Individual actions would decrease litigation and settlement leverage, reduce resources, and would not increase the prospect for recovery. Individual class members also do not have an emotional stake in the litigation and did not suffer significant damages. The litigation already commenced by class members will be dismissed through this settlement. Of any forum, California is the logical venue for concentration of claims as Clorox is headquartered in Oakland, California and its alleged misrepresentations emanated from California. (Doc. No. 104 at p. 8.) Thus, the proposed class meets the requirements of Rule 23(b)(3). Therefore, the Court **GRANTS** certification of the class for the purposes of settlement and overrules the objections to class certification.

**B.     The Settlement**

Pursuant to Rule 23(e), a district court must determine whether a proposed settlement is "fundamentally fair, adequate and reasonable." A court considers several factors in making this determination, including: (1) the strength of the case; (2) the risk, expense, complexity and likely duration of further litigation and the risk of maintaining class action status throughout the trial; (3) the stage of the proceedings (investigation, discovery and research completed); (4) the settlement amount; (5) whether the class has been fairly and adequately represented during settlement negotiations; and (6) the reaction of the class to the proposed settlement. *Staton*, 327 F. 3d at 959. Courts require a higher standard of fairness when settlement takes place prior to class certification to ensure class counsel and defendant have not colluded in settling the case. *Hanlon*, 150 F.3d at 1026. Ultimately, "[t]he court's

intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982).

**1.      The Strength of the Case and Risk, Expense, Complexity and Duration of Further Litigation and Maintaining Class Certification**

Defendant asserts that it has strong factual and legal defenses to the asserted claims. (Doc. No. 81-2 at pp. 8-9.) Clorox would argue that CATBC is safe for plumbing when used as directed and that it produced testing documentation to that effect. (*Id.*) Additionally, Clorox would have contended that there are other causes for the harm alleged by plaintiff. (*Id.*) In light of these defenses and because the outcome of litigation is never certain, the Court finds that this factor weighs in favor of the settlement.

The parties recognize that the risk, expense and duration of further litigation support the settlement. (Doc. No. 81-1 at pp. 11-12 and Doc. No. 81-2 at pp. 8-9.) Defendant asserts that plaintiff would struggle to show causation and reliance with her own claim and to maintain class action certification throughout the litigation. (Doc. No. 81-2 at p. 9.) Plaintiff concedes that defendant would vigorously contest each issue and competently oppose the lawsuit. (Doc. No. 82 at p. 2.) Defendant further asserts that if litigated through trial, the case would be unmanageable as the court would have to engage in individual inquiries for thousands of class members. (*Id.* at p. 10.) Additionally, the parties assert that litigating the class action through trial would be time-consuming and expensive as the issues are complex and require expert analysis. (Doc. No. 81-1 at pp. 11-12.)

The Court agrees that the risks, expenses, complexity and duration of further litigation are significant. Plaintiff faced substantial risk in establishing liability, causation and damages. The parties would have continued with expert discovery and motion practice had the litigation continued. Notably, this case has been pending since 2006 and discovery and motion practice could have further delayed any recovery for the class members. Likewise, the expense of this further litigation would be significant. Considering these risks, expenses and delays, an immediate and certain recovery for class members,

/ / /

06cv2705

including full relief for property damage or the reimbursement of the cost of the product favors settlement of this action.

### 2. The Stage of the Proceedings

The parties have engaged in substantial investigation and discovery regarding the issues in this case and did not discuss settlement until three years into the litigation and following significant discovery.  (Doc. No. 81-1 at p. 9.)  Prior to settlement negotiations, Clorox produced 42,400 pages of documents in response to written discovery which Plaintiff reviewed.  Clorox also responded to interrogatories and requests for admissions.  (Doc. No. 82 at pp. 3-4.)  Plaintiff's counsel retained consultants, conducted laboratory testing of the product, obtained documents from industry officials, interviewed industry consultants and representatives of the industry committees formed to investigate the allegedly damaging effects of chlorinated in-tank cleaners,  conducted an informal interview with a former Clorox employee, and engaged and worked with a consultant to review and analyze testing documents produced by Clorox.  (Doc. No. 81-2 at pp. 9-10.)  Based on the stage of the proceedings and the discovery completed, the Court is satisfied that the parties are familiar with the legal bases for the claims and defenses, and capable of balancing the risks of continued litigation and the benefits of the proposed settlement.  Thus, this factor weighs in favor of settlement.

### 3. Amount of the Settlement

The proposed settlement provides for cessation of the language "does not harm plumbing" on future CATBC labels, packages, promotional and advertising materials, and for up to 100 percent recovery of the property damage through a claims process.  (Doc. No. 77 at pp. 7-10.)  Clorox agrees to provide at least $7 million and up to $8 million as a claim fund ($750,000 of that fund for administration expenses).  (*Id.*)  Additionally, Clorox has agreed to pay attorneys' fees and any additional administrative expenses separately.  (*Id.*)  Each class member only needs to submit a claim form with a de minimus showing of damages in order to recover 100 percent of those claimed damages.  This relief is greater than most individuals would have received if they had litigated their own case and relieves the burdens of showing reliance and causation for a modest recovery.   Based on the foregoing, the Court finds the proposed amount of the settlement is fair and reasonable and this factor weighs in favor of settlement.

### 4.     Experience and Views of Counsel

The recommendations of counsel are given great weight since they are most familiar with the facts of the underlying litigation. *Nat'l Rural Telecommuns. v. DirecTv, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004). Class Counsel has extensive experience working on class actions. (*See* Doc. No. 82 at Ex. 1; Doc. No. 84 at Ex. A; Doc. No. 85 at Ex. A; Doc. No. 81-3 at Ex. A; Doc. No. 81-4 at Ex. A; Doc. No. 87 at Ex. A.)  Additionally, the settlement was reached through mediation with Judge Gary Taylor (Retired), an experienced mediator. (Doc. No. 81-1 at p. 10.)  Counsel negotiated the details of the settlement for several months before a final agreement was reached.  They have weighed the strengths and weaknesses of both their claims and have endorsed the settlement. (Doc. No. 81-1 at pp. 8-13 and Doc. No. 81-2 at pp. 6-12.)  Their recommendation is entitled to weight and favors settlement.

### 5.     Reaction of Class to Settlement

The absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of the settlement are favorable to the class members. *Nat'l Rural Telecommuns.*, 221 F.R.D. at 529.  As discussed above, the class notice was mailed to counsel for plaintiff in any related litigation, to approximately 9,000 known individuals, to the Attorney General of the United States and state attorneys general, and was posted in various magazines and certain websites estimated to reach 75-83 percent of the class. (Doc. No. 86 at pp. 11-14; Doc. No. 90 at pp. 2-3.)  No attorney general has requested further information regarding the action. (Doc. No. 91-2 at p. 6.)  Only ten class members have requested exclusion (Doc. No. 104 at p. 1) and three class members have objected to the class settlement (Doc. Nos. 98, 100 and 102).  Only one objector appeared at the final fairness approval hearing.  Of the potentially thousands of individuals that received the class notice, only three objected indicating the fairness of the settlement.  Accordingly, the reaction of the class weighs in favor of granting final approval.

### 6.     Absence of Fraud or Collusion

In assessing possible fraud or collusion, courts address whether the agreement is the result of either over misconduct by the negotiators or improper incentives of certain class members at the expense of other class members. *Staton*, 327 F.3d at 960.  As discussed in the background of this case, counsel for both parties investigated this case and litigated the matter for almost three years prior to

06cv2705

entering settlement negotiations. By that time, counsel was able to assess the strengths and weaknesses of their positions. An experienced mediator then prompted the settlement which was finalized after months of further adversarial negotiations. The settlement was accomplished through informed, extensive, and arms-length negotiations. Thus, the manner in which counsel reached settlement and the lack of any improper incentive to certain class members weighs in favor of settlement.

### 7. Objections to Settlement

The objectors' main contention with the settlement amount is the structure for handling unclaimed funds. Any remaining funds after the claims process will be distributed *cy pres* to charitable organizations approved by the Court and the parties. (Doc. No. 77 at p. 9.) The objectors contend: (1) unclaimed funds should be distributed to class members pro rata; (2) the parties should be required to identify the charitable organization in their motion for final approval; and (3) a *cy pres* distribution is not appropriate until all class members are made whole. (Doc. No. 102 at pp. 3-4; Doc. No. 100 at p. 1; Doc. No. 98 at pp. 1-2.)

*Cy pres* distributions to a charity are appropriate where proof of individual claims is burdensome or distribution of damages costly or where there are unclaimed funds. *See Six (6) Mexican American Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990); *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 436 (2nd Cir. 2007). The issue of *cy pres* distribution, however, is premature until the claims process is concluded and it is determined that there are unclaimed funds. *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 966 (9th Cir. 2009) (finding *cy pres* distribution "becomes ripe only if entire settlement fund is not distributed to class members" and declining to determine propriety of *cy pres* at that time). Additionally, distribution to claimants on a pro rata basis is inappropriate if it would result in a windfall to those claimants. *See, e.g.*, *McKinnie v. JP Morgan Chase Bank, N.A.*, 678 F.Supp.2d 806, 813 (E.D. Wis. 2009).

Regarding Mr. Rivero's objection that all class members should be made whole prior to a *cy pres* distribution, the settlement agreement provides that the claim administrator should pay all claims before any *cy pres* distribution and only unclaimed funds should be distributed to a charitable organization. (Doc. No. 77 at pp. 7-10.) Thus, Mr. Rivero's objection is overruled. Objectors Newman and Cannata's argument that the *cy pres* recipients must be identified is without merit. The Ninth Circuit has found

that identification of *cy pres* recipients is not ripe until it is determined there will be unclaimed funds. *See Rodriguez*, 563 F.3d at 966. Determining the recipient after the claims' process is a logical procedure as the amount of unclaimed funds, if any, may affect the choice of charitable organization. Moreover, if no funds remain, the court and the parties would waste unnecessary time litigating a non-issue. Lastly, the Court overrules objector Cannata's argument that the claimants should receive any unclaimed funds on a pro rata basis. In these circumstances, the claimants will recover 100 percent of their claimed losses. The damages per individual in this case are modest. Therefore, distributing unclaimed funds, which can be significant in comparison to an individual's property damage, would result in a substantial windfall to those class members. This type of windfall could encourage individuals to bring class actions that will result in large unclaimed damage funds and create conflicts of interest between named plaintiffs and other class members.

For the foregoing reasons, the Court finds that the settlement in this case appears to be "fair, reasonable, and adequate." FED. R. CIV. PROC. 23(e)(2). Accordingly, the Court **GRANTS** the joint motion for final approval of the settlement.

## C. Attorneys' Fees and Costs

The stipulation for settlement provides that Co-Lead Counsel will seek and, Clorox will not oppose, an award of up to $2,250,000 in attorneys' fees and expenses. (Doc. No. 77 at p. 16.) In diversity actions, the Ninth Circuit applies state law determines the right to fees and the method for calculating fees. *See Mangold*, 67 F.3d at 1478. Under California law, the primary method for determining the amount of reasonable attorneys' fees is the lodestar method. *In re Consumer Privacy Cases*, 175 Cal.App.4th 545, 556-57 (2009). The lodestar is calculated by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate. *Id*. A court may increase or decrease that amount by applying a positive or negative multiplier based on, among other factors, the quality of representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented. *Id.*

In cases in which the class benefit can be monetized with a reasonable degree of certainty, a percentage of the benefit approach may be used to cross-check the lodestar calculation. *Id.* at 557-58 (citing *Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 26-27 (2000)). California courts use

06cv2705

this percentage cross-check not only in conventional common fund cases but also in cases in which the defendant creates a common fund for the benefit of the class members and agrees to pay attorneys' fees separately. *See Lealao*, 82 Cal.App.4th at 35-37. California courts view the award to the class and the agreement on attorneys' fees a package deal. *Id.* at 33.

Under the percentage method, California has recognized that most fee awards based on either a lodestar or percentage calculation are 33 percent and has endorsed the federal benchmark of 25 percent. *In re Consumer Privacy Cases*, 175 Cal.App.4th 556 n.13. As to the settlement fund amount: "If an agreement is reached on the amount of a settlement fund and a separate amount for attorney fees and expenses, both amounts must be disclosed to the class. Moreover, the sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel. The total fund could be used to measure whether the portion allocated to the class and to attorney fees is reasonable." *Id.* at 553-54 (citing Manual for Complex Litigation (4th ed. 2008) § 21.71, p. 525).[3] The ultimate goal is to award a reasonable fee. *Id.*

### 1. Objections to Fee Award

Regarding the application for attorneys' fees, objector Rivero contends that the Court should use the percentage method for determining fees and that the class should be given more time to respond to the application. (Doc. No. 100 at p. 1.) On the other hand, objector Newman contends that California law governs the attorneys' fee application and requires a lodestar method and states that the objectors do not have sufficient information to analyze the requested attorneys' fees but they "seem[] high." (Doc. No. 98 at pp. 10-12.) Additionally, objector Newman contends that the Court must review any fee splitting among the attorneys and that some of the sought costs are unreimburseable. (Doc. No. 98 at pp. 11-17.) Objector Cannata argues that the attorneys' fees are unreasonable under both the percentage and lodestar methods contending the percentage should be based on the amount of the fund actually claimed by class members and the lodestar amount has little evidentiary support. (Doc. No. 102 at pp. 2-3.)

---

[3] Under Ninth Circuit law, it is an abuse of discretion to base the percentage recovery on the amount of claimed funds rather than the entire settlement fund. *Williams v. MGM-Pathe Communs. Co.*, 129 F.3d 1026, 1027 (9th Cir. 1997).

06cv2705

1   Objector Cannata also argues that Clorox's agreement not to oppose an application for attorneys' fees

2   up to $2.25 million is not binding on the Court. (*Id.* at pp. 4-5.)

3        As an initial matter, class members had a sufficient amount of time to respond to the application

4   for attorneys' fees and costs as the application was filed and served within the time requirements of

5   Southern District of California Local Rule 7.1. The procedure for requesting fees is governed by federal

6   law. *See Carnes v. Zamani*, 488 F.3d 1057, 1059 (9th Cir. 2007). Additionally, the Court overrules the

7   objections as to the method used to calculate the attorneys' fee award as the Court finds the request for

8   attorneys' fees and expenses is reasonable under both a percentage and lodestar calculation as further

9   explained below. Even under California law, courts have discretion to cross-check the lodestar

10  calculation with a percentage calculation to ensure that the fee awarded is reasonable. *See In re*

11  *Consumer Privacy Cases*, 175 Cal.App.4th at 555. The remaining objections are overruled as discussed

12  below.

13       **2.    Requested Fee Award Under the Lodestar Method**

14       Objector Newman contends that the class has not been provided any information regarding the

15  details of the fee request.[4] Class counsel, however, indicated on the class notice that it would be filing

16  its motion for attorneys' fees on or around November 22, 2010 and the document would be available via

17  the website or mail by calling the toll-free number. (Doc. No. 86 at Ex. B.) Thus, the class members

18  could have obtained a copy of the documents filed in support of the motion for attorneys' fees by calling

19  the toll free number.

20       Plaintiff's counsel has spent 5,995.4 hours on this matter, the related state court action, and the

21  related *Wachowski* federal action. (Doc. No. 91 at p. 2-3 [hours of Bock and Hatch]; Doc. No. 92 at pp.

22  2-3 [hours of Bonnett, Fairbourn, Friedman & Balint]; (Doc. No. 94 at pp. 2-3 [hours of

23  LakinChapman]); Doc. No. 93 at pp. 1-2 [hours of Waters Kraus and Paul]); Doc. No. 96 at pp. 1-2 and

24  Exs. B-C [hours of Robbins Geller Rudman & Dowd]; Doc. No. 89 at pp. 10-11 [hours of Blood, Hurst

25  & O'Reardon]). Attorneys from each firm provided declarations attesting to the number of hours

26

27  _____

28      [4] Moreover, objector Newman's point is not well-taken as her counsel discusses the contents of declarations filed in support of the motion for attorneys' fees showing that counsel had access to the details of the attorneys' fee request. (Doc. No. 98 at pp. 11.)

worked by each member of the firm and the expenses incurred.  The hourly rates range from $675[5] for an experienced partner's time to $100 per hour for a paralegal's time.  (*See id.*)  Pursuant to the hourly rates indicated in the supporting declarations, the total lodestar is $2,371,773.80.  (*See id.*)

### a.    Reasonable Hourly Rate

Objector Newman contends that "concerns arise regarding the hourly rate of some of the professionals," specifically paralegals, and calls for the court to order class counsel to file all time records.  (Doc. No. 98 at p. 11.)  A reasonable hourly rate is determined pursuant to the prevailing market rates in the relevant community.  *See PLCM Group v. Drexler*, 22 Cal. 4th 1084, 1096-97 (using prevailing hourly rate in community for comparable legal services); *see also Sorenson v. Mink*, 239 F.3d 1140, 1145 (9th Cir. 2001).  The rates detailed in the declarations of class counsel have been accepted in other class action cases and are comparable to rates approved by other district courts in class action litigation.  *See, e.g.*, *Create-A-Card, Inc. v. Inuit, Inc.*, No. C 07-06452 WHA, 2009 WL 3073920, at *2 (N.D. Cal. Sep. 22, 2009) (awarding fees based on hourly rates ranging from $700 to $315 for attorneys and $235 to $150 for paralegals but declining to award requested multiplier); *Lingenfelter v. Astrue*, No. CV 03-00264, 2009 WL 2900286, at *4 (C.D. Cal. Sep. 3, 2009) (finding $600 to be reasonable compensation); *POM Wonderful, LLC v. Purely Juice, Inc.*, No. CV 07-2633, 2008 WL 4351842, at *4 (C.D. Cal. Sept. 22, 2008) (finding partner rates of $750 to $475 and associate rates of $425 to $275 reasonable).  Moreover, based on the Court's familiarity with the rates charged by other firms in the San Diego area, the Court finds the rates charged by the attorneys and paralegals in this action reasonable.

### b.    Reasonable Number of Hours

Five plaintiff firms have expended 5,995.4 hours on this matter, the related state court action, and the related *Wachowski* federal action.  This matter has been pending for over four years and the related federal action has been pending for over a year.  Additionally, plaintiff was required to file a state court action for injunctive relief.  The total hours spent on this case represent approximately one person working on the case for 28 hours per week for a four year time period.  Given the complexity of the case,

---

[5] There are two hours at $795 for partner John J. Stoia from the Robbins Geller Rudman & Dowd firm.  (*See* Doc. No. 96, Ex. B.)

1 this figure is reasonable. Two out of the five the law firms performed the majority of the work on these

2 cases. As this is a nationwide class action against a large company, that arrangement also is reasonable.

3      The Court finds that the nature of the case, a nationwide class action against a large national

4 company, required class counsel to develop a complicated factual record and investigate the claims to

5 provide sufficient evidence to convince a sophisticated defendant of its litigation exposure. Class

6 counsel engaged consultants, reviewed document productions, and analyzed testing produced by Clorox

7 in preparation for negotiations. Moreover, the record shows that the settlement negotiations were

8 contentious and lengthy. Considering the four year duration of this case, the effort expended in motion

9 practice, settlement negotiations, and resolution of the case, and the work completed in the related

10 matters, the Court finds the number of hours reasonable.

11      The Court overrules the objectors' request for complete time records and postponement of the

12 issue until they are received. Neither California courts or federal courts require counsel to submit

13 complete time records when requesting an attorneys' fee award. A court may review the summaries

14 provided in declarations by counsel without reviewing contemporaneous time records. *Lobatz v. U.S.*

15 *West Cellular of Cal., Inc.*, 222 F.3d 1142, 1149 (9th Cir. 2000); *see also Martino v. Denevi*, 182

16 Cal.App.3d 553, 559 (1986) (finding testimony of attorney as to total hours work sufficient without time

17 records).

18         **c.**    **Multiplier**

19      The Court can adjust the lodestar either upward or downward under both California and federal

20 law based on the quality of representation, the novelty and complexity of the issues, the results obtained,

21 and the contingent nature of the risk presented. *Thayer v. Wells Fargo Bank, N.A.*, 92 Cal.App.4th 819,

22 833 (2001); *see also Gates v. Deukmejian*, 987 F.2d 1392, 1402 n.12 (9th Cir. 1992). The parties are

23 not requesting a positive multiplier but request less than the lodestar fees. The Court finds no reason to

24 further reduce the attorneys' fees in this case based on the above factors. The skill and experience of

25 class counsel, combined with the favorable result and work completed to negotiate the result, supports a

26 finding that the requested fees are reasonable. (*See* Doc. Nos. 89, 91-94, and 96.)

27 / / /

28 / / /

### 3. Requested Fees Based on a Percentage

As discussed above, California courts recognize the use of a percentage method as a cross-check on the fee award in cases easily monetized. *In re Consumer Privacy Cases*, 175 Cal.App.4th at 557. Clorox agreed to create a settlement fund of at least $7 million for payment of class member claims and up to $750,000 in administration and notice costs. (Doc. No. 77 at pp. 7-10.) Any unclaimed portion of the fund will be distributed *cy pres* to a charitable organization for the benefit of absent class members and will not revert to Clorox. (*Id.*) Additionally, Clorox has agreed to pay separately all additional notice and claim administration costs, estimated at $500,000, and attorneys' fees and costs of up to $2,250,000. (*Id.*)

In cases such as this one, where attorneys' fees are paid separately from the claim fund, courts base the fee award on the entire settlement fund as that package is the benefit to the class. This amount includes notice and administration costs and separately paid attorneys' fees and costs. *In re Consumer Privacy Cases*, 175 Cal.App.4th at 553-554; *see also*, *Johnston v. Comerica Mortg. Corp.*, 83 F.3d 241, 246 (8th Cir. 1996); *In re Cylink Sec. Litig.*, 274 F.Supp.2d 1109, 1115 (N.D. Cal. 2003). Moreover, objector Cannata's argument that the Court should base the attorneys' fee award on the amount actually claimed by class members is without merit as that argument has been rejected and the unclaimed funds do not revert to Clorox but are distributed *cy pres* for the benefit of the class. *See Williams*, 129 F.3d at 1027 (finding it is an abuse of discretion to base award on amount of claimed fund rather than entire settlement fund).

The entire settlement fund is at least $9.25 as the attorneys' fee award is paid separately from the claim fund. The request for attorneys' fees in the amount of $2.25 million represents 24 percent of the settlement fund. This amount is reasonable based on the federal benchmark and California cases. Thus, the attorneys' fees and costs are reasonable under the percentage method.[6]

/ / /

/ / /

---

[6] Objector Cannata's request that the Court independently review the motion for attorneys' fees due to the "clear sailing" provision is noted. The Court has reviewed the attorneys' fees requested and not relied strictly on the agreement of the parties. The Court, however, recognizes that clear sailing agreements are routinely accepted in both the federal and California courts. *See In re Consumer Privacy Cases*, 175 Cal.App.4th at 553; *see also Malchman v. Davis*, 761 F.2d 893, 905 n.5 (2nd Cir. 1985).

### 4. Requested Costs

Class counsel seeks $112,021.08 in total costs for the litigations and provides declarations detailing these costs. (Doc. No. 91 at p. 2-3 [Bock and Hatch]; Doc. No. 92 at pp. 2-3 [ Bonnett, Fairbourn, Friedman & Balint]; (Doc. No. 94 at pp. 2-3 [LakinChapman]); Doc. No. 93 at pp. 1-2 [Waters Kraus and Paul]; Doc. No. 96 at p. 2 and Ex. C [Robbins Geller Rudman & Dowd]; Doc. No. 89 at pp. 10-11 [Blood, Hurst & O'Reardon].) The majority of these costs are for consultant fees. (Doc. No. 92 at p. 3 and Doc. No. 96 at Ex. C.) The consulting fees are reasonable in light of the fact that the focus of this litigation was the effect of the product on plumbing. Thus, in order to negotiate a settlement in this matter, Class Counsel needed to have evidence regarding the product's potential to damage plumbing. The balance of the costs are for online legal research, copying, postage, fax and long distance charges, travel expenses, filing fees, mediation fees, and investigation fees. The only expense claimed by Class Counsel that is not clearly a cost of this litigation alone is the scanning software expense of $1,018.86. (Doc. No. 92 at p. 3.) Without further explanation as to how this expense is a cost of this litigation solely, the Court finds this expense unreasonable. The Court finds all other claimed expenses reasonable in the amount of $111,002.22.

Based on the foregoing, the Court finds the attorneys' fees in the amount of $2,371,773.80 and costs in the amount of $111,002.22 reasonable. Class Counsel has already decreased its fees and costs to $2,250,000 and the Court **GRANTS** the motion for fees and costs for that amount.

### 5. Allocation of Fees Among Counsel

Under Federal Rule of Civil Procedure 23(e)(3) "parties seeking approval of a class action settlement must file a statement identifying any agreement made in connection with the proposal." As explained in the Manual of Complex Litigation, this provision requires disclosure of agreements that may affect the interests of the class members by allocating money that they may have received elsewhere. (4th ed.) § 21.631. As discussed above, the procedure for requesting attorneys' fees is governed by federal law and, therefore, the relevant inquiry is what Rule 23(e)(3) requires, not a California procedural rule. *See Carnes v. Zamani*, 488 F.3d at 1059.

The parties have identified the agreement for attorneys' fees; Clorox has agreed not to oppose a request for attorneys' fees and costs not to exceed $2.25 million. The agreement as to the amount of

06cv2705

attorneys' fees could affect the class members. The allocation of those fees amongst class counsel does not affect the monetary benefit to class members. Moreover, federal courts routinely affirm the appropriateness of a single fee award to be allocated among counsel and have recognized that lead counsel are better suited than a trial court to decide the relative contributions of each firm and attorney. *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 781 (6th Cir. 1996); *Longden v. Sunderman*, 979 F.2d 1095, 1101 (5th Cir. 1992); *see also Atlas v. Accredited Home Lenders Holding Co.*, No. 07-cv-00488, 2009 WL 3698393 (S.D. Cal. Nov. 4, 2009) (allowing funds to be paid to lead counsel and allocated in manner that in good faith reflects contributions of each counsel to prosecution and settlement of litigation). The parties negotiated the attorneys' fees and costs after negotiating the settlement fund in this matter. (Doc. No. 82 at p. 5.) The Court finds the parties have acted in good faith and concludes that it is appropriate to allow class counsel to allocate the fee award in good faith reflecting the contributions of each firm. The Court retains jurisdiction under the stipulation for settlement to resolve any disputes that arise regarding allocation. (Doc. No. 77 at p. 18.)

**D. Service Awards to Plaintiff Hartless and Plaintiff Wachowski**

Incentive awards are fairly typical in class actions. *Rodriguez v. West Publishing Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009) (citation omitted). They are intended to "compensate class representatives for work done on behalf of the class, to make up for financial or reputational risk undertaken in bringing the action and, sometimes, to recognize their willingness to act as a private attorney general." *Id.*; *Bell v. Farmers Ins. Exch.*, 115 Cal.App.4th 715, 726 (2004) (affirming award of service payments).

In this case, Plaintiff Hartless requests a service award of $4,000 and Plaintiff Wachowski requests a service award of $2,000. Plaintiff Hartless has protected the interests of the class and has spent the past four years meeting with counsel, supervising counsel's efforts on behalf of the class, participating in discovery and efforts leading to settlement, and approving the amount and type of settlement proposed for the class. (Doc. No. 81-3 at p. 5.) The class has benefitted from these actions by receiving a settlement that represents up to 100 percent of the claimed property damage and injunctive relief. Likewise, Plaintiff Wachowski has spent the last year meeting with counsel, supervising counsel's efforts on behalf of the class, participating in discovery and efforts leading to

settlement, and approving the amount and type of settlement proposed for the class. (Doc. No. 91-3.) Moreover, no class member has objected to these service awards. Therefore, the Court finds these request for service awards reasonable and **GRANTS** the requests.

**E.    Incentive Payment to Objector Newman**

Objector Newman requests an "incentive" award for her role in "improving the settlement." (Doc. No. 98 at p. 19.) She does not, however, provide any authority for this request. Attorneys' fees are sometimes available under a common fund or substantial benefit doctrine if the objection confers a significant benefit to the class (where the ultimate class recovery exceeds the amount that would have been achieved without the objector's effort). *Vizcaino v. Microsoft Corp.*, 290 F.3d 1043, 1051-52 (9th Cir. 2002); *Consumer Cause, Inc. v. Mrs. Gooch's Natural Foods Mkts., Inc.*, 127 Cal.App.4th 387, 397-98 (2005). The benefit must be actual and concrete not conceptual or doctrinal. *Robbins v. Alibrandi*, 127 Cal.App.4th 438, 448 (2005). In this case, objector Newman did not raise any issues that resulted in a cognizable benefit to the class. The objections raised by Newman as to the settlement did not confer a benefit on the class or add anything to this decision. Moreover, objector Newman raises this issue in one sentence at the end of his objection and not as a properly brought request for attorneys' fees. Thus, the Court finds no grounds to grant an incentive award to objector Newman and that request is **DENIED**.[7]

### III.  CONCLUSION

**IT IS HEREBY ADJUDGED AND DECREED THAT**:

1.    This Judgment incorporates by reference the definitions in the Stipulation of Settlement dated May 21, 2010 ("Stipulation") (Doc. No. 77) and all capitalized terms used herein shall have the same meanings as set forth in the Stipulation unless set forth differently herein. The terms of the Stipulation are fully incorporated in this Judgment as if set forth fully here.

2.    The Court has jurisdiction over the subject matter of this action and all Parties to the action, including all Class Members who do not timely exclude themselves from the Class. The list of excluded Class Members was filed with the Court on January 20, 2011 and is attached as Exhibit A.

---

[7] The Court also notes that the objection provided by Sonia Newman lacks the information required by this Court's preliminary approval order. (*See* Doc. No. 80 at p. 13, ¶ 2.)

06cv2705

3.     Pursuant to Federal Rule of Civil Procedure 23(b)(3), the Court hereby certifies the following Class:  All persons or entities in the United States who purchased, used or suffered any property damage from the use of Clorox Automatic Toilet Bowl Cleaner with Bleach ("CATBC") at any time from December 13, 2002 to September 15, 2010.  Specifically excluded from the Class are: (a) all federal court judges who have presided over this Action and their immediate family; (b) all persons who have submitted a valid request for exclusion from the Class; (c) Defendant's employees, officers, directors, agents, and representatives and their family members; and (d) those who purchased CATBC for the purpose of resale.

4.     Pursuant to Federal Rule of Civil Procedure 23(c)(3), all such persons or entities who satisfy the Class definition above, except those Class Members who timely and validly excluded themselves from the Class, are Class Members bound by this Judgment.

5.     For settlement purposes only, the Court finds:

(a)     Pursuant to Federal Rule of Civil Procedure 23(a), Shawndee Hartless, is a member of the Class, her claims are typical of the Class, and she fairly and adequately protected the interests of the Class throughout the proceedings in the Action.  Accordingly, the Court hereby appoints Shawndee Hartless as class representative;

(b)     The Class meets all requirements of Federal Rules of Civil Procedure 23(a) and (b)(3) for certification of the class claims alleged in the First Amended Complaint filed by Shawndee Hartless, including: (a) numerosity; (b) commonality; (c) typicality; (d) adequacy of the class representative and Class Counsel; (e) predominance of common questions of fact and law among the Class for purposes of settlement; and (f) superiority; and

(c)     Having considered the factors set forth in Rule 23(g)(1) of the Federal Rules of Civil Procedure, Class Counsel have fairly and adequately represented the Class for purposes of entering into and implementing the settlement, and thus, hereby appoints Class Counsel as counsel to represent Class Members.

6.     Persons or entities who filed timely exclusion requests are not bound by this Judgment or the terms of the Stipulation and may pursue their own individual remedies against Defendant.  However, such excluded parties are not entitled to any rights or benefits provided to Class

06cv2705

Members by the terms of the Stipulation. The list of persons and entities excluded from the Class because they filed timely and valid requests for exclusion is attached hereto as Exhibit A.

7.    The Court directed that notice be given to Class members by publication and other means pursuant to the notice program proposed by the Parties in the Stipulation and approved by the Court. The Declaration of Garden City Group, Inc., attesting to the dissemination of the notice to the Class, demonstrates compliance with this Court's Preliminary Approval Order.  The Class Notice advised Class members of the terms of the settlement; the Final Approval Hearing and their right to appear at such hearing; their rights to remain in or opt out of the Class and to object to the settlement; the procedures for exercising such rights; and the binding effect of this Judgment, whether favorable or unfavorable, to the Class.

8.    The distribution of the notice to the Class constituted the best notice practicable under the circumstances, and fully satisfied the requirements of Federal Rule of Civil Procedure 23, the requirements of due process, 28 U.S.C. §1715, and any other applicable law.

9.    Pursuant to Federal Rule of Civil Procedure 23(e)(2), the Court finds after a hearing and based upon all submissions of the Parties and other persons that the settlement proposed by the Parties is fair, reasonable, and adequate.  The terms and provisions of the Stipulation are the product of arms-length negotiations conducted in good faith and with the assistance of an experienced mediator, Honorable Gary Taylor (retired).  The Court has considered any timely objections to the Settlement and finds that such objections are without merit and should be overruled.  Approval of the Stipulation will result in substantial savings of time, money and effort to the Court and the Parties and will further the interest of justice.

10.    Upon the Effective Date, the named Plaintiff and each Class Member shall be deemed to have, and by operation of this Final Settlement Order and Judgment shall have released, waived and discharged with prejudice Defendant from any and all claims, demands, rights, causes of action, suits, petitions, complaints, damages of any kind, liabilities, debts, punitive or statutory damages, penalties, losses and issues of any kind or nature whatsoever, asserted or unasserted, known or unknown (including, but not limited to, any and all claims relating to or alleging deceptive or unfair business practices, false or misleading advertising, intentional or negligent misrepresentation, negligence,

concealment, omission, unfair competition, promise without intent to perform, unsuitability, unjust enrichment, and any and all claims or causes of action arising under or based upon any statute, act, ordinance, or regulation governing or applying to business practices generally, including, but not limited to, any and all claims relating to or alleging violations of Bus. & Prof. Code §§ 17200-17209 and § 17500, the CLRA (Civil Code §§ 1750-1784), or any and all other federal, state, and/or local statutes analogous or similar to the California statutes cited herein), arising out of or related to the Clorox Lawsuits, that were asserted or reasonably could have been asserted in the Clorox Lawsuits by or on behalf of all Releasing Parties, whether individuals, class, representative, legal, equitable, administrative, direct or indirect, or any other type or in any other capacity, against any Released Party.

11.     All Class Members who have not timely and validly submitted requests for exclusion are bound by this Judgment and by the terms of the Stipulation.

12.     The plaintiffs in the Clorox Lawsuits initiated their respective lawsuits, acted to protect the Class, and assisted their counsel.  Their efforts have produced the Stipulation entered into in good faith that provides a fair, reasonable, adequate and certain result for the Class.  Plaintiff Hartless is entitled to an incentive award of $4,000.  Plaintiff Wachowski is entitled to an incentive award of $2,000.  Class Counsel is entitled to reasonable attorneys' fees and expenses which the Court finds to be $2,250,000.

13.     The Court hereby dismisses with prejudice the Action, and the Released Parties are hereby released from all further liability for the Released Claims.

14.     Without affecting the finality of this Judgment, the Court reserves jurisdiction over the implementation, administration and enforcement of this Judgment and the Stipulation, and all matters ancillary thereto.

15.     The Court finding that no reason exists for delay in ordering final judgment pursuant  to Federal Rule of Civil Procedure 54(b), the clerk is hereby directed to enter this Judgment forthwith.

16.     The Parties are hereby authorized without needing further approval from the Court to agree to and adopt such modifications and expansions of the Stipulation, including without limitation

/ / /

/ / /

06cv2705

the claim review procedure, that are consistent with this Judgment and do not limit the rights of Class

Members under the Stipulation.

   **IT IS SO ORDERED.**

DATED:  January 20, 2011

_____

**CATHY ANN BENCIVENGO**
United States Magistrate Judge

06cv2705

# EXHIBIT A

## Hartless v. Clorox Company
## Exclusion Report
## December 29, 2010

| GCG No. | Name | Address 1 | Address 2 | City | State | Zip 5 | Zip 4 |
|---------|------|-----------|-----------|------|-------|-------|-------|
| 2000241 | M A ARMOUR | 9920 JOEGER RD | | AUBURN | CA | 95603 | 9006 |
| 2002936 | EDWARD G FULMER | 742 PONDELLA RD | APT 110 | N FT MYERS | FL | 33903 | 5767 |
| 2003619 | MARGARET HARING | 3333 5TH AVE | | PITTSBURGH | PA | 15213 | |
| 2003754 | ANNE HEEREN | 445 N WILMOT RD | APT 319 | TUSCON | AZ | 85711 | 2623 |
| 2004077 | PAUL HUGHES | 464 MINE GAP RD | | EAST FLAT ROCK | NC | 28726 | 2620 |
| 2004751 | KERRY KNAPP | PO BOX 200 | | EFFORT | PA | 18330 | 0200 |
| 2006968 | JOHN POWERS | 13303 HOPEFUL HILL RD | | NEVADA CITY | CA | 95959 | 9787 |
| 4079 | IMA JEAN STEPHENS | 910 PRIVATE ROAD 2069 | | WINTERS | TX | 79567 | 4256 |
| 2008404 | GLORIA STILES | 11476 FOREMAN ST | | LOWELL | MI | 49331 | 9647 |
| 2008789 | MARY TOWNSAGER | 915 DIVISION ST | | BARRINGTON | IL | 60010 | 5087 |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

SHANNON SCHULTE, on behalf of )
herself and all others similarly situated )
)
                    Plaintiff, )     Case No. 09-cv-6655
   -v-                      )
)     Judge Robert M. Dow, Jr.
FIFTH THIRD BANK )
)
             Defendant. )
)

## MEMORANDUM OPINION AND ORDER

Before the Court is the settling parties' motion for final approval of the settlement and

Class Counsel's motion for approval of attorneys' fees, costs, and expenses, and for approval of

incentive awards for the Class Representatives [103]. For the reasons explained below, the

motion is granted in part and denied in part. Specifically, the Court (1) grants final approval of

the settlement, finding that the settlement is fair, reasonable, and adequate; (2) approves Class

Counsel's request for attorneys' fees of $3,166,666; (3) denies Class Counsel's request for cost

and expense reimbursement without prejudice; and (4) approves an incentive award of $1,000

each for the Class Representatives, Shannon Schulte and Marlene Willard.

## I.    Factual Background

### A.    History of the Litigation

Plaintiff filed her class action complaint in this case [1][1] on November 21, 2009. In their

---

[1] On February 1, 2010, Marlene Willard filed a similar action in the Northern District of Georgia against Fifth Third. *Willard v. Fifth Third* Bank, N.D. Ga., Case No. 1:10-CV-0271-JOF. While Willard is not a party to this action, she is a party to the Settlement Agreement, which provides that upon entry of final approval, the *Willard* action will be dismissed with prejudice. Willard and Schulte together are referred to as "Plaintiffs" or the "Class Representatives." The Settlement Agreement refers to the *Schulte* and *Willard* cases as the "Actions."

complaints, Plaintiffs allege that they were Fifth Third[2] accountholders and had used a debit card in connection with their accounts. Plaintiffs further allege that Fifth Third improperly assessed them (and other Fifth Third customers) overdraft fees for insufficient funds on debit card purchases and ATM withdrawals by "re-sequencing" transactions in order to maximize the number of overdraft fees. To explain, Fifth Third did not process debit card and ATM transactions in strict chronological order; rather, within a given posting period, the bank processed the transactions in high-to-low order. If a customer overdrew his account, posting transactions in a high-to-low order sometimes resulted in Fifth Third charging the customer a higher number of overdraft fees than it would have charged had it posted the transactions chronologically. Plaintiffs allege that Fifth Third's practice was unlawful and caused them and others similarly situated to suffer financial injury.

On February 16, 2010, Defendant filed a motion to dismiss the *Schulte* case [17].

On March 2, 2010, the United States Judicial Panel on Multidistrict Litigation ("JPML"), entered a Conditional Transfer Order ("CTO 13") conditionally transferring the Actions to the Southern District of Florida, where the Multidistrict Litigation, *In re Checking Account Overdraft Litigation*, MDL No. 2036 (the "Overdraft MDL"), was and remains pending. Shortly thereafter, Plaintiffs and Defendant filed oppositions to CTO 13 and, on April 2, 2010, Fifth Third filed a motion with the JPML requesting that the Actions be transferred to this Court for coordinated or consolidated pretrial proceedings.

That same day, Objector Michelle Keyes, who is represented, *inter alia*, by various counsel from the Overdraft MDL, filed a complaint against Fifth Third in the United States District Court for the Southern District of Florida. See *Keyes v. Fifth Third Bank*, Case No. 10-cv-21283 (S.D. Fla.). Less than a week later, on April 7, 2010, Objector Keyes requested that

---

[2] The Court will refer to Defendant Fifth Third Bank as "Fifth Third" or "Defendant."

her case be consolidated into the Overdraft MDL; that request was granted on April 19, 2010. On April 19, 2010, an attorney representing Objector Keyes sent a letter to the JPML arguing that Defendant's motion to transfer the Actions was inappropriate, because it would create a new MDL and Objector Keyes' case had already been consolidated into the Overdraft MDL.

On May 27, 2010, the parties entered into the Settlement Agreement, the terms of which are discussed below. That day, the parties filed a motion for preliminary approval of the settlement [35].[3]

Later that day, counsel for the settling parties notified the JPML that the parties had entered into the Settlement Agreement and, on June 3, 2010, the JPML vacated CTO 13. The JPML reasoned that in light of the settlement reached between Plaintiffs and Defendant, the *Schulte* and *Willard* cases should not be transferred into the Overdraft MDL. The Panel further ruled that the *Schulte* and *Willard* cases should not be centralized as a separate and new MDL in this district. The Panel noted that its ruling does not bar either the creation of a new MDL, or the transfer of the Actions to the Overdraft MDL, in the event that the settlement here was not approved or did not fully resolve those actions.

On June 9, 2010, Objectors Michelle Keyes, Amanda Ratliff and Verdel Ratliff appeared and filed objections to the motion for preliminary approval of the proposed settlement [39]. The Court postponed ruling on the motion for preliminary approval to allow the parties time to respond in writing to the objections. See [45, 46]. Objectors Keyes and the Ratliffs subsequently filed a copy of the Findings of Fact and Conclusions of Law After Bench Trial issued in *Guitierrez v. Wells Fargo Bank*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010) [53], another case involving overdraft fees resulting from debit reordering, which the Objectors argued

---

[3] The Settlement Agreement is attached as Ex. A to Plaintiffs' motion for final approval of the settlement [103].

supported their position that the settlement here should not be preliminarily approved. The parties each responded to that filing [54, 57].

After considering the arguments from the parties and from the Keyes and Ratliff Objectors, on September 10, 2010, the Court entered an order addressing the various objections and (1) preliminarily approving the settlement; (2) approving the notice plan; (3) appointing a notice specialist and claims administrator; (4) certifying the Settlement Class for settlement purposes only; (5) appointing Class Counsel; and (6) scheduling a final fairness hearing to consider final approval of the settlement [59]. The Court subsequently reset the final fairness hearing to March 3, 2011 [70].[4]

Beginning in January, 2010, a number of Class Members submitted objections to the settlement.[5] On March 7, the parties each filed their memoranda in support of final approval [102, 103], which, *inter alia*, responded to the various objections. After denying a request by the parties to conduct discovery on some of the objectors (see [111]), the Court held a fairness hearing on March 16, 2011 [112], at which time the Court heard argument from counsel for the parties and from a number of objectors. Subsequently, the Court requested additional briefing on one issue raised at the fairness hearing [117], and the parties provided that briefing shortly

---

[4] On November 8, 2010, the Court denied a motion by the Keyes and Ratliff Objectors to amend the schedule that the Court had set for considering final approval of the settlement. [68]. The Objectors had asked the Court to (1) amend the schedule *ex ante* to provide objectors an opportunity to file a reply brief in support of their objections, and (2) delay the final approval hearing until after the close of the claims period.

[5] The Settlement Agreement, at § 19, provided a procedure for the filing of objections. To be considered valid, an objection had to be filed with the Clerk of the Court at least 21 days before the final approval hearing and sent to Class Counsel and Defendant's counsel. The Settlement Agreement also imposed a number of requirements on the objection itself; for example, objectors were required to include "a list of all other objections filed by the objector during the five years prior to the date the objection was filed." *Id.* With the agreement of counsel for the parties, the Court has considered *all* of the objections that it received, regardless of whether the objections were properly and timely filed with the Court, or complied with the other formal requirements. However, Plaintiffs preserve their right to challenge improperly-submitted objections on the basis of their invalidity. See Pl. Mem. at 19 n.11.

thereafter [118].  Finally, on June 3, 2011, the Keyes and Ratliff Objectors filed a Notice of

Recent Developments in Support of Objections, in which they notified the Court of an order

preliminarily approving a settlement in MDL 2036.

B.     Terms of the Settlement[6]

The Court here briefly summarizes the more important provisions of the Settlement

Agreement.   The Agreement and Preliminary Approval Order define the relevant class as

follows:

> All persons in the United States who hold or held a Fifth Third Account who at
> any time during the Class Period incurred at least one Overdraft Fee (as defined in
> the Settlement Agreement) associated with at least one Fifth Third Debit Card
> Transaction.
>
> Excluded from the Settlement Class are Fifth Third Bank, any parent, subsidiary,
> affiliate or sister company of Fifth Third Bank, and all officers or directors of
> Fifth Third Bank, or any parent, subsidiary, affiliate or sister company at any time
> during the Class Period, and the legal representatives, heirs, successors, and
> assigns of any of the foregoing.  The Court presiding over any motion to approve
> the Settlement Agreement is excluded from the Settlement Class.  Also excluded
> from the Settlement Class is any person who timely submits a valid request to be
> excluded from this Settlement.

¶ 7; Preliminary Approval Order [59] at 10.  The class period is from October 21, 2004 through

July 1, 2010.  ¶ 1(d).  The term "Overdraft Fee" means an "insufficient funds fee, overdraft fee,

or other similar fee, incurred as a result of the 're-sequencing' of a Fifth Third Debit Card

Transaction in non-chronological order that was not previously reversed, refunded, or returned to

the Settlement Class Member by Defendant."  ¶ 1(s).  The term "re-sequencing" is not defined in

the Agreement or elsewhere.  A "Fifth Third Debit Card Transaction" is a transaction that is

"effectuated with or relating to such Fifth Third Debit Card(s), including but not limited to

automatic teller machine ("ATM") transactions and point of sale ("POS") transactions."  ¶ 1(l).

---

[6] Unless otherwise indicated, all citations in this section are to the Settlement Agreement.

Accordingly, the settlement covers overdraft fees that result from debit card purchases and ATM transactions, but not fees that are the result of the payment of checks or other transfers.

The settlement provides for the creation of a $9,500,000 settlement fund from which Class Members may receive reimbursement for overdraft charges incurred during any one continuous forty-five day period within the Class Period. ¶¶ 9, 23-24. There is no cap on the amount that an individual Class Member may recover. If, after fees, costs, expenses, and incentive awards are paid, the amount claimed by Class Members is less than the remaining amount, the remainder will be distributed to claimants on a *pro rata* basis, with each such Class Member receiving up to (but not exceeding) three times the amount claimed on his or her claim form. After that, any remaining amounts will be distributed under the *cy pres* doctrine to one nonprofit credit counseling organization in each of the twelve states in which Fifth Third has branches. See ¶¶ 30, 31.

In order to obtain these benefits, Class Members are required to fill out a claim form. Dissatisfaction with the claim form (in fact, with the entire claims process) has been the subject of many of the objections submitted to the Court. Following the preliminary approval order, in which the Court expressed some skepticism regarding the claims process ([59] at 8-9), the parties submitted a revised claim form [62], which the Court approved [64]. On the revised form, Class Members must provide their name, address, social security or tax identification number, and account number(s) with Fifth Third. Class Members can then choose one of two options for submitting a claim. "Option 1" is the option for customers who "do not have all of [their] records," and allows the Class Member to make a claim "to the best of [his or her] knowledge or belief." Class Members are asked to identify a year, and then estimate the number of Overdraft Fees incurred during *any* 45-day period within that year, along with the aggregate amount of fees

charged during that 45-day period. Class Members are not asked to identify the specific 45-day period for which they are making a claim, only the year. "Option 2" is for customers who "used [their] bank statements and/or other records to determine the information" that they were providing. Under that option, the Class Member was to identify the number and amount of "Overdraft Fees" incurred in a particular 45-day period. Under both options, the Class Member was asked to "declare under penalty of perjury that I believe that the information I am providing is true and correct to the *best of my knowledge and belief*." (emphasis in original).

The settlement also provides for non-monetary consideration. By entering into the settlement, Fifth Third agrees to modify its business practices to no longer re-sequence debits from highest to lowest amount; instead, it will process all charges in the order that they are presented to Defendant for payment. ¶ 10(a).[7] Fifth Third further agrees to train its call center telephone operators on issues related to overdraft charges and to authorize those operators to waive any overdraft fee for good cause (including an automatic waiver of one overdraft fee per year, plus those resulting from errors in account reporting and other hardship situations such as hospitalization or illness causing an inability to examine account balances). ¶ 10(b).

In addition to paying Class Members, the $9.5 million settlement fund was also intended to be used to pay all attorneys' fees, costs and expenses, incentive payments, and the costs of claims administration and notice. ¶ 9; see also ¶¶ 14; 20.[8] To date, $1,000,984.18 had been paid from the fund to cover such costs. Further, in a letter to the Court, the parties indicated that as of

---

[7] At the fairness hearing, counsel for Defendant informed the Court that the injunctive relief provided for in the Settlement Agreement "will be fully implemented by the first quarter of 2011." Transcript of Final Fairness Hearing [120] at 46:25-47-1. As the Court has had no indication that that schedule has been delayed, the Court assumes that the prospective relief is now in place.

[8] However, Defendant agreed to directly pay for the portion of the notice costs that involved notices on Defendant's website or in the monthly statements that Defendant sends to its customers (i.e., these costs were not paid out of the fund). ¶ 15. Defendant has paid at least $416,000 out of pocket to cover such costs. Pl. Mem. [103] at 6.

May 18, 2011, they "have agreed that the Settlement Fund will not be required to pay any more of the notice and claims administration costs * * *" [119]. It appears that Defendant has paid at least an additional $668,580.52 out of pocket to cover notice and claims administration costs. See [113]. The Agreement provides that Class Counsel will "seek approval of the Court for payment of not more than one-third of the Settlement Fund for attorneys' fees." ¶ 11. The Agreement also provides for an incentive award not to exceed $1,000 for Plaintiffs Schulte and Willard. ¶ 12. In their motion [103], Class Counsel requests $3,166,666 (which is 33.3% of the settlement fund) in attorneys' fees, and $54,281.32 as reimbursement for costs and expenses. Counsel also requests an incentive award of $1,000 for Plaintiffs Schulte and Willard.

Once the settlement becomes final (see ¶ 32), Class Members will be bound to a broad release. ¶ 34. The Agreement provides that Defendant "expressly denies any and all liability" in the lawsuits. ¶ 33.

As of May 13, 2011, the claims administrator had received "over 100,000 claims." Parties Supplemental Mem. [118] at 1. In contrast to this high participation rate, 342 Class Members excluded themselves from the settlement, and 15 Class Members submitted 13 separate objections to the settlement.

### C. Plaintiffs' Expert Report

As explained in detail below, before the Court can finally approve the settlement, it must first quantify the "net expected value of continued litigation to the class." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006). For that reason, in its order preliminarily approving the settlement, the Court called for the parties to provide at the final approval stage "evidence that would enable the Court to determine the potential value of Class Members' claims." [59] at 5.

In response to that directive, Plaintiffs have attached to their memorandum in support of final approval an expert report prepared by Mr. Thomas A. Tarter, an expert in banking and financial institutions.[9]  Class Counsel retained Mr. Tarter to estimate: (1) the amount of excess overdraft fees caused by Defendant's practice of re-sequencing debit card and ATM transactions from the highest to lowest amount during the class period; and (2) the present value of Defendant's change in business practices, required under the settlement, to no longer re-sequence debit card and ATM transactions.  Tarter Expert Report at 6.  Mr. Tarter estimates that during the class period, Defendant collected approximately $97.7 million as a result of its re-sequencing policy.  *Id.* at 15.  Mr. Tarter also estimates that the present value of Fifth Third's agreement to end its practice of re-sequencing is $58.8 million over the next five years, or $108.8 million over the next ten years (computed at a 3.5% discount rate).  *Id.* at 15-16.

In order to reach his opinions, Mr. Tarter reviewed various documents including the complaint, settlement-related documents, Defendant's public filings and web site, and information provided by Defendant including non-public and confidential documents and data. *Id.* at 5.

To estimate total "Excess OD Fees" (Mr. Tarter's term for earnings from overdraft fees resulting from re-sequencing), Mr. Tarter multiplied the net overdraft fees attributable to debit card and ATM transactions by the probability that the fees collected by FTB were the result of

---

[9] No one has challenged Mr. Tarter's experience and qualifications, so the Court need not discuss them in detail.  Briefly, Mr. Tarter holds a B.S. in business from the University of California at Los Angeles and an M.B.A. from Santa Clara University.  Mr. Tarter is currently the managing director of the Andela Consulting Group, a consulting firm whose services include research, management consulting (especially for troubled companies), litigation consulting, and expert witness services.  Mr. Tarter's experience in the banking industry spans more than 40 years.  Mr. Tarter has worked as a financial and management consultant, business advisor, and board member for public and private companies engaged in deposit transactions.  Mr. Tarter has also been a senior bank officer at four banks, has served on the boards of directors for two banks, and has served as an independent outside director and chair of the audit committee for a large mortgage company.

re-sequencing. First, using data provided by Defendant, Mr. Tarter took the total amount of overdraft fees received from customers for each month during the class period (adjusted for waivers, reversals and charge offs).[10] He then multiplied these monthly charge amounts by .57, to reflect that approximately 57% of overdraft fees were generated by debit card and ATM transactions. See *id.* at 8. These monthly totals gave Mr. Tarter an estimation of the total monthly amounts of overdraft fees collected by Defendant that resulted from debit card or ATM transactions. Mr. Tarter then attempted to estimate how much of these totals were "Excess OD Fees."

Defendant provided Mr. Tarter with the average number of overdraft fees charged to customers who incurred one or more overdraft fee for each month during the class period. *Id.* at 9. (Over the class period, the average number of overdraft fees for this customer population ranged between 3.12 and 4.24 fees per month). Mr. Tarter recognized that there was a direct relationship between the number of overdraft fees charged to a customer in any given day[11] and the likelihood that one or more of the fees was the result of re-sequencing. When a fee was the result of re-sequencing, Mr. Tarter called it a "mismatch." Using a set of matrices, Mr. Tarter calculated that the probability of mismatch was 0% where there was only one overdraft transaction,[12] 10% for two, 17.65% for three, and 20.21% for four. *Id.* at 11. These probabilities were plotted on a graph, and a "best-fit" curve was created, which enabled Mr. Tarter to

---

[10] For example, Defendant received $15,546,166 in February 2006 from overdraft fees paid by its customers (after waiving, reversing, or charging off $1,647,754). Ex. E-1 to Tarter Report.

[11] The Court uses the word "day" here, but technically, Defendant processes debits for the purpose of assessing overdraft fees at the end of each "business cycle." A "business cycle" is the end of the business day Tuesday through Friday. *Id.* at 9. Processing at the end of the day on Monday incorporates transactions made since the end of the banking day on the previous Friday. *Id.*

[12] Of course, if a customer was assessed only one overdraft fee within a given posting period, the order in which the debits were posted would not have had any effect on the number of fees assessed.

calculate the probability of "mismatch" for average numbers of overdraft transactions that were not whole numbers.[13]

Mr. Tarter calculated the total amount of Excess OD Fees for three different scenarios, assessing the likely total Excess OD Fees depending on whether the average number of fees assessed per month all occur on one day, or are spread over two or three days. Mr. Tarter reasoned that if overdrafts were spread over two or three days, the percentage of OD fees that were "mismatched" would be lower. To calculate Excess OD Fees, assuming the average number of fees assessed per month all occur on one day, Mr. Tarter multiplied 57% of the total amount of overdraft fees collected for a given month by the mismatch probability for that month. Each month's totals were then summed, giving Fifth Third's total Excess OD Fee earnings for the entire class period, assuming the average number of fees assessed per month all occurred on one day. The calculation assuming the average number of fees assessed per month occurred on two or three days was identical, except that Mr. Tarter divided the probability of a "mismatch" by two or three, respectively, to reflect the chance that overdrafts within a particular month were spread over two or three days.

Ultimately, Mr. Tarter concluded, based on his experience in banking, that the average number of overdraft fees assessed per month would likely be spread over two or three days. This assumption was based on the fact that most people are paid by their employers either twice or three times per month, and individuals are most likely to overdraft their accounts the day before they are paid. *Id.* at 9. Thus, to calculate Excess OD Fees for the class period, Mr. Tarter averaged the total Excess OD Fees collected, where the average number of overdraft fees

---

[13] For an example, the Court returns to February 2006. Since the average number of fees assessed on customers who incurred at least one fee during that month was 3.19, if all of the fees were assessed on one day (explained below), Tarter estimates that 18.3% of the fees collected during that month were the result of re-sequencing. Ex. E-1 to Tarter Report.

assessed per month would likely be spread over two or three days.  This resulted in a figure of $97.7 million.[14]

Mr. Tarter then estimated the present value of Defendant's change in business practices, required under the settlement, to no longer re-sequence debit card and ATM transactions.  In determining this figure, Mr. Tarter had to account for Regulation E, which became effective in July and August of 2010.  This regulation provided that accountholders can only be assessed overdraft fees for debit and ATM transactions if they have affirmatively authorized a bank to allow them to overdraft their account—otherwise, the transaction is simply declined.  *Id* at 13. Analysis of data provided by Defendant indicated that Regulation E is associated with a 36% decrease in overdraft fee revenue.

Thus, to estimate the present value of the settlement's requirement that Defendant no longer re-sequence, Mr. Tarter used the most recent completed calendar year for which data was available, 2009, to calculate Defendant's likely theoretical future earnings from re-sequencing. In this calculation, the estimated Excess OD Fees for 2009 were reduced by 36% to take into account Regulation E.  *Id* at 14.  The resulting figure was discounted at a rate of 3.50% (to correlate with the 10-year U.S. Treasury Bond) for five and ten years, resulting in a net present value of $58.8 million over five years or $108.3 million over ten years in losses to Defendant resulting from the settlement's requirement that it no longer engage in re-sequencing.

### D.    Defendant's Damage Calculation

Attached to their memorandum in support of final approval of the settlement (Ex. 1 to [102]), Defendant includes its own damage calculation that estimates that "the impact of high-to-

---

[14] As a side note, Mr. Tarter cites a report from the American Bankers Association for the proposition that 77% of U.S. deposit accountholders polled said that they had not paid any debit card overdraft fees during the 12-month period preceding mid-August 2010.  Tarter Report at 7.  Accordingly, Mr. Tarter concluded that "the great majority of [Defendant's] customers would not be affected by the Settlement Agreement." *Id*. at 8.

low posting on debit and ATM transactions during the Class Period was $16,752,710 annually." See Affidavit of Kevin Sullivan, Senior Vice President, CFO-Retail, Banking ("Sullivan Aff."), ¶ 9. Extrapolated out over the entire class period, that figure amounts to approximately $95,281,038.

Mr. Sullivan explains that over the class period, Fifth Third realized an average total of approximately $244,922,667 per year in overdraft fees.[15] This figure represents all overdraft fees, not just those that resulted from debit card or ATM transactions. Fifth Third determined that "approximately 57% of the yearly realized overdraft fees were the result of a debit card or ATM transaction." *Id.* ¶ 8. Thus, multiplying the above figure by .57 resulted in average yearly overdraft fees of $139,605,920 that were the result of debit card and ATM transactions. Using financial models that Fifth Third prepared for its periodic regulatory filings, Fifth Third estimated that approximately 12% of the overdraft fees relating to debit card and ATM transactions were attributable to its use of a high-to-low posting order. *Id.* ¶ 9. Thus, the "estimated impact of high-to-low posting on debit and ATM transactions during the Class Period was $16,752,710 annually," *id.*, which is $1,396,059 per month, or $95,281,038 over a 68.25-month class period.

Fifth Third's data further showed that approximately 72% of the overdraft fee revenue was generated by the approximately 7% of Fifth Third's customers who overdrafted six or more times a month. *Id.* ¶ 10. Adjusting for these "chronic overdrafters," the "total estimated impact of high-to-low posting on debit card and ATM transactions for the 93% 'non-frequent overdrafters' was * * * $26,711,266" over the entire class period. *Id.* ¶ 11.

---

[15] This figure is adjusted for waivers, reversals, and charge-offs.

E.    **Objections to the Settlement**

As noted above, construing the term "objection" broadly, 15 Class Members filed 13 separate objections to the settlement.  The Court summarizes each of the objections below.

1.    **Keyes and Ratliff, and Kannapel Objections**

Objectors Michelle Keyes, Amanda Ratliff, Verdel Ratliff, and Laura Kannapel are each represented by members of the Plaintiffs' Executive Committee ("PEC") in the Overdraft MDL. Objectors Keyes, Amanda Ratliff, and Verdel Ratliff filed an objection [90] that challenges the settlement on numerous grounds.  Objector Kannapel filed a separate objection [91].  In further support of their objection, the Keyes/Ratliff Objectors filed the preliminary approval order of a settlement agreement reached between the plaintiffs and defendant Bank of America in the Overdraft MDL [121].  The Court will discuss these objections together and will refer to the two groups of objectors collectively as the "PEC Objectors."

a.    Amount of Settlement Fund and Criticism of Expert Report

The PEC Objectors argue that given the potentially high value of Class Members' claims, the amount that the settlement fund provides to reimburse Class Members is inadequate.

Before discussing this objection, the Court should note that pursuant to the schedule set by the Court, the PEC Objectors' filed their objections before the parties filed their briefs in support of the settlement.  As discussed in detail above, Plaintiffs' brief attached and discussed the Tarter Expert Report and Defendant provided its own damages calculation.  In their opening objections, the PEC Objectors argued that the Court could not grant final approval because the settling parties had, at the time those objections were filed, failed to provide evidence that would enable the Court to determine the value of Class Members' claims.  See, *e.g.* Keyes/Ratliff

Objection at 3-4; Kannapel Objection at 4-5. The filing of the Tarter Report and Sullivan Affidavit corrected this deficiency, and so, the Court need not discuss these arguments further.

After receiving the parties' memoranda in support of final approval, the PEC Objectors did not seek leave to file a reply brief to attack the Tarter Report or Sullivan Affidavit (or to address any other issues with the parties' memoranda).[16] However, at the fairness hearing, counsel for Objectors Keyes and Ratliff did offer two specific criticisms of the way in which Mr. Tarter calculated the value of the class's claims. See Fairness Hearing Tr. at 96-100. First, the Keyes/Ratliff Objectors note that while Mr. Tarter recognized that those individuals who incurred only one overdraft fee in a month could not be Class Members, the population from which he obtained his average number of fees charged per month was customers who incurred *one or more* overdraft fees for each month during the class period. Tarter Report at 9. Counsel argues that there is no way to know how much this "mistake" skewed Mr. Tarter's results. Second, Mr. Tarter assumed that because 57 percent of all transactions were debit card or ATM transactions, 57 percent of overdraft fees were attributable to debit card or ATM transactions. Counsel argues that this is a *non sequitur*. In fact, according to counsel, a customer would probably be more likely to overdraft when making a debit card transaction than when writing a check. Fairness Hearing Tr. at 98-99 ("Debit cards probably account for 95 percent of the overdraft fees.").

Because the PEC Objectors could not challenge the Tarter Report or Sullivan Affidavit in their opening objections, the PEC Objectors instead pointed to settlements and verdicts in other cases involving claims similar to those at issue in this lawsuit as proof that the settlement amount

---

[16] In a previous order (see [68] at 2), the Court indicated that it would entertain a motion by the PEC Objectors for leave to file a reply brief in support of their objections. The PEC Objectors decided not to take the Court up on this offer.

here is inadequate. Specifically, the objectors argue that the decision in *Gutierrez v. Wells Fargo Bank*, Case No. C07-05923 WHA (N.D. Cal. Aug. 10, 2010), where a judge excoriated Wells Fargo for its debit reordering practices and ordered it to pay $203 million in restitution to its California customers and cease its reordering practices, is evidence of the inadequacy of this settlement. Keyes/Ratliff Obj. at 5-6. The Court discussed the *Gutierrez* decision in its preliminary approval order ([59] at 6 n.4) and will do so again below. Further, the objectors point to a settlement reached in the Overdraft MDL between the plaintiffs there and Bank of America, in which Bank of America agreed to pay class members $410 million to resolve the claims pending against it in that litigation. See Ex. A to [121]. The Court will address the objection about the size of the $9.5 million fund in detail below, along with each of the other objections raised.

### b. Benefits Allocation

The PEC Objectors argue that the distribution of the settlement proceeds is arbitrary and capricious, resulting in unwarranted inequitable treatment of Class Members. Keyes/Ratliff Obj. at 7-9; Kannapel Obj. at 7-10. Objectors argue that by forcing Class Members to choose a single 45-day period in which to claim a refund of overdraft charges, the settlement will unfairly "benefit[] a Class Member who incurred the brunt of his or her overdraft fees over a short period of time at the expense of another Class Member who accumulated a larger amount of impermissible fees over a greater period of time." Kannapel Obj. at 8. For instance, a customer who incurred a total amount of overdraft fees of $100, but incurred them all in one month, may be entitled to a full refund. However, a customer who incurred $1,000 in total fees, spread out evenly over a two-year period, could only recover approximately $63. Further, the Objectors take issue with the fact that funds left over after the initial distribution are to be used to pay up to

treble damages to Class Members who have already been compensated, instead of being used to refund Class Members for charges from outside the 45-day period.

          c.     <u>Claims Process</u>

The PEC Objectors argue that the claims process is unnecessary and that it is unduly burdensome on Class Members and deters claims.

First, the Objectors have a fundamental disagreement with the need for a claims process. The Objectors argue that because the identity of Class Members and the amount that each has been overcharged can be determined from Fifth Third's records, there is no need for customers to submit a claim form. Instead, argue the Objectors, Fifth Third should simply send payments directly to Class Members. The Keyes/Ratliff Objectors argue that "[t]he Bank of America settlement demonstrates the feasibility of a direct distribution of settlement benefits to class members without the requirement of self identification." [121] at 1. "There, the settlement administrator will identify class members and the harm they incurred for the [class period] and then class members will have a credit posted to their account, or in the case of former customers, have a check sent to their most recent address." *Id.*

Next, the Objectors identify problems with the claims process as it is employed in this case. First, as the Court explained in its order calling for additional briefing [117], the Objectors argued that it would be impossible for any Class Member to submit a claim in good faith on the basis of the settlement documents as they currently are written. *Id.*; see also Kannapel Obj. at 12; Fairness Hearing Tr. at 73-78. As the Court also explained in its prior order, under both options in the claim form, a Class Member must identify an amount of "Overdraft Fees" that he or she incurred during a particular time period. Again, the term "Overdraft Fee" means "an insufficient funds fee, overdraft fee, returned item fee, daily overdraft fee, overlimit fee, or other

similar fee, incurred as a result of the 're-sequencing' of a Fifth Third Debit Card Transaction in non-chronological order that was not previously reversed or refunded."   According to the Objectors, a major problem with the settlement is that Class Members have no way of knowing which fees were the "result of [* * *] 're-sequencing'" such that they could accurately fill out the form and make a claim.  The Objectors argue that Defendant has not disclosed how it determines the order in which charges are posted to customers' accounts.  Counsel further submitted that a Class Member viewing his or her statement would not be able to determine which fees were "Overdraft Fees" in part because the statements do not indicate the date on which charges were posted within a posting period—they only indicate the date on which a purchase was made.

Next, the Objectors vociferously object to Fifth Third's refusal to make Class Members' statements over the 69-month class period available for free so that Class Members can accurately fill out claim forms.  The Settlement Agreement only provides free statements for a period going back 16 months from the date of request by the Class Member.  A customer must pay $5 per month for additional statements.   The 16-month period of "free statements" does not appear to be a concession to Class Members as part of the settlement; rather, it appears to be Fifth Third's standard practice with regard to making past statements available to customers. The Objectors argue that the requirement that Class Members pay Fifth Third for the records that they need to determine the value of their claims is unfair and intended to deter claims.

### d.   Amount of Discovery Conducted at Time of Settlement

Finally, the PEC Objectors argue that the absence of pre-settlement discovery demonstrates that Class Counsel failed to properly evaluate the merits of the claims at issue in this litigation.  Keyes/Ratliff Obj. at 3; 10-11; Kannapel Obj. at 6.  The Objectors point out that the "docket reflects that no formal or informal discovery was conducted, and the settlement

reached at the early stage of the proceedings suggests that none was conducted." Keyes/Ratliff Obj. at 10. Further, the Objectors argue that the 30-day period of "confirmatory discovery" provided for in the Settlement Agreement is "an inadequate substitute for adversary discovery." *Id.* at 11.

### 2. Vitali Objection

Aaron Vitali raises a number of objections to the settlement. See Vitali Obj. [88]. First, Mr. Vitali takes issue with the fact that Defendant "[has] not admitted guilt." To Mr. Vitali, this "is much more important than any nominal fee or recovery." Next, Mr. Vitali argues that the class period ends on July 1, 2010, and Defendant will have no "repercussions" and Class Members will have no recovery "for the months post July 2010." In recognition of lost interest and "emotional and financial hardship" suffered by customers as a result of Defendant's conduct, Mr. Vital proposes that interest "be taken into account when repaying the fees incurred." Next, Mr. Vitali objects that "Fifth Third is only willing to refund a 45 day window of fees"— Mr. Vitali feels that Fifth Third should refund all fees wrongfully obtained. Furthermore, Mr. Vitali argues that the "online data provided only goes back 16 months" and "the only ones who can bring up past data about closed accounts or older accounts is Fifth Third." Mr. Vitali asserts that Fifth Third (or rather, an independent agency working with Fifth Third) should determine the amount of refund owed to each Class Member. Mr. Vitali appeared at the fairness hearing and reiterated these objections.

### 3. Katz Objection

Joshua K. Katz raises three objections to the settlement. See Katz Obj. [93]. First, Mr. Katz argues that the proposed settlement fund is too small. Second, Mr. Katz argues that the court in the Overdraft MDL has already "considered and rejected" some of the arguments that

Defendant makes in its motion to dismiss.  Mr. Katz argues that this shows that the "plaintiff's case rests on very solid ground [* * * and therefore] there is no justification for accepting such a small amount in comparison to the amount of money wrongfully realized by the defendant." Katz Obj. at 1.  Mr. Katz's third objection is "that the settlement contains a provision whereby the defendants will actually make money from the class members if they need to obtain their banking records in order to submit a claim."  *Id*.  In this settlement, because a Class Member "may not be aware of what specific 45-day period should be used in submitting his or her claim," there is a "legitimate need to examine 5 years' worth of records to make this decision."  Mr. Katz argues that Defendant should provide customer records for the entire class period to those who request them at no charge.

### 4.    Scyoc Objection

David R. Scyoc identifies three problems with the proposed settlement and makes three proposals as to how Defendant's business practices should be changed going forward.  See Scyoc Obj. [96].  First, Mr. Scyoc argues that the class period should extend through December 31, 2010.  Scyoc also objects that a "45 continuous days claim period is too restrictive;" instead, a Class Member should choose "any 45 [presumably non-contiguous] days during [the] claim period."  Finally, like Objector Katz, Mr. Scyoc argues that "16 months [of] free statements is too restrictive."  With regard to the change in Defendant's business practices, Mr. Scyoc believes that instead of agreeing to process charges chronologically, Defendant should "process all charges from lowest to highest unless requested otherwise by [the] customer in writing." Further, the bank should "reject/deny all prospective charges if [there are] insufficient funds in [the] customer's account unless [the] customer has requested otherwise in writing."  Finally, Mr.

Scyoc argues that Defendant should "credit deposits first, before processing debits." Mr. Scyoc appeared at the fairness hearing and reiterated these objections.

### 5. Ackerson Objection

Objector Roger Ackerson did not file his objection; instead it was mailed directly to the Court and to Class Counsel. Class Counsel attached Mr. Ackerson's objections to Exhibit I to Plaintiffs' memorandum in support of final approval [103]. Mr. Ackerson objects that the settlement only covers customers who utilized debit cards or ATMs. Further, Mr. Ackerson argues that "[i]f indeed wrongdoing was done, then a single period of 45 days seems to be of little value." Ackerson Obj. at ¶ 5. Mr. Ackerson argues that claims period should be "expanded to the amount of time that I held accounts with Fifth Third Bank." Portions of Mr. Ackerson's objection relate to a dispute that he had with Fifth Third about his particular account, and not to the settlement generally. In addition to his objection, Mr. Ackerson has included some correspondence with the Better Business Bureau and Fifth Third executives that relates to this dispute. The Court has not considered this material.

### 6. Cannata Objection

Objector Sam P. Cannata also did not file his objection; instead it was mailed directly to Class Counsel. Class Counsel also included Mr. Cannata's objection in Exhibit I to Plaintiffs' memorandum [103]. First, Mr. Cannata argues that the fees sought by Class Counsel (1/3 of the entire settlement fund) are excessive. Mr. Cannata notes that much of this fund will not be paid out to Class Members; some may be distributed in a *cy pres* and other amounts will go towards covering administrative costs. Mr. Cannata argues that the issue of attorney's fees should be "deferred until such time as the Court has received reports indicating the amount of monetary relief that has actually been delivered to the Class." Cannata Obj. at 2.

Second, Mr. Cannata takes issue with the *cy pres* distribution itself.  Mr. Cannata argues that distributions to Class Members should be "large enough so as to exhaust the fund," such that no *cy pres* is needed.  Further, Mr. Cannata questions how the charity that will be the recipient of the distribution will be chosen.  Cannata Obj. at 3-4.

### 7. Albright Objection

The Court received a letter dated March 9, 2011 from Patrick Albright.  In it, Mr. Albright includes receipts and account statements and argues that these materials show that he was improperly assessed overdraft charges.  With respect to the instant settlement, Mr. Albright argues that it "astounds [him] that [* * * the settlement] [l]imits the period of questionable transactions to 45 days."  Further, Mr. Albright questions the need for a claims process—instead the amounts owed to customers "should be determined by Fifth Third's own records [because] * * * [t]hey know exactly how much they took."  Third, Mr. Albright objects that the settlement "[a]llows for no admission of guilt or punitive damages, and has no deterrent value."  Mr. Albright argues that "$9.5M is an insulting sum from a bank that may have profited ten times that amount by their fraudulent practices."

### 8. Other Objections and Submissions

The Court has received the following additional communications from Class Members.  Some of these are not "objections" in the formal sense; however in the interest of completeness, the Court will summarize them below.

On February 14, 2011, Elizebeth Stackel filed a packet of material with the Court [89].  The Court has closely read Ms. Stackel's filing and concludes that it does not identify any specific objection to the settlement.

In a handwritten letter to Class Counsel dated February 23, 2011, Andrew Kelly states only that he is "an objector to this settlement [and is] hiring my own lawyer!"  Mr. Kelly's letter was included in Exhibit I to Plaintiffs' memorandum.  Mr. Kelly identifies no specific grounds for his objection.

In a handwritten letter to the Court dated December 27, 2010 and filed with the Court [84], Christopher Basie states that he "object[s] to the settlement" and gives the Court permission to use "[t]he history of my checking account and phone calls [to the Goodlettsville, TN Branch]" in support of his objection.  Mr. Basie identifies no specific grounds for his objection.

On February 24, 2011, Teresa and Timothy Drew filed a "declaratory affidavit" with the Court [95].  The Drews report that on February 15, 2011, they attempted to obtain records that they needed in order to prepare their claim form, and were told that they could not obtain the records free of charge.  The Drews argue that the "requirement to pay for the records necessary to establish [their] claim create[s] a hardship and [is] divisive to just and equitable discovery of the facts to settle damages and is directly contrary to the findings & Settlement Order of Judge Robert M. Dow, Jr."  Further, the Drews attach various of their bank account records and identify instances where transactions "were posted out of sequence with obvious results."  The Drews state that "[i]f it is found that mine or my sons credit record was in some way impugned, and or I do not receive at least the amount of recovery per my claim herein, I may seek additional damages and hereby give Notice that I reserve the right to do so and to be conditionally excluded* * *."  Because the Drews' affidavit attempts to reserve certain claims that would otherwise be released in the settlement and purports to seek "conditional" exclusion, the Court interprets the Drews' affidavit as a request for exclusion.

The Court received two letters from R. McKinley Elliot, Esq. The first, dated March 2, 2011, informs the Court that Defendant "continues to reorder the posting of checks to customer accounts." The second letter, dated March 11, 2011, complains that the implementation date for Fifth Third's change in business practices was twice pushed back, finally to March 25, 2011.

## II.    Legal Standard

A court may approve a settlement that would bind class members only if it determines after a hearing that the proposed settlement is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(3). To evaluate the fairness of a settlement, a court must consider "the strength of plaintiffs' case compared to the amount of defendants' settlement offer, an assessment of the likely complexity, length and expense of the litigation, an evaluation of the amount of opposition to settlement among affected parties, the opinion of competent counsel, and the stage of the proceedings and the amount of discovery completed at the time of settlement." *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 653 (7th Cir. 2006) (quoting *Isby v. Bayh*, 75 F.3d 1191, 1199 (7th Cir. 1996)).

"The 'most important factor relevant to the fairness of a class action settlement' is the first one listed: 'the strength of plaintiff's case on the merits balanced against the amount offered in the settlement.'" *Synfuel*, 463 F.3d at 653 (quoting *In re Gen. Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1132 (7th Cir. 1979)). Furthermore, "[i]n conducting this analysis, the district court should begin by 'quantifying the net expected value of continued litigation to the class.' To do so, the court should 'estimate the range of possible outcomes and ascribe a probability to each point on the range.'" *Id.* (quoting *Reynolds v. Beneficial Nat'l Bank*, 288 F.3d 277, 284-85 (7th Cir. 2002)). Although the Seventh Circuit has recognized that "a high degree of precision cannot be expected in valuing a litigation," the court should

nevertheless "insist that the parties present evidence that would enable possible outcomes to be estimated," so that the court can at least come up with a "ballpark valuation." *Id.* (quoting *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 285 (7th Cir. 2002). In essence, a court must weigh the value of the proposed settlement against the total amount that the class could recover, discounted by the weaknesses and risks inherent in the class' claims.

"Federal courts naturally favor the settlement of class action litigation." *Isby*, 75 F.3d at 1196. Nevertheless, the Seventh Circuit has warned that "the structure of class actions under Rule 23 * * * gives class action lawyers an incentive to negotiate settlements that enrich themselves but give scant reward to class members, while at the same time the burden of responding to class plaintiffs' discovery demands gives defendants an incentive to agree to early settlement that may treat the class action lawyers better than the class." *Thorogood v. Sears, Roebuck & Co.*, 627 F.3d 289, 293 (7th Cir. 2010) (emphasis omitted). District courts must therefore "exercise the highest degree of vigilance in scrutinizing proposed settlements of class actions." *Synfuel*, 463 F.3d at 652; see also *Reynolds*, 288 F.3d at 280.

## III.  The Settlement Satisfies Rule 23 Because It Is Fair, Reasonable, and Adequate

Applying the five factors identified in *Synfuel*, 463 F.3d at 653, the Court concludes that the settlement is "fair, reasonable, and adequate" and thus meets the requirements of Rule 23.

### A.  Strength of Plaintiffs' Case Balanced Against Amount of Settlement

As noted above, the "most important factor" in determining whether a proposed settlement satisfies Rule 23 is the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement." *Synfuel*, 463 F.3d at 653. Because the Settlement promises to yield benefits to the class that are significant in light of Defendant's potentially strong defenses should the case proceed to trial, the first factor under *Synfuel* counsels approval.

### 1.      Potential Value of the Class's Claims

The Court begins its task by "'quantify[ing] the net expected value of continued litigation to the class.'"  *Synfuel*, 463 F.3d at 653 (quoting *Reynolds*, 288 F.3d at 284-85).  Setting aside the specter of punitive damages, the evidence introduced by the settling parties established that the top of "the range of possible outcomes," *id.*, is a recovery by the class of between $95.2 million (Defendant's number) and $97.7 million (Plaintiffs' expert's number).  The potential exposure calculations put forward by the parties went essentially unchallenged,[17] and no objector sought to introduce his own analysis of the class's potential recovery in this case.  The evidence before the Court therefore conclusively establishes that around $96.5 million (the average of parties' top-end damage calculations) is the most that the class could hope to recover.

The next step in determining the fairness of the settlement is to discount the value of the class's claims based on the various defenses available to the defendant.  See *Synfuel*, 463 F.3d at 653.  The record in this case establishes that Plaintiffs would face considerable hurdles if they proceeded toward trial.   Were this litigation to proceed absent settlement, Fifth Third's

---

[17] The Court will here address the PEC Objectors' criticisms of the Tarter Report.  Both are unwarranted. Objectors argue that Mr. Tarter erred because the population from which Mr. Tarter drew his average number of fees incurred per month included customers who incurred just one overdraft fee per month, and these individuals could not be Class Members.  Tarter Report at 9.  But Mr. Tarter accounted for the inclusion of these individuals in the way in which he calculated and applied the mismatch probabilities— those calculations recognized that the probability of mismatch was 0% where there was only one overdraft transaction in particular day.  *Id.* at 11.  The PEC Objectors' second criticism of the Tarter Report is equally unfounded.  Again, the PEC Objectors criticize Mr. Tarter's assumption that because 57 percent of all transactions were debit card or ATM transactions, 57 percent of overdraft fees were attributable to debit card or ATM transactions.  First of all, the Sullivan Aff. at ¶ 8 ("Based on modeling done by Fifth Third in connection with the preparation of its periodic regulatory filings, it has been determined by approximately 57% of the yearly realized overdraft fees were the result of a debit card or ATM transaction.").  And in any event, assuming *arguendo* that Mr. Tarter's assumption was not validated by Mr. Sullivan's affidavit, the Objectors offer no concrete evidence to substantiate their concern that Mr. Tarter's choice to equate percentage of transactions performed with percentage of fees generated may have materially affected his ultimate damages calculation.  The PEC Objectors did not seek to depose Mr. Tarter, nor did they seek to discover the information upon which Mr. Tarter based his analysis in order to test it or to offer an expert report of their own.

memorandum in support of its motion to dismiss [23] shows that it would argue that Fifth Third was contractually authorized to re-sequence Class Members' debit card transactions from the highest to lowest amount, and that the terms of the Deposit Agreement preclude a finding that Fifth Third engaged in any deception or unfair conduct. *Id.* at 2-3. All customers signed a signature card when opening a personal deposit account, which provides that the terms and conditions contained in the card, "together with resolutions or authorizations which accompany this signature card, if applicable, and the Rules, Regulations, Agreements and Disclosures of Bank constitute the Deposit Agreement ("Agreement") between individual(s) or entity(ies) named hereon ("Depositor") and the Bank." *Id.* at 2. Fifth Third's Rules and Regulations state, *inter alia*:

> In the case of overdraft or overpayment of any account, whether such by error, mistake, inadvertence, or otherwise, the amount of such overdraft shall immediately be paid to [Fifth Third]. An overdraft fee may be assessed by [Fifth Third] whether [Fifth Third] pays the item or not. If multiple items are presented to [Fifth Third] and there are not sufficient collected funds to pay all of those items, [Fifth Third] (not customer) has the right to decide the order of the items that will be paid and which items will be returned, if any. [Fifth Third] may select any payment order at any time, which may include paying the largest items first such as your mortgage, rent or car payment.

*Id.* at 2.

While Plaintiffs would oppose a contract-based defense, a number of courts have accepted similar arguments when made by bank defendants in cases where the plaintiff was alleging that the defendant bank's re-sequencing practices were unlawful. Most notably, in *Hassler v. Sovereign Bank*, 374 Fed. Appx. 341 (3d Cir. 2010), where a New Jersey plaintiff alleged that the defendant bank's practice of re-sequencing debit card transactions from highest-to-lowest amount was unlawful, the Third Circuit affirmed the dismissal of the plaintiff's breach of contract for violation of the duty of good faith and fair dealing, consumer fraud, and unjust

enrichment claims based on its determination that the account agreement at issue (which Fifth Third has argued is similar to the language of the Deposit Agreement) allowed the defendant bank to reorder overdraft fees and "explicitly provided for the reordering of charges." *Id.* at 344; see also *Fetter v. Wells Fargo Bank, N.A.*, 110 S.W.3d 683, 691 (Tex. App. Ct. 2003) (affirming summary judgment against breach of implied duty of good faith and fair dealing claim because the deposit agreement "specifically permit[ted] high to low posting in addition to the authorization provided in UCC section 4.303(b)"); *Daniels v. PNC Bank, N.A.*, 738 N.E.2d 447, 449 (Ohio Ct. App. 2000) (dismissing breach of implied duty of good faith and fair dealing claim because the deposit agreement that authorized the defendant bank to post items "in any order convenient to [the bank]" authorized the bank to post items from highest-to-lowest); *Smith v. First Union Nat'l Bank*, 958 S.W.2d 113, 114 (Tenn. Ct. App. 1997).

Fifth Third has also argued that federal and Illinois law authorized it to re-sequence debit card transactions from highest to lowest amount, and accordingly, Plaintiffs could not establish a violation of the Illinois Consumer Fraud Act (Count I) or other similar state consumer fraud statutes. See, *e.g.* 815 ILCS 505/10b(1) ("Nothing in this Act shall apply to * * * [a]ctions or transactions specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States."). In its memorandum in support of its motion to dismiss, Fifth Third relied on an Illinois decision affirming the dismissal of claims alleging that a bank's practice of reordering checking transactions was unlawful. See *Hill v. St. Paul Fed. Bank for Savings*, 768 N.E.2d 322, 328 (Ill. App. Ct. 1st Dist. 2002). Citing to 815 ILCS 505/10b(1), the *Hill* Court held that "a bank's failure to disclose the posting order of checks in its schedule of fees comes under the Act's exemption for conduct authorized by law." *Id.* at 328. The court explained that the portion of the federal Truth in Savings Act addressing

bank fees specifies that a bank "need not include" in its disclosures "any information not specified" in applicable regulations.  *Id.* at 327-328 (quoting 12 U.S.C. § 4303(a)).  That regulation, 12 C.F.R. Pt. 230, Supp. I, § 230.4(b)(4), requires only that the bank state the fee amount and the conditions under which a fee may be imposed, such as by stating a "$4.00 monthly service fee."  *Id.* at 328.  Because the order in which overdrawn checks are posted "is not a 'condition' under which overdraft fees are assessed within the meaning of section 4303(b)(1)," the court concluded that "federal law does not require banks to disclose in their schedules of fees the posting order of checks and other items."  *Id.*

Furthermore, under the Illinois Uniform Commercial Code, banks are expressly authorized to post "items" to a customer's account "in any order."  810 ILCS 5/4-303(b) (UCC § 4-303(b)).  An "item" is defined in the UCC as "an instrument or a promise or order to pay money handled by a bank for collection or payment."  810 ILCS 5/4-104(9) (UCC § 4-104(9)).  Paragraph 7 of the Official Comments to 810 ILCS 5/4-303 (UCC § 4-303) provides the rationale for allowing banks to pay "items" in any order:

> As between one item and another no priority rule is stated.  This is justified because of the impossibility of stating a rule that would be fair in all cases, having in mind the almost infinite number of combinations of large and small checks in relation to the available balance on hand in the drawer's account; the possible methods of receipt; and other variables.  *Further, the drawer has drawn all of the checks, the drawer should have funds available to meet all of them and has no basis for urging one should be paid before another*; and the holders have no direct right against the payor or bank in any event, unless of course, the bank has accepted, certified or finally paid a particular item, or has become liable for it under Section 4-302. Under subsection (b) the bank has the right to pay items for which it is itself liable ahead of those for which it is not.

*Id.*, Official Comment ¶ 7 (emphasis added); see also *Hill*, 768 N.E. 2d at 325 (discussing 810 ILCS 5/4-303(b)).  While *Hill* concerned the re-sequencing of checks, Defendant would argue that the same rationale would apply to re-sequencing of debit card and ATM transactions.  In

their memorandum, Plaintiffs acknowledged that Defendant's contract-based defenses and arguments that its conduct was authorized by law would be difficult to overcome.

With regard to Plaintiffs' unjust enrichment claims, in addition to the foregoing arguments, Fifth Third would argue that such claims are barred because Fifth Third's relationship with each Class Member was governed by the express terms of the Deposit Agreement. Although some exceptions exist, Plaintiffs acknowledge that each of twelve states in which Fifth Third has offices recognizes that a cause of action for unjust enrichment does not lie when an express contract governs the relationship between parties. See Unjust Enrichment Chart, Exhibit D to Pl. Mem [103]. Plaintiffs concede that "this issue would necessitate briefing and review, further complicating this matter absent settlement." Pl. Mem. at 15.

Plaintiffs would also be required to face arguments relating to the voluntary payment doctrine. As a general matter, the voluntary payment doctrine provides that "[a]bsent fraud, coercion or mistake of fact, monies paid under a claim of right to payment but under a mistake of law are not recoverable." *Spivey v. Adaptive Mktg. LLC*, 622 F.3d 816, 822 (7th Cir. 2010) (discussing Illinois' interpretation of the voluntary payment doctrine). According to Plaintiffs, each of the states where Fifth Third has offices recognizes a similar form of the voluntary payment doctrine. See Voluntary Payment Doctrine Chart, Exhibit E to Pl. Mem. As attested to in the Affidavit of Kevin Sullivan, Fifth Third estimates that approximately 72% of its overdraft fee revenue was generated from the approximately 7% of Fifth Third customers who overdrafted six or more times a month. Sullivan Aff. ¶ 10. Fifth Third would likely argue that, at some point, such persons had actual or constructive notice of Fifth Third's practice of re-sequencing debit card and ATM transactions, potentially rendering such Class Members' claims barred (or greatly reduced) by the voluntary payment doctrine.

In addition to these defenses on the merits, absent settlement, Plaintiffs would be required to overcome a contested class certification proceeding. There is no guarantee that Plaintiffs would prevail at this stage. See *Pella Corp. v. Saltzman*, 606 F.3d 391, 393 (7th Cir. 2010) ("Class treatment of consumer fraud cases can certainly present difficulties, and courts should consider these concerns before deciding to grant class certification"). At such a proceeding, Plaintiffs would have to demonstrate the manageability of the case; a requirement absent in a class certified for settlement purposes only. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997) ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems for the proposal is that there be no trial.") (citations omitted). Additionally, any ruling on class certification would likely be appealed pursuant to Rule 23(f), further lengthening and complicating the matter.[18]

While Plaintiffs maintain that their claims would ultimately succeed, the above discussion establishes that Fifth Third has a number of potentially meritorious defenses. Absent settlement, Class Members would face the real risk that they would win little or no recovery. What is assured is that any victory would come only after many months (or years) of hard-fought litigation. For these reasons, the use of a significant discount percentage is appropriate. In fact, Mr. Sullivan's calculations show that if the Court accepted just one of Defendant's defenses— the "chronic overdrafter"/voluntary payment argument—the value of the Class's claims would fall approximately 72% (from $95.3 million to $26.7 million). Sullivan Aff. ¶ 11.

---

[18] The Court makes clear that in enumerating Defendant's potential defenses, it does not purport to determine whether or not they would ultimately be successful. See *Williams v. General Elec. Capital Auto Lease*, 1995 WL 765266, at *4 (N.D. Ill. Dec. 26, 1995) ("It is neither appropriate nor necessary to resolve the merits of the conflicting positions in the case in order to evaluate the fairness of the settlement.").

## 2.    Value of the Settlement to Class Members

On the other side of the ledger, the evidence presented to the Court establishes that Class Members will realize significant benefits from the settlement.  In addition to paying $9.5 million to the settlement fund, Fifth Third has also expended over $416,000 in fulfilling its notice obligations under the agreement.  Also, Fifth Third has paid at least an additional $668,580.52 out of pocket to cover other notice and claims administration costs.  See [113].  This amounts to a total expenditure of at least $10.58 million.  It must also be remembered that "a dollar today is worth a great deal more than a dollar ten years from now," *Reynolds*, 288 F.3d at 284, and a major benefit of the settlement is that Class Members may obtain these benefits much more quickly than had the parties not settled.  If the Class Members were "required to await the outcome of a trial and inevitable appeal, [* * *] they would not receive benefits for many years, if indeed they received any at all."  *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2204584, at *24 (N.D. Ill. June 2, 2011).

Further, the prospective relief agreed to by Defendant, including its agreement to cease its practice of re-sequencing transactions from the highest to lowest amount, is an important and valuable benefit for the numerous Class Members who inevitably will continue to bank with Fifth Third.  For those customers, the prospective relief will reduce the number of overdraft fees that they will pay in the future.  Plaintiff's expert has estimated the value of this relief to be $58.8 million over the next five years, and $108.3 million over the next ten years.  Tarter Rep. at 16.  Class Counsel represents that it is his belief that "this relief is groundbreaking, in that no other bank defendant has agreed to that concession in a case settlement related to the re-sequencing of debit card transactions."  Pl. Mem. at 5.

### 3.     The Amount of the Benefits Offered in the Settlement is Fair

"The uncertain nature of the legal issues implicated by proceeding to trial makes it difficult to calculate a precise probability of success." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2204584, at *25 (citing *Synfuel*, 463 F.3d at 653). Nevertheless, the information before the Court conclusively establishes that the amount of settlement benefits offered to the class is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).

As an initial matter, without taking into account the $1.08 million that Defendant has paid to effectuate the settlement, and without taking into account the real value of the prospective change in Defendant's business practices, the $9.5 million settlement fund still represents approximately 10% of the $96.5 million that is the class's maximum potential recovery. Numerous courts have approved settlements with recoveries around (or below) this percentage. See, *e.g. Lazy Oil Co. v. Witco*, 95 F. Supp. 2d 290, 339 (W.D. Pa. 1997) (approving settlement amounting to 5.35% of damages for the entire class period, and 25.5% of damages within the limitations period); *Erie Forge and Steel, Inc. v. Cyprus Minerals Co.*, Civil No. 94-404 (W.D. Pa. Dec. 23, 1996) (approving settlement of $3.6 million where plaintiffs' expert estimated damages at $33 million); *In re Domestic Air Tranp. Antitrust Litig.*, 148 F.R.D. 297, 325 (N.D. Ga. 1993) (12.7% to 15.3%); *In re Newbridge Networks Sec. Litig.*, 1998 WL 765724, at *2 (D.D.C. Oct. 23, 1998) (approving settlement and concluding that while "[c]ourts have not identified a precise numerical range within which a settlement must fall in order to be deemed reasonable; [] an agreement that secures roughly six to twelve percent of a *potential* trial recovery, while preventing further expenditures and delays and eliminating the risk that no recovery at all will be won, seems to be within the targeted range of reasonableness"); *In re*

*Ravisent Techs., Inc. Sec. Litig.*, 2005 WL 906361, at *9 (E.D. Pa. Apr. 18, 2005) (approving settlement, which amounted to 12.2% of damages, and citing study by Columbia University Law School, which determined that "since 1995, class action settlements have typically recovered between 5.5% and 6.2% of the class members' estimated losses.") (internal citations omitted).

In *Domestic Air Transp. Antitrust Ligitation*, the court reasoned that simply because "the proposed settlement amounts to a fraction of potential recovery does not render the proposed settlement inadequate and unfair." 148 F.R.D. at 325. "In fact, there is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery. * * * The proposed settlement cannot be judged without reference to the strength of plaintiffs' claims and other factors relating to a potential recovery for plaintiffs." *Id.* (citing *Detroit v. Grinnell Corp.*, 495 F.2d 448, 455 n. 2 (2d Cir. 1974)). When the Court takes Fifth Third's strong defenses into account, and considers the real value of the prospective relief (at least to those who continue to bank with Fifth Third), the Court must conclude that the "most important factor" in determining whether a proposed settlement satisfies Rule 23—namely the "strength of plaintiff's case on the merits balanced against the amount offered in the settlement," *Synfuel*, 463 F.3d at 653—supports approving the Settlement Agreement in the present case. In short, the settlement provides immediate value to the Class Members that is well within the range of—and may in fact significantly exceed—their expected recovery from proceeding to trial.

In their objections, the PEC Objectors argue that this is a low-ball settlement. Support for this argument relies on the Objectors' comparison of the settlement fund in this case with the amounts awarded ($203 million in *Guitierrez*) and the amounts agreed to ($410 million against Bank of America in the Overdraft MDL) in cases involving similar claims. The Court concludes

that comparison of this settlement with the recoveries in similar cases does not upset the Court's conclusion that this settlement merits approval.

As an initial matter, the Court recognized in its order preliminarily approving the settlement that "comparison of settlements in similar cases is relevant to whether a settlement is fair, adequate and reasonable." [59] at 5. That is undoubtedly true. See *Trombley v. National City Bank*, 759 F. Supp. 2d 20, 24-25 (D.D.C. 2011) ("The Court recognizes that the comparison of settlements in similar cases can be relevant when evaluating the fairness, adequacy, and reasonableness of a proposed settlement."). However, when it granted preliminary approval to the settlement, the Court agreed with the PEC Objectors' criticisms of the parties' "adequacy by analogy" argument, and warned that such an argument was no substitute for evidence concerning *this case* that would enable the Court to determine the potential value of Class Members' claims. [59] at 5. It appears that the PEC Objectors did not take their own criticism to heart: While the parties presented expert and other evidence regarding the value of the class's claims in *this lawsuit*, the PEC Objectors' main challenge to the settlement is an "*inadequacy by analogy*" argument. Indeed, it bears repeating that the PEC Objectors did not seek to conduct discovery on the basis for the settling parties' damages calculations or offer an expert report of their own. Each case is different and must be evaluated on its own merits. *E.g. Liebman v. J.W. Petersen Coal & Oil Co.*, 73 F.R.D. 531, 536 (C.D. Ill. 1973). And due to the inevitable variations among different cases, solid evidence involving the value of the class's claims in *this case* is inherently more persuasive than comparisons to other settlements or verdicts. See *Goldberg v. Touche Ross & Co.*, Fed. Sec. L. Rep. (CCH) ¶ 96,892 (S.D.N.Y. 1979) (in approving the settlement, the court did not consider plaintiffs' comparative table of settlements in other actions of claimed comparative value as having any impact because the variables between cases were too many to

justify such a comparison) (cited in William B. Rubenstein, Alba Conte and Herbert B. Newberg, 4 NEWBERG ON CLASS ACTIONS § 11:47 (4th ed. 2011)).

Regardless, neither the *Guitierrez* case nor the Bank of America settlement in the Overdraft MDL shows that the amount of this settlement is insufficient. In a 90-page opinion following a bench trial, the Court in *Gutierrez v. Wells Fargo Bank*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010), ordered Wells Fargo to and cease its reordering practices and pay $203 million in restitution to its California customers. Most importantly, this award is not an appropriate basis for comparison because it is the result of a judgment after a bench trial; not a settlement. Further, Plaintiffs have explained that there are significant differences between *Gutierrez* and this case that make comparison difficult. The law at issue in *Gutierrez* was different than the law at issue in this case. There, the plaintiffs prevailed on claims brought under California's Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.* Under that statute, relief is available <u>without</u> individualized proof of deception, reliance, and injury. *Gutierrez*, 730 F. Supp. 2d at 1138. Further, the court in *Gutierrez* relied heavily on the California version of U.C.C. § 4-303 and its California-specific comments, which expressly prohibit establishing a practice solely to maximize overdraft fees. *Id.* at 1121. As explained above, Illinois's version of U.C.C. § 4-303 contains no such prohibition. Fifth Third Bank has no branches in California. And finally, as the Court explained in its previous order, once the differences between the relative sizes of Wells Fargo and Fifth Third are taken into account, it is possible that the result in *Gutierrez* actually supports the fairness of the size of the recovery here. See [59] at 6 n.4; [54] at 4.[19]

---

[19] In briefing at the preliminary approval stage, Plaintiffs argued that "adjusting [the award in *Gutierrez*] for the relative size between the class certified in *Gutierrez* and the proposed Settlement Class here, that judgment is reduced, on a comparative basis, to $29 million." [54] at 4. In her objection, Kannapel argues that in Plaintiffs' reduced the *Gutierrez* settlement too much, because they failed to account for the fact that the settlement only applied to Wells Fargo's *California* customers. Kannapel Obj. at 4-5.

The PEC Objectors have also filed an order preliminarily approving a settlement agreement between Bank of America and a group of plaintiffs in the Overdraft MDL. Ex. A to [121]. Tellingly, neither of the PEC Objections nor the "Notice of Recent Developments" [121] to which the PEC Objectors attached the Bank of America settlement agreement contains a discussion of the similarities between this case and the lawsuit against Bank of America, a discussion of the relative sizes of the banks or the settlement classes, or other information that would permit the Court to compare the two settlements. Accordingly, it is of little value to the Court in assessing the sufficiency of the benefits of this settlement.

### B.       Likely Complexity, Length, and Expense of the Litigation

The Seventh Circuit has held that the likely complexity, length, and expense of continued litigation are relevant factors in determining whether a class-action settlement is fair, reasonable, and adequate. *Synfuel*, 463 F.3d at 653. Those factors support approval of the Settlement Agreement in this case.

If the Court approves the Agreement, the present lawsuit will come to an end and Class Members will realize both immediate and future benefits as a result. If the Court denies approval, however, protracted litigation would likely ensue (either in this Court or before the court presiding over the Overdraft MDL). If the Court denied approval, Defendant would likely re-file its motion to dismiss. If Plaintiffs' claims survive that hurdle, the parties would engage in discovery related both to the merits of the Class' claims and to the propriety of class certification. "The costs associated with discovery in complex class actions can be significant." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2204584, at *26 (citing Nicola Faith Sharpe, *Corporate Cooperation Through Cost-Sharing*, 16 MICH. TELECOMM. &

---

However, this objection seems misplaced, as Plaintiffs' did compare the number of Wells Fargo's *California* customers to the number of Fifth Third's customers nationwide. [54] at 4.

TECH. L. REV. 109, 110 (2009) ("Discovery accounts for about 50% of all litigation costs and up to 90% of the costs in the top 5% of the most expensive case.") (citation omitted)).  As explained above, a class certification proceeding would likely be hotly-contested and followed by an inevitable appeal.  If the Class was certified, and if Plaintiffs survive through summary judgment proceedings, they would still be required to establish their entitlement to damages at trial.  Settlement allows the class to avoid the inherent risk, complexity, time, and cost associated with continued litigation.  See *Weinberger v. Kendrick*, 698 F.2d 61, 73 (2d Cir. 1982) ("There are weighty justifications, such as the reduction of litigation and related expenses, for the general policy favoring the settlement of litigation.").

C.        **Amount of Opposition to the Settlement**

The Seventh Circuit has instructed district courts to evaluate the amount of opposition to a settlement among affected parties in deciding whether to approve a class-action settlement.  *Synfuel*, 463 F.3d at 653.  A very small percentage of affected parties have opposed the settlement.  As of May 13, 2011, the claims administrator had received "over 100,000 claims."  Parties Supplemental Mem. [118] at 1.  In contrast to this high participation rate, only 342 Class Members excluded themselves from the settlement and only 15 Class Members submitted documents that could be considered objections.  See *In re Mexico Money Transfer Litig.*, 164 F. Supp. 2d 1002, 1021 (N.D. Ill. 2000) (holding that the fact that more than "99.9% of class members have neither opted out nor filed objections * * * is strong circumstantial evidence in favor of the settlement"), aff'd., 267 F.3d 743 (7th Cir. 2001); *cf. The Authors Guild, et al. v. Google, Inc.,* WL 986049, at *6 (S.D.N.Y. Mar. 22, 2011) (denying approval of Google's class action, in part because "an extremely high number of class members—some 6,800—opted out" and because "the objections [were] great in number").

### D.      Opinion of Competent Counsel

The opinion of competent counsel is relevant to the question whether a settlement is fair, reasonable, and adequate under Rule 23.  *Synfuel*, 463 F.3d at 653.  Class Counsel has extensive experience in consumer class actions and complex litigation and there is no indication that the Settlement Agreement is the victim of collusion.  Class Counsel believes that the Settlement is beneficial to the Class and meets the class-certification requirements of Rule 23.  See Pl. Mem. at 20.  The Court thus concludes that the opinion of competent counsel in this case supports its approval of the Settlement.  Accord *Retsky Fam. Ltd. v. Price Waterhouse L.L.P.*, 2001 WL 1568856, at *3 (N.D. Ill. Dec.10, 2001) ("[T]heir opinion that the settlement is fair, reasonable and adequate also favors approval of the settlement.").

### E.      Stage of the Proceedings and the Amount of Discovery Completed at the Time of Settlement

The last factor that the Seventh Circuit deems relevant to the question whether a class-action settlement is fair, reasonable, and adequate concerns the stage of the proceedings and the amount of discovery completed.  *Synfuel*, 463 F.3d at 653.  This factor is relevant because it determines "how fully the district court and counsel are able to evaluate the merits of plaintiffs' claims."  *Armstrong v. Bd. of Sch. Dirs. of City of Milwaukee,* 616 F.2d 305, 325 (7th Cir. 1980), overruled on other grounds by *Felzen v. Andreas,* 134 F.3d 873 (7th Cir. 1998).

The PEC Objectors argue that the absence of formal pre-settlement discovery demonstrates that Class Counsel failed to properly evaluate the merits of the claims at issue in this litigation.  Keyes/Ratliff Obj. at 3; 10-11; Kannapel Obj. at 6.  The Objectors point out that the "docket reflects that no formal or informal discovery was conducted, and the settlement was reached at the early stage of the proceedings suggests that none was conducted."  Keyes/Ratliff Obj. at 10.  Further, the Objectors argue that the 30-day period of "confirmatory discovery"

provided for in the Settlement Agreement is "an inadequate substitute for adversary discovery." *Id.* at 11.

Apart from exchanging initial disclosures pursuant to Rule 26(a), Class Counsel concedes that no formal discovery was conducted, but states that "[d]uring months of arms-length negotiations occurring prior to settlement, Settlement Class Counsel engaged in substantial informal discovery." Pl. Mem. at 21. That discovery apparently consisted of "multiple meetings and conversations with Fifth Third's counsel, during which information was appropriately shared." *Id.* In addition, prior to settling, Class Counsel conducted a "great deal of independent research" to evaluate his claim, including "examining hundreds of pages of bank statements to study the manner in which Fifth Third's practices affected Settlement Class Members." *Id.*

The Court concludes that this factor does not weigh against approval of the settlement. As the Court noted in its preliminary approval order, that counsel conducted no formal discovery prior to settlement does not necessarily preclude final approval. See *In re Prudential Ins. Co. of America Sales Practices Litigation*, 148 F.3d 283, 319 (3rd Cir. 1998); *Cotton v. Hinton,* 559 F.2d 1326, 1332 (5th Cir. 1977) ("It is true that very little formal discovery was conducted and that there is no voluminous record in the case. However, the lack of such does not compel the conclusion that insufficient discovery was conducted."). Indeed, the "label of 'discovery' [either formal or informal] is not what matters." *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2204584, at *29. Instead, "[t]he pertinent inquiry is what facts and information have been provided." *Id.* As the Southern District of New York has noted:

> [T]he question that this Court must answer is not how much or how little discovery was completed by the parties before they agreed to the settlement, but rather whether the discovery that was completed was sufficient for "effective representation." * * * Intervenors * * * have not explained how additional discovery would have been in the interest of the class. Discovery has costs, and further discovery would have taken additional time and resulted in the

> expenditure of additional funds on both sides, neither of which is in plaintiffs' interests.* * * [C]lass counsel's decision to forgo additional discovery in the hopes of minimizing costs and achieving a quick recovery for their clients appears to be both fair and reasonable[.]

*McBean v. City of New York,* 233 F.R.D. 377, 384–85 (S.D.N.Y. 2006); see also *In re Corrugated Container Antitrust Litigation,* 643 F.2d 195, 211 (5th Cir. 1981) (finding settlement appropriate, despite absence of formal discovery, when "plaintiffs did have access to information").

Here, Class Counsel asserts that they had access to sufficient information such that they could effectively represent the Class. The Objectors have not explained "how additional discovery would have been in the interest of the class" or would have resulted in a better settlement. *McBean*, 233 F.R.D. at 384-85. Indeed, as the Seventh Circuit has suggested, the fact that Class Counsel negotiated a fair settlement is evidence that he had enough information to effectively represent the class. *Mars Steel Corp. v. Continental Illinois Nat. Bank and Trust Co. of Chicago*, 834 F.2d 677, 684 (7th Cir. 1987) ("Rather than attempt to prescribe the modalities of negotiation, the district judge permissibly focused on the end result of the negotiation, which was more favorable to the class than any class member could reasonably have expected. The proof of the pudding was indeed in the eating."). Further, pursuant to the Settlement Agreement, settlement Class Counsel was entitled to reasonable confirmatory discovery. This discovery confirmed the fairness of the settlement.[20] This is not the sort of case where the absence of formal discovery suggests collusion or that the class counsel otherwise failed to get the best

---

[20] Plaintiffs report that they engaged in "wide-rang[ing]" and "detailed" confirmatory discovery following preliminary approval. See Pl. Mem. [103] at 7-8. Class Counsel examined financial information including "data and information pertaining to monthly summaries of consumer overdraft item fees, daily fee dollars, waivers, reversals and charge offs; net consumer fees; principal losses; realized fees; the number of monthly overdraft occurrences; the number of accounts with occurrences (that is, the posting of an overdraft fee); and the average number of overdraft occurrences." *Id.* Class Counsel (and their expert) also participated in several in-person and telephone conferences with Fifth Third's attorneys and management wherein Fifth Third responded to various questions. *Id.*

agreement possible for their class. *Cf. Olden v. Gardner,* 294 Fed. Appx 210, 218 (6th Cir. 2008); *Reynolds v. Beneficial Nat. Bank*, 260 F. Supp. 2d 660, 687-88 (N.D. Ill. 2003) (declining to approve settlement on remand and disqualifying class counsel because evidence established that they attempted to settle case without first undertaking sufficient discovery to estimate class damages).

The stage of proceedings at which this case settled does not weigh against approval. In *In re Asbestos Litigation,* 90 F.3d 963, 988 (5th Cir. 1996), rev'd on other grounds *sub nom. Ortiz v. Fibreboard Corp.,* 527 U.S. 815 (1999), the court held that that the fact that the parties "filed their proposed settlement agreement on the same day as the plaintiff class filed its complaint [and] clearly did not intend to litigate the complaint" did not "change the adversarial nature of the disputes which the settlement resolves and does not contradict the district court's finding that settlement negotiations were heated, difficult and conducted at arm's length." That a case is settled early does not establish that the class was ill-represented or that the settlement was the product of collusion. *Id.* In any event, the stage of proceedings here was further along than in *Asbestos Litigation*—the parties did not come to this Court holding hands. Rather, the filing of Defendant's motion to dismiss suggests that the parties began the litigation in an adversarial posture. See also *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2204584, at *29 (quoting *Molski v. Gleich,* 318 F.3d 937, 959 (9th Cir. 2003) ("Early dispute resolution is salutary, and we should not encourage the unnecessary expense, delay, and uncertainty caused by lengthy litigation when the parties are prepared to compromise. Nor should we hold * * * that a prompt settlement necessarily suggests a failure to prosecute or defend the action with due diligence and reasonable prudence. To the contrary, an early resolution may demonstrate that the parties and their counsel are well prepared and well aware of

the strength and weaknesses of their positions and of the interests to be served by an amicable end to the case.") (Graber, J., concurring), overruled on other grounds by *Dukes v. Wal–Mart Stores, Inc.,* 603 F.3d 571 (9th Cir. 2010), and judgment reversed by 131 S.Ct. 2541 (2011)).

## IV. Objections to the Settlement

For the preceding reasons, the five factors outlined by the Seventh Circuit support approving the Settlement Agreement. Nevertheless, 15 Class Members have filed 13 separate objections, which collectively articulate a number of specific arguments why the Court should not approve the settlement. The Court has addressed some of these objections in the discussion above and will consider the balance here. The objections filed by Class Members do not establish that the Court should deny final approval of the settlement.

### A. Benefits Allocation

As discussed above, the settlement does not distribute benefits on a strictly *pro rata* basis depending on the amount of fees incurred. Instead, customers must choose a 45-day period within the Class Period for the reimbursement of fees. The Court concludes that this allocation of benefits is appropriately tailored to the facts and law at issue in this case, and is fair, reasonable, and adequate. As the Court recognized in its order preliminarily approving the settlement, "when real and cognizable differences exist between the likelihood of ultimate success for different plaintiffs, it is appropriate to weigh distribution of the settlement in favor of plaintiffs whose claims comprise the set that was more likely to succeed." *In re PaineWebber Ltd. Partnerships Litigation*, 171 F.R.D. 104, 133 (S.D.N.Y. 1997) (internal quotations and citations omitted); see also *id.* (collecting cases); see also *In re Lucent Techs., Inc., Secs. Litig.*, 307 F. Supp. 2d 633, 649 (D.N.J. 2004) (citing *In re Cendant Corp. Litig.*, 264 F.3d 201, 248-49

(3d Cir. 2001) ("Courts have routinely approved plans of allocation that provide different payments to class members.")).

By reimbursing customers for damages incurred in a 45-day period, the settlement recognizes that customers who incurred "surprise" charges have stronger claims than the "chronic overdrafters" who paid many fees over a long period of time. This allocation method ensures that the benefits of the settlement are made available to all Class Members, while protecting the interests of Class Members with the strongest claims—those who incurred "surprise" overdraft charges—from erosion of the settlement fund by Class Members who were chronic overdrafters, and therefore those with arguably the weakest claims. Approximately 72% of all overdraft fee revenue was generated from the approximately 7% of Fifth Third's customers who overdrafted six or more times a month. Sullivan Affidavit ¶ 10. As the Court has explained, these frequent overdrafters arguably have weaker claims than the other Members of the Settlement Class because they can be said to have had actual or constructive notice of Fifth Third's reordering policies and are more susceptible to defenses such as the voluntary payment doctrine. The way in which the settlement allocates benefits is fair because it recognizes these important differences among Class Members. What would be "arbitrary, unreasonable, and unfair[]" (Objector Kannapel's words) would be to distribute 72% of the settlement fund to the 7% of Class Members who have the weakest claims.

In *Trombley v. National City Bank*, a class action where a plaintiff alleged that a bank's re-sequencing of debit/check card and ATM transactions was unlawful, the court reached a similar conclusion when granting preliminary approval of a settlement that allowed class members to file claims for reimbursement of overdraft fees incurred during any two months of the class period at issue there, in stating that:

> Reimbursing for the highest amount of overdraft fees incurred in any two calendar months-the two months do not have to be consecutive-enables Class Members to receive compensation, even though they may have had reasonable notice of the manner in which overdraft fee charges are imposed. There is also no cap on the number of overdraft fees that Class Members may recover for the two calendar months that they select for reimbursement. Limiting the recovery period to two months also prevents chronic overdrafters, who had notice of National City Bank's overdraft policies yet continued incurring overdraft fees anyway, from being unfairly rewarded for their behavior. It appears to be, therefore, a reasonable allocation methodology for the settlement funds, with the remaining funds then distributed among Class Members on a pro rata basis.

2011 WL 87235, *6 (D.D.C. Jan. 11, 2011). Thus, the allocation method provided for under the Settlement takes is tailored to the facts of this case and is fair, reasonable, and adequate. The Court overrules the objections of the PEC Objectors, and Objectors Vitali, Scyoc, Ackerson, and Albright, all of whom complain that recovery should not be limited to a 45-day period.[21]

## B.  Claims Process

As discussed above, a number of Objectors have argued that various aspects of the claims process are unfair, unduly burdensome on Class Members, and designed to deter claims. While some of the Objectors' concerns about the claims process are indeed concerning, they are not serious enough to warrant rejection of the settlement in its entirety.

A few initial points about the claims process: First, many of the concerns about the claims process were voiced before data about the Class's response to the settlement was available. Again, Class Members have filed more than 100,000 claims. This excellent response strongly suggests that many of the concerns about the allegedly burdensome or confusing character of the claims process were unwarranted. Next, the Court has reviewed the claim form

---

[21] Objector Cannata takes issue with the *cy pres* aspect of the settlement, and argues that distributions to Class Members should be "large enough so as to exhaust the fund," such that no *cy pres* is needed. In their papers and at the fairness hearing, Class Counsel confirmed that because of the large number of claims filed by the Class, there will be no *cy pres* distribution. Fairness Hearing Tr. at 16-17; see also *id.* at 88; Pl. Mem. at 34. For this reason, the Court need not discuss the *cy pres* aspects of the settlement further.

and concludes that it is not unduly burdensome, long, or complex.  All information called for on the form is required of the claims administrator in order for it to process claims.  See *In re WorldCom. Inc. Sec. Litig.,* 2004 WL 2591402, at *12 (S.D.N.Y. Nov. 12, 2004) (holding that "[t]he [one] objection to the length and complexity of the proof of claim form is * * * meritless," as "the information that claimants are required to submit is necessary in order for a fair distribution of the settlement proceeds"); *In re Wireless Telephone Federal Cost Recovery Fees Litigation*, 2004 WL 3671053, at *14 (W.D. Mo. April 20, 2004) ("The objectors also complain that the claim form for former subscribers is 'burdensome.'  The one-page form merely requires a claimant to provide enough information to enable Defendants to search their records to confirm that the claimant falls within the definition of the relevant subclass.  This requirement is reasonable.").  The parties' use of a settlement website and toll free number suggests that the claims process was designed to encourage—not discourage—the filing of claims.  For example, the ability to submit a claim online through the settlement website allowed Class Members to submit a claim without the need to pay for a stamp.  See, *e.g. In re Nasdaq Market-Makers Antitrust Litigation*, 2000 WL 37992, *4-5 (S.D.N.Y. Jan. 18, 2000) (recognizing that the "innovative use" of "electronic claim forms is likely to contribute to a far larger number of claims"); see also 3 NEWBERG ON CLASS ACTIONS § 8:40 (4th ed.) ("the inclusion of toll-free numbers in notices serves to facilitate, and thereby encourage, the filing of claims") (collecting cases).  And as the Court observed in its order preliminarily approving the settlement, because Defendant's total monetary payment to the settlement fund will be $9.5 million regardless of the number of claims filed, it seems unlikely that the claims process is designed to limit the "take rate" of the Class Members.

That said, a number of Objectors raised three specific concerns about the claims process. First, the PEC Objectors, and Objectors Vitali, Katz, and Scyoc argue that the provision of only 16 months of free statements from the date of a Class Member's request is unfair, when Class Members could use statements going back to the start of the Class Period to determine which 45-day period would be the best for making their claim. Assuming that these records are indeed kept, the Court imagines that there are costs associated with the retrieval and transmission of years-worth of old account statements. Plaintiffs explain that the number of account statements that would be provided was a negotiated term, and the Objectors' arguments that more free statements should have been provided are "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Browning v. YahooA Inc.*, 2007 WL 4105971, at *5 (N.D. Cal. Nov. 16, 2007) (citing *Hanlon v. Chrysler Corp.,* 150 F.3d 1011, 1027 (9th Cir. 1998)). Further, Class Members did not *need* all of their account statements in order to file a claim—the claim form provided that if Class Members were unable to locate their statements, they could submit a form based on the best of their knowledge and belief, identifying only a year in which they incurred overdraft charges.

Perhaps the claims process would have functioned better if Class Members had all of their account statements for the months during the Class Period that they were customers. However, "the courts have held that their function is not to modify the terms of a proposed settlement; but rather to approve or disapprove of the proposed settlement 'as a whole.'" 8 NEWBERG ON CLASS ACTIONS § 24:126 (4th ed.) (citing *Evans v. Jeff D.*, 475 U.S. 717, 727 (1986) ("the power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed."); see also *Turner v. Murphy Oil, USA, Inc.*, 472 F. Supp. 2d 830, 843 (E.D. La. 2007)

("the Court is also limited in that it may not make unilateral modifications or alterations to the proposed settlement, but rather may only accept or reject the agreement as a whole."); 7B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, FEDERAL PRACTICE AND PROCEDURE § 1797.5 & n.9 (3d ed. 2005); MANUAL FOR COMPLEX LITIGATION § 21.61. For all of the reasons explained above, the settlement *as a whole* is worthy of approval; that the Court believes that one or a few terms could have been improved—such as the number of free statements made available—is an insufficient grounds for rejection.

Next, as explained above, the PEC Objectors argue that it would be impossible for any Class Member to submit a claim in good faith on the basis of the settlement documents as they currently are written. Again, the claim form asks customers to identify an amount of "Overdraft Fees" that he or she incurred during a particular time period, where "Overdraft Fees" are fees "incurred as a result of the 're-sequencing' of a Fifth Third Debit Card Transaction in non-chronological order." The Objectors argue that Class Members cannot know which overdraft fees are "the result of 're-sequencing.'"

The settling parties conclusively rebutted this objection in the joint supplemental brief called for by the Court [118]. The parties explain that there are a number of ways that a Class Member could know that a specific overdraft fee was caused by re-sequencing. First, a Class Member's personal knowledge of his account activity, transactional history, and prior overdraft charges could support a claim made in "the best of [their] knowledge and belief." Claim Form at 1. The parties explain that based on their knowledge of their daily schedules and purchasing habits, customers often knew when fees were the result re-ordering. See [118] at 3-4. Other customers—such as Plaintiff Willard—kept contemporaneous personal financial records from which they could deduce that they were the victims of high-to-low re-sequencing. See

Declaration of Marlene Willard, Ex. 4 to [118] (explaining that she ascertained that she had incurred fees as a result of re-sequencing by examining her actual receipts and notebook ledger).

Second, the parties explain that Fifth Third mailed customers an "Overdraft Letter" each time that a customer incurred an overdraft charge. See Ex. 2 to [118], Affidavit of Thomas K. Kappes, Jr., at ¶ 7. Each Overdraft Letter, *inter alia*: detailed the date of overdraft(s), amount the account was overdrawn by, and amount of overdraft charges incurred; included a summary of relevant account activity detailing the beginning balance, the amount of any deposits/credits, whether there were any unavailable funds from deposits, the pending amounts and withdrawals/debits deducted from any balance, and the ending balance; and stated "[i]f you have questions or need additional information, please call us at 1-800-972-3030." *Id.* ¶¶ 8, 9. The Overdraft Letters also included the date an item was charged or credited to a customer's account, the date each debit card transaction occurred (in the description for each charge), and detailed the order in which debit card transactions were charged to the customer's account—from highest to lowest amount. *Id.* The parties provided examples of such letters. A Settlement Class Member could use an Overdraft Letter to determine that a particular overdraft fee was the result of re-sequencing. [118] at 4-5. If a Class Member did not have his or her relevant Overdraft Letters, the Class Member could use his or her monthly account statements to determine that multiple overdraft fees were charged on one day and that the amount of money in the account at the beginning of the day was sufficient to pay at least one debit card charge. The Class Member could then use the description of the debit card charges and overdraft fees on the statement and knowledge of his transactional history and daily activity to come to an informed belief that he incurred an overdraft fee as the result of Fifth Third's re-sequencing of debit card transactions. Finally, Class Members could submit a claim in good faith if they had a conversation with a Fifth

Third customer service representative, during which they were informed that fees has been charged as a result of the bank's re-sequencing policy. According to Defendant, Fifth Third's customer service representatives were trained to explain to customers the basis of any overdraft fees charged, including those resulting from the bank's re-sequencing of debit card transactions in non-chronological order. *Id.* (citing Affidavit of Anna Gise, at ¶ 4, Ex. 3 to [118]).

All of the above conclusively rebuts the assertion that Class Members could not in good faith fill out and submit a claim form, and the "proof of the pudding" (*Mars Steel Corp.*, 834 F.2d at 684) is the fact that Class Members have submitted more than 100,000 claims, and none has submitted an objection or other document complaining that it was impossible for them to file a claim in good faith.

Finally, the PEC Objectors and Objector Albright question the very need for a claims process. The Keyes/Ratliff Objectors note that in the Bank of America settlement, class members will be paid directly; they will not be required to submit a claim form. There, the settlement administrator will identify class members and the harm they incurred and then class members will have a credit posted to their account, or in the case of former customers, have a check sent to their most recent address. The Court rejects this objection.

First, as the Court noted in its prior opinion, there is nothing inherently suspect about requiring class members to submit claim forms in order to receive payment, see, *e.g. Milliron v. T-Mobile,* 2009 WL 3345762, *6 (D.N.J. 2009) ("the Court finds it perfectly appropriate to require Class members to submit certain information proving they are entitled to collect the relief awarded in this case"); 3 NEWBERG ON CLASS ACTIONS § 8:45 (4th ed.) (settlements employing proof of claim requirement are "commonly employed" in consumer fraud cases), especially in a common fund case like this, where the defendant's payout is capped regardless of the take rate.

Second, and perhaps most importantly, the claims process is a negotiated facet of this settlement, which, as the Court explained above, is fair as a whole. The Court may not "make unilateral modifications or alterations to the proposed settlement," *Turner*, 472 F. Supp. 2d at 843, such as the substitution of a claims process for a direct payout.

Third, despite the fact that Defendant presumably knows (or could ascertain) which Class Members incurred overdraft fees as the result of re-sequencing, there is evidence before the Court to support the argument that a claims process is not completely superfluous. For one, there would presumably be costs associated with investigating how much is owed to each Class Member under the settlement and distributing payments. Had the onus of that process been placed on Defendant, there may have been less money available to pay claims. Second, there has been some suggestion that certain customers intentionally overdrafted their accounts, using the overdraft as an "easy loan program." Fairness Hearing Tr. at 27:24. The option to file (or to not file) a claim gives customers who were aware of and assented to Defendant's re-sequencing policies the ability to opt out of receiving a payment that they feel they do not deserve. See *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) (rejecting objection that "the [claim] form is unnecessary because it does not provide [defendant] with any information they do not already have" in part because "the claim form and opt-in procedure are negotiated components of the settlement that [defendant] insisted upon in order to force Settlement Class Members to affirm that they would have purchased a lower-priced policy had it been offered to them.").

And finally, it must be noted that a direct-distribution of settlement benefits (at least to former customers who would be mailed checks) is not a panacea. See, *e.g. In re: Educational Testing Service Praxis Principles of Learning and Teaching Grades 7-12*, MDL No. 1643, 2006

WL 3332829, at *2 (E.D. La. Nov. 15, 2006) (overruling objection that a "claims process for the expedited payments was unnecessary * * * because the names and addresses of [class members] are known" and checks could therefore be mailed directly to class members; finding that claims process prevents checks from being mailed to unverified and old addresses and thereby reduces undeliverable mail and fraudulently cashed checks).[22]

## C.     Miscellaneous Objections

Objectors Albright and Vitali take issue with the fact that Defendant has not admitted guilt.  But Defendant is not required to admit that it did anything wrong when settling a case.  In fact, it "is common to most settlement agreements" that the defendant "does not admit liability." *Hernandez v. Talman Home Mortg. Corp.*, 1986 WL 5205, at *3 (N.D. Ill. April 29, 1986); see also *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2008 WL 2566867, at *12 (S.D. Tex. June 24, 2008) ("A settlement is not tantamount to an admission of liability. Defendants settle for many reasons, such as the avoidance of bad publicity and litigation costs, the possibility of an adverse verdict, and the maintenance of favorable commercial relationships.").

Objector Scyoc argues that the Class Period should extend through December 31, 2010. Similarly, Objector Vitali argues that the Class Period ends on July 1, 2010, and Defendant will have no "repercussions" and Class Members will have no recovery "for the months post July 2010."  Plaintiffs explain that the length of the Class Period was tailored to the facts of this case, specifically, the effectuation of Regulation E, which provides:

---

[22] The Keyes/Ratliff Objectors renew their request that the Court postpone any decision on final approval until after completion of the claims process.  This would allow the Court to learn the actual number of claims filed by class members before granting or denying approval of the settlement.  Because the large number of claims filed suggests no problems with notice to the class or with the claims process, and for the reasons explained in its previous order on this subject [68], the Court need not delay ruling.

(1) Existing account holders. For accounts opened prior to July 1, 2010, the financial institution must not assess any fees or charges on a consumer's account on or after August 15, 2010 for paying an ATM or one-time debit card transaction pursuant to the overdraft service, unless the institution has complied with § 205.17(b)(1) and obtained the consumer's affirmative consent.

(2) New account holders. For accounts opened on or after July 1, 2010, the financial institution must comply with § 205.17(b)(1) and obtain the consumer's affirmative consent before the institution assesses any fee or charge on the consumer's account for paying an ATM or one-time debit card transaction pursuant to the institution's overdraft service.

12 C.F.R. § 205.17(c). With the effect of this regulation in mind, the Court concludes that the length of the Class Period is not a reason that approval of the settlement should be withheld.

Next, Objector Vitali argues that [i]n recognition of lost interest and "emotional and financial hardship" suffered by customers as a result of Defendant's conduct, interest "be taken into account when repaying the fees incurred." As this objection simply argues that the amount awarded to Class Members should be increased, it is "tantamount to complaining that the settlement should be 'better,' which is not a valid objection." *Browning v. YahooA Inc.*, 2007 WL 4105971, at *5. Similarly, Objector Scyoc's proposals about how the prospective relief could be improved are not proper grounds upon which to deny final approval. *Id.*

Finally, Objector Ackerson objects that the settlement only covers customers who utilized debit cards or ATMs, and does not provide reimbursement for fees incurred as a result of overdrawn checks. The Settlement Agreement provides that Class Members only release claims that relate to "the use of a Fifth Third Debit Card." Settlement Agreement at ¶ 34. While the settlement provides no compensation for overdraft fees that were the result of overdrawn checks, it does not purport to release such claims either. That the settlement does not cover checks is not a reason why the approval should be withheld.

V.      **Class Notice**

Constitutional due process and Federal Rule of Civil Procedure 23(c)(2)(B) require that absent class members receive "the best notice that is practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort." What comprises the best notice possible depends on various elements, including the size of the class, whether the class members can be easily identified, and the probability notice will reach the intended audience. See, *e.g. Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 166-67 (1974) (considering the size, ease of identifying the class, and probability of receiving notice); *Phillips Petroleum v. Shutts*, 472 U.S. 797 (1985). Where lists of class members and their addresses are readily ascertainable, the court generally demands individual notice. *Id.* at 173. Here, no one objects to the sufficiency of Notice, and the Court concludes that it is indeed unobjectionable.[23]

The Notice Program was developed and implemented by Hilsoft Notifications, a professional class action notification company. Cameron R. Azari, Esq., a Hilsoft executive, filed an affidavit with the Court attesting to the implementation and adequacy of the Notice Program. See Azari Aff., Ex. C to Pl. Mem. Azari attests that Fifth Third was able to identify names and contact information for virtually all potential Class Members, and individual Notice reached approximately 89.7% of potential Settlement Class Members. *Id.* ¶¶ 7, 13.[24] In addition

---

[23] In its order preliminary approving the settlement [59], the Court preliminarily approved the form and content of the Notice Plan and approved and appointed Hilsoft Notifications as Notice Specialist. *Id.* at ¶¶ 10; 11; 14.

[24] Individual Notice was comprised of the following: A summary notice of the settlement ("Summary Statement Notice") was included in the monthly statements of all potential Class Members who were current Fifth Third customers as of December 1, 2010, and who received monthly paper statements by mail. *Id.* ¶ 14. The Summary Statement Notices were inserted in the envelopes containing the monthly paper statements so that the headline of the Summary Statement Notices faced the flap of the envelopes and the Summary Statement Notices would be the first thing seen when the envelopes were opened. *Id.* The outside of the envelopes containing the monthly paper statements mailed to potential Class Members included a printed "call out" to alert Class Members that important legal information was included. *Id.* Additionally, the enclosed statements included text directing Class Members to the enclosed Summary

to individual notice, the parties disseminated notice by publication on the internet, in a number of daily newspapers, and via press release.[25] The parties also established a toll-free number, maintained by the Claims Administrator, with which Class Members could listen to answers to frequently asked questions and/or request that a copy of the Claim Form or Detailed Notice be mailed to them. *Id.* ¶ 36. As of March 7, 2011, the toll-free number had handled 66,906 calls representing 181,206 minutes of use. *Id.*

The Court has reviewed the content of all of the various notices, as well as the manner in which Notice was disseminated, and concludes that the Notice given to the Class fully complied with Federal Rule of Civil Procedure 23, as it was the best notice practicable, satisfied all constitutional due process concerns, and provided the Court with jurisdiction over the absent Class Members. Fed. R. Civ. P. 23(c)(2)(B); *Eisen*, 417 U.S. at 177-78; *Phillips Petroleum*, 472 U.S. at 797. Indeed, the high number of claims filed is further proof of the adequacy of the

---

Statement Notices. *Id.* ¶ 14. Fifth Third has reported that 1,425,631 account statements including the Summary Statement Notice were mailed to potential Class Members. *Id.* ¶ 15. In addition, a Summary Postcard Notice was mailed to potential Class Members who were Fifth Third customers who did not receive monthly statements by mail, and to all potential Class Members who were former Fifth Third customers. *Id.* ¶ 16. Prior to mailing, the addresses of potential Class Members who were former Fifth Third account holders were verified and, where appropriate, updated. *Id.* ¶¶ 16-18. Altogether, 2,711,981 Summary Postcard Notices were mailed to potential Class Members. *Id.* ¶ 23.

[25] Publication notice of the settlement appeared in a weekday edition of 19 daily newspapers, having a combined daily circulation of over 3.6 million, in markets where Fifth Third has a significant number of branch offices. *Id.* ¶¶ 26-29. Additionally, a Court-approved informational release was issued to approximately 5,600 press outlets throughout the United States. *Id.* ¶ 31. Notice was also posted on the settlement website, www.OverdraftSettlement.com, in English and Spanish. *Id.* ¶ 33. The settlement website allows Class Members to view information about the settlement, including copies of the Detailed Notice, Settlement Agreement, and the Court's orders regarding the settlement. The settlement website also contains answers to frequently asked questions and includes contact information for the Claims Administrator. *Id.* By visiting the settlement website, Class Members can view and file a Claim Form, and can download and print a paper Claim Form. *Id.* As of March 7, 2011, there had been 243,574 website visitor sessions in which 1,291,650 website pages were viewed, which equates to just over 5.3 pages per visitor session. *Id.* ¶ 34. Additionally, a banner displaying the notice headline was also posted on Fifth Third's website, www.53.com, throughout the notice period, which included the address of the settlement website. *Id.* ¶ 30.

Notice program. See *In re Agent Orange Product Liability Litigation MDL No. 381*, 818 F.2d 145, 169 (2d Cir. 1987) (fact that large number of claims were filed by class members "suggest[ed] that no practical problem exist[ed] as to the adequacy of the notice").

## VI. Motion for Fees, Costs, Expenses, and Incentive Awards

Class Counsel requests approval of attorneys' fees, costs and expenses, and for approval of incentive awards for the Class Representatives (see [103]). For the reasons explained below, the Court approves attorneys' fees of $3,166,666. The request for cost and expense reimbursement of $54,281.32 is denied without prejudice. The Court approves an incentive award of $1,000 each for Plaintiffs Schulte and Willard.

### A. Attorneys' Fees

"In a certified class action, the court may award reasonable attorney's fees * * * that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). The Settlement Agreement provides that Class Counsel would "seek approval of the Court for payment of not more than one-third of the Settlement Fund for attorneys' fees," Settlement Agreement at ¶ 11, and Class Counsel have indeed sought $3,166,666, which is precisely one-third of the $9.5 million fund. In determining whether this sought-after amount is reasonable, the Court "must balance the competing goals of fairly compensating attorneys for their services rendered on behalf of the class and of protecting the interests of the class members in the fund." *Skelton v. Gen. Motors Corp.*, 860 F.2d 250, 258 (7th Cir. 1988).

To determine the reasonableness of the sought-after fee in this, a common-fund case, "courts must do their best to award counsel the market price for legal services, in light of the risk of nonpayment and the normal rate of compensation in the market at the time." *In re Synthroid Mktg. Litig.*, 264 F.3d 712, 718 (7th Cir. 2001) ("*Synthroid I*"); see also *In re Cont'l Ill. Sec.*

*Litig.*, 962 F.2d 566, 572 (7th Cir. 1992) ("[t]he object in awarding a reasonable attorney's fee * * * is to give the lawyer what he would have gotten in the way of a fee in arm's length negotiation, had one been feasible. In other words the object is to simulate the market where a direct market determination is infeasible."). The Seventh Circuit has recognized, however, that "[s]uch estimation is inherently conjectural[.]" *Trans Union Corp. Privacy Litig.*, 629 F.3d 741, 744 (7th Cir. 2011). In *Synthroid I*, the Seventh Circuit held that the "market rate for legal fees depends in part on (1) the risk of nonpayment a firm agrees to bear, in part (2) the quality of its performance, in part on (3) the amount of work necessary to resolve the litigation, and in part on (4) the stakes of the case." *Synthroid I*, 264 F.3d at 721; see also *Taubenfeld v. AON Corp.*, 415 F.3d 597, 599 (7th Cir. 2005).[26] The probability of success at the outset of the litigation is relevant to this inquiry. See *Florin v. Nationsbank of Ga., N.A.*, 34 F.3d 560, 565 (7th Cir. 1994).

Consideration of all of the relevant factors reveals that an award of $3,166,666 is reasonable. First, Class Counsel incurred a significant risk of nonpayment by accepting this case. *Trans Union*, 629 F.3d at 746 ("within the set of colorable legal claims, a higher risk of loss does argue for a higher fee."). As discussed in detail above, Fifth Third possesses a number of potentially meritorious defenses to the Actions. At the inception of this lawsuit, there was no certainty that Plaintiffs would win, or that the case would settle; and if Plaintiffs had lost, Class Counsel "would receive no fees at all." *Id.* All contingent fee class action cases involve some degree of risk for plaintiffs' counsel. See *Sutton v. Bernard*, 504 F.3d 688, 694 (7th Cir. 2007) ("there is generally some degree of risk that attorneys will receive no fee (or at least not the fee that reflects their efforts) when representing a class because their fee is linked to the success of

---

[26] Of course, district courts must exercise caution in focusing on the first factor, for a dogmatic application of the principle would justify large attorneys' fees for frivolous class-actions suits that defendants agreed to settle. *In re Trans Union Corp. Privacy Litig.*, 629 F.3d at 746.

the suit"). Further, the Seventh Circuit recognizes that "the higher the risk of failure the higher the contingent fee that a client would have to pay in an arm's length negotiation with the lawyer in advance of the suit." *Trans Union*, 629 F.3d at 746. That at the inception of this lawsuit, Plaintiff Shannon Schulte authorized her attorney (Mr. Burton H. Finkelstein) to seek a fee of up to 33.3% of her potential recovery is further evidence that the risk that Counsel was undertaking at the beginning of the suit was relatively high. *Id.*; see also *Synthroid I*, 264 F.3d at 718-19.

Second, the quality of Class Counsel's performance in this litigation favors approval of the fees requested. Class Counsel have navigated a complicated case and have negotiated a Settlement Agreement that provides significant benefits to the Class Members.

Third, the amount of work necessary to resolve this lawsuit was substantial. *Synthroid I*, 264 F.3d at 721. As of March 3, 2011, Class Counsel and other attorneys from their firms reported having spent 2,815.50 hours advancing this matter, which represents a lodestar of $1,258,385.20. See Summary of Attorney Time, Ex. H to Pl. Mem. Class Counsel undoubtedly spent additional time since March 3, 2011 attending the fairness hearing and responding to the Court's request for additional briefing. While many courts in this circuit have criticized the use of a lodestar cross-check in common fund cases,[27] the fee request here would nevertheless survive such an analysis. The requested award here would represent a multiplier of less than 2.5, which is not an unreasonable risk multiplier. See *Harman v. Lyphomed, Inc.*, 945 F.2d 969, 974 (7th Cir. 1991) (noting that "[a risk] multiplier is, within the court's discretion, appropriate when

---

[27] "The use of a lodestar cross-check in a common fund case is unnecessary, arbitrary, and potentially counterproductive." *Will v. General Dynamics Corp.*, 2010 WL 481874, at *3 (S.D. Ill. Nov. 22, 2010) (citing *In re Synthroid Mktg. Litig.*, 325 F.3d 974, 979-980 (7th Cir. 2003) ("The client cares about the outcome alone" and class counsel's efficiency should not be used "to reduce class counsel's percentage of the fund that their work produced."); *In re Comdisco Sec. Litig.*, 150 F.Supp.2d 943, 948 n.10 (N.D. Ill. 2001) ("To view the matter through the lens of free market principles, [lodestar anaylsis] (with or without a multiplier) is truly unjustified as a matter of logical analysis.")).

counsel assume a risk of non-payment in taking a suit" and "[m]ultipliers anywhere between one and four * * * have been approved").

The Court also observes that the stakes in the case are high given the size of the Class, the scale of the challenged activity, the complexity and costs of the legal proceedings, and the amount of money involved. Accord *In re AT&T Mobility Wireless Data Services Sales Tax Litig.*, 2011 WL 2173746, at *9 (N.D. Ill. June 2, 2011).

Lastly, the Court should consider attorneys' fee awards in other class actions when assessing a fee request. See *Taubenfeld,* 415 F.3d at 600-601. A number of fee awards in common-fund cases from within the Seventh Circuit show that an award of 33.3% of the settlement fund is within the reasonable range. See *Taubenfeld v. Aon Corp.*, 415 F.3d 597, 598–600 (7th Cir. 2005) (finding that the district court was within its discretion in awarding lead counsel 30% of a $7.25 million settlement fund); *In re Synthroid Mktg. Litig.* (*Synthroid II*), 325 F.3d 974, 980 (7th Cir. 2003) ("We * * * give consumer class counsel 30% of the first $10 million and 25% of the next $10 million * * * from $20 million to $46 million, consumer class counsel is entitled to 22% of that portion of the recovery. And we think that 15% of all amounts over that is a decent estimate of the fee that would have been established in ex ante arms'-length negotiations. Because the consumer class recovered a total of $88 million, the fee comes to $17.52 million, or 19.9% of the fund."); *Meyenburg v. Exxon Mobil Corp.*, 2006 WL 2191422, at *2 (S.D. Ill. July 31, 2006) ("The Court is independently aware that 33 1/3% to 40% (plus the cost of litigation) is the standard contingent fee percentages in this legal marketplace for comparable commercial litigation."); *Abrams v. Van Kampen Funds, Inc.,* 2006 WL 163023, at *7 (N.D. Ill. Jan. 18, 2006) ("This bench has previously found that 25% is the median fee award in cases involving recoveries of $5–$15 million. The present case is in a somewhat higher

category, with the gross recovery being $31,500,000. However, * * * 25% of the net recovery will be considered the median fee award in the present type of case. The court will award fees based on that percentage unless the specific circumstances of this case call for a higher or lower award."); *Gaskill v. Gordon,* 942 F.Supp. 382, 388 (N.D. Ill. 1996) ("[T]he Court concludes that the professionals should recover 38% of the total fund available for distribution. This award reflects an increase of five percent over the court's original award of 33% and exceeds the range of most common fund fee awards.") (citing *Swedish Hosp. Corp. v. Shalala,* 1 F.3d 1261, 1272 (D.C. Cir. 1993) for the proposition that "common fund awards typically fall between twenty and thirty percent"); *Goldsmith v. Tech. Solutions Co.,* 1995 WL 17009594, at *8 (N.D. Ill. Oct. 10, 1995) ("Thirty-three percent appears to be in line with what attorneys are able to command on the open market in arms-length negotiations with their clients.").

In addition, it must be remembered that Class Counsel's fee award is much less than one-third of the Class's total recovery once the value of the prospective relief is taken into account. Where a settlement includes substantial affirmative relief, such relief must be considered in evaluating the overall benefit to the class. *Will*, 2010 WL 481874, at *1 (citing MANUAL FOR COMPLEX LITIGATION (Fourth) § 21.71, at 337 (2004); PRINCIPLES OF THE LAW OF AGGREGATE LITIGATION, § 3.13 (2010); *cf. Blanchard v. Bergeron,* 489 U.S. 87, 95 (1989) (cautioning against an "undesirable emphasis" on monetary "damages" that might "shortchange efforts to seek effective injunctive or declaratory relief.")). Taking the value of this relief into account is further proof of the reasonableness of Class Counsel's sought-after fees.[28]

---

[28] Because the Court has approved the amount of attorneys' fees sought by Class Counsel, it overrules Mr. Cannata's objection that the amount of attorneys' fees sought are excessive. See Cannata Obj. Further, Mr. Cannata argues that the issue of attorney's fees should be "deferred until such time as the Court has received reports indicating the amount of monetary relief that has actually been delivered to the Class." *Id.* at 2. Because there is no *cy pres* distribution and because the fund's exposure for the costs of notice

### B.     Costs and Expenses

The Federal Rules of Civil Procedure allow the Court, in a certified class action, to "award reasonable * * * nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h).  Here, the agreement states that "Class Counsel shall seek approval of the Court for reimbursement of reasonable costs and expenses incurred by [Class Counsel] in litigating, handling, and resolving the Actions."  Settlement Agreement at ¶ 11.  Exhibit 2 to the Affidavit of Sharon Harris (one of Plaintiff's attorneys) is a list of expenses incurred through March 4, 2011.  The exhibit is a one-page document that shows the amount of expenses incurred in broad categories only; for example, it shows $12,908.41 in "Hotels, Transportation, (airfare & taxi service), and Meals."  The other expenses sought by Class Counsel are for court reporter fees, filing fees, transcript fees, copying, travel, expert fees, and so forth.

Although no one has objected to Class Counsel's request for reimbursement of costs and expenses—and thus any such objections are waived—the Seventh Circuit has explained that district courts must exercise their discretion to "disallow particular expenses that are unreasonable whether because excessive in amount or because they should not have been incurred at all." *Zabkowicz v. W. Bend Co., Div. of Dart Indus., Inc.*, 789 F.2d 540, 553 (7th Cir. 1986) (quoting *Henry v. Webermeier*, 738 F.2d 188, 192 (7th Cir. 1984)).  The requested expenses do not seem excessive on their face.  However, Class Counsel has provided insufficient itemization and back-up documentation of the expenses so to allow the Court to make a meaningful assessment.  The Seventh Circuit has explained that "the amount of itemization and detail required is a question for the market." *Synthroid II*, 264 F.3d at 722.  "If counsel submit

---

and administration has been capped by agreement of the parties as discussed above, the Court is aware now of how much of the fund will actually be distributed to Class Members.

bills with the level of detail that paying clients find satisfactory, a federal court should not require more." *Id.* Paying clients (especially in today's marketplace) typically would require more detail than Class Counsel has provided regarding how its attorneys are spending the Class's money. To be sure, the Court is not requesting an encyclopedic accounting of the expenditures; a summary document containing the amount of detail that generally accompanies a bill of costs submitted under Fed. R. Civ. P. 54(d) and 28 U.S.C. § 1920 will suffice to enable the Court to perform its oversight function. *Cf. Northbrook Excess & Surplus Ins. Co. v. Proctor & Gamble*, 924 F.2d 633, 643 (7th Cir. 1991) (explaining that a prevailing party submitting a bill of costs is "not required to submit a bill of costs containing a description so detailed as to make it impossible to economically recover photocopying costs"). But the single page submitted thus far is simply not enough. Class Counsel's request for reimbursement of costs and expenses is denied without prejudice; counsel may re-submit its request along with additional supporting materials, within 30 days of the date of this order.

## C. Incentive Payments

With respect to incentive payments, the Seventh Circuit has explained that such "awards are justified when necessary to induce individuals to become named representatives." *Synthroid I*, 264 F.3d at 722. In deciding whether an incentive award is proper, and, if so, in what amount, "relevant factors include the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, and the amount of time and effort the plaintiff expended in pursuing the litigation." *Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) (approving incentive award of $25,000). Class Counsel represents that the Class Representatives participated in this litigation and willingly undertook "the responsibilities and risks attendant with bringing this class action." Pl. Mem. at 41. Further, notice of this lawsuit

was sent to millions of customers and it and similar suits have garnered attention in the press. Class Representative's willingness to publically place their names on this suit and open themselves up to scrutiny and attention is certainly worth some remuneration. The Court grants the requested incentive award of $1,000 each.

## VII. Conclusion

For the reasons set forth above, the Court (1) grants final approval of the settlement, finding that the settlement is fair, reasonable, and adequate; (2) approves Class Counsel's request for attorneys' fees of $3,166,666; (3) denies Class Counsel's request for cost and expense reimbursement without prejudice to re-filing within 30 days of the date of this order; and (4) approves an incentive award of $1,000 each for the Class Representatives, Shannon Schulte and Marlene Willard.

Dated: July 29, 2011

_____
Robert M. Dow, Jr.
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DORIS J. MASTERS, individually and as   )
the representative of a class of similarly   )
situated persons,   )
                              )
       Plaintiff,   )
                              )
v.   )
                              )
LOWE'S HOME CENTERS, INC.,   )
                              )
       Defendant.   )

Case No. 09-cv-255-JPG-PMF

<u>**July 14, 2011 Hearing Date (1:30 p.m.)**</u>

Judge J. Phil Gilbert

## <u>ORDER OF FINAL APPROVAL</u>

THIS MATTER is before the Court upon Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement [Dkt. No. 57]. The Court has carefully reviewed this Motion and the entire court file and is otherwise fully advised in the premises.

Plaintiff Doris J. Masters ("Masters") has submitted for final approval a proposed settlement of this class action, which is unopposed by Defendant Lowe's Home Centers, Inc. ("Defendant" or "Lowe's"). Capitalized terms used in this Order that are not otherwise identified herein have a meaning assigned to them in the Settlement Agreement and the Amendment To Settlement Agreement (collectively the "Settlement Agreement").

By an Order of Preliminary Approval [Dkt. No. 47] dated January 11, 2011 and a Supplemental Order Of Preliminary Approval [Dkt. No. 51] dated March 11, 2011 (collectively the "Order of Preliminary Approval"), the Court preliminarily approved the proposed Settlement Agreement and Amendment To Settlement Agreement by the Parties based on the terms and conditions of the Unopposed Motion for Preliminary Approval of the Settlement Agreement [Dkt. No. 42] (the "Motion for Preliminary Approval"), the Settlement Agreement [Dkt. No. 46],

the Amendment To Settlement Agreement [Dkt. No. 49, Exhibit 1], and the Agreed Motion To Amend The Settlement Agreement [Dkt. No. 49], subject to further consideration at the Final Settlement and Fairness Hearing conducted on July 14, 2011. In its Order of Preliminary Approval, the Court conditionally certified the cases to proceed as a class action for settlement purposes only and temporarily certified Plaintiff as representative of the following class:

> All past and present holders of Lowe's branded GE Money Bank credit cards who made an in-store payment on their Lowe's branded GE Money Bank credit card balance at a new Lowe's store between January 1, 2005 and December 3, 2006 or at any Lowe's store between December 4, 2006 and March 24, 2008, and who received a receipt for their in-store payment showing more than the last five digits of their account. A new Lowe's store is a Lowe's store opened after January 1, 2005 and is identified on the list attached to the Agreement as Exhibit A.

The Court also ordered that the NOTICE OF PROPOSED SETTLEMENT AND RIGHT TO OPT OUT, attached as Exhibit C to the Amendment To Settlement Agreement (the "Notice of Proposed Settlement"), be mailed no later than April 1, 2011.

On July 14, 2011, the Court conducted a Fairness Hearing to determine:

a.      Whether the Court should certify the Settlement Class and whether Plaintiff and her counsel have adequately represented the Class Members;

b.      Whether the Settlement Agreement, on the terms and conditions provided for in the Settlement Agreement, should be finally approved by the Court as fair, reasonable, and adequate;

c.      Whether the Lawsuit should be dismissed on the merits and with prejudice as to Lowe's;

d.      Whether the Court should permanently enjoin the assertion of any claims that arise from or relate to the subject matter of the Lawsuit against Lowe's, Lowe's Affiliates, GE Money Bank, and the Released Parties;

-2-

e. Whether the application for attorneys' fees and expenses to be submitted by Class Counsel in connection with the final settlement hearing to which Lowe's does not oppose should be approved; and

f. Whether the application for an incentive award to Plaintiff to be submitted in connection with the final settlement hearing to which Lowe's does not oppose should be approved.

All interested persons were afforded the opportunity to be heard. The Court has duly considered all of the submissions and arguments presented on the proposed Settlement Agreement. After due deliberation and for the reasons set out below, the Court has determined that the Settlement Agreement is fair, reasonable, and adequate and should therefore be approved.

Accordingly, after due consideration, it is

**ORDERED AND ADJUDGED** that Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement [Dkt. No. 57] be approved and the same is hereby **GRANTED** as follows:

1. On July 14, 2011, the Court held a Fairness Hearing, after due and proper notice, to consider the fairness, reasonableness and adequacy of the proposed Settlement Agreement. In reaching its decision in this case, the Court considered the Parties' Settlement Agreement, the Court file in this case, and the presentations by Class Counsel on behalf of the Plaintiff and the Class and counsel for Lowe's in support of the fairness, reasonableness, and adequacy of the Settlement Agreement.

2. As recognized in the Order of Preliminary Approval [Dkt. Nos. 47 and 51], the Court previously certified a class for settlement purposes only, pursuant to Federal Rules of Civil

Procedure 23(a) and (b)(3).

3.     The Court hereby affirms its decision certifying that class and approving the Settlement Agreement.  The Court finds that the requirements for approving a settlement class pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) have been met.

4.     In the Order of Preliminary Approval, the Court preliminarily approved the Notice and found that the proposed form and content of the Notice Of Proposed Settlement And Right To Opt Out to the Class Members satisfied the requirements of due process.  The Court reaffirms that finding and holds that the best practicable notice was given to Class Members under the circumstances and constitutes due and sufficient notice of the Settlement Agreement and Fairness Hearing to all persons affected by and/or entitled to participate in the Settlement Agreement or the Fairness Hearing.

5.     Upon reviewing all of the circumstances and evidence including without limitation, the Declaration of Kelley Bethke, the Declaration of Julie Schechter, and the Declaration of Michael Tummillo, the Court has determined that the Settlement Agreement is fair, reasonable, and adequate and should be approved.  *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 652 (7th Cir. 2006).  The factors considered are: (1) the strength of the plaintiff's case on the merits compared to the amount of the settlement; (2) the defendant's ability to pay; (3) the likely complexity, length and expense of further litigation; (4) opposition to the settlement from members of the class; (5) evidence of collusion; (6) opinions of counsel; (7) the stage of the proceedings and the amount of discovery completed at the time of settlement; and (8) the public interest.  *Isby v. Bayh*, 75 F.3d 1191, 1196 (7th Cir. 1996).

The Court has considered the submissions of the Parties, and the confirmatory discovery conducted in this case, along with the Court file, all of which show that there remains substantial

risk and uncertainty in Plaintiff and the Settlement Class ultimately prevailing on their claims. Given the considerable open issues, the benefits available directly to the Class Members represent an excellent result that can be summarized as follows:

The Settlement Agreement requires that a claims procedure be established pursuant to which all Class Members who timely file a valid Proof of Claim by the Claims Submission Deadline shall be entitled to receive a gift card from Lowe's. The value of the Lowe's gift card shall be $25 if the Claimant made one payment at a Lowe's store on his/her GE Money Bank Account balance, $33 if the Claimant made two payments at a Lowe's store on his/her GE Money Bank Account balance, and $40 if the Claimant made three or more payments at a Lowe's store on his/her GE Money Bank Account balance. The amount of a Claimant's gift card will be reduced if the total claims made by Claimants exceed $7,000,000. In the event that the total claims made by Claimants exceed $7,000,000, the Claimants shall share *pro rata* on the same basis, with the order of priority going to providing each Claimant with a $25 gift card or their *pro rata* share, then providing each Claimant, who made two or more payments, a $33 gift card or their *pro rata* share, and finally providing each Claimant, who made three or more payments, a $40 gift card or their *pro rata* share. To determine the value of the gift cards for each Claimant, the Settlement Administrator shall identify the number of Claimants making only one payment at a Lowe's store ("Group One Claimants"), the number of Claimants making only two payments at a Lowe's store ("Group Two Claimants"), and the number of Claimants making three or more payments at a Lowe's store ("Group Three Claimants"). The value of the gift cards for each of these groups shall be determined by the Settlement Administrator based on the following formula:

a.    <u>Step A</u>.  If $7,000,000 divided by the total number of Claimants is less than or equal to $25, all Claimants will receive a gift card equal to the the amount obtained by dividing $7,000,000 by the number of Claimants ("Step A Result").  The Settlement Administrator shall proceed to Step B only if the Step A Result is greater than $25.

b.    <u>Step B</u>.  If the Step A Result is greater than $25, all Group One Claimants will receive a $25 gift card.  The Settlement Administrator then will multiply $25 by the number of Group One Claimants, subtract this product from $7,000,000, and divide the difference by the number of Group Two Claimants plus the number of Group Three Claimants ("Step B Result").  If the Step B Result is less than or equal to $33, all Group Two Claimants and Group Three Claimants will receive a gift card for an amount equal to the Step B Result.  The Settlement Administrator shall proceed to Step C only if the Step B Result is greater than $33.

c.    <u>Step C</u>.  If the Step B Result is greater than $33, all Group One Claimants will receive a $25 gift card and all Group Two Claimants will receive a $33 gift card.  The Settlement Administrator then will multiply $25 by the number of Group One Claimants and multiply $33 by the number of Group Two Claimants.  The sum of the two products calculated in the previous sentence will be subtracted from $7,000,000 and the difference will be divided by the number of Group Three Claimants ("Step C Result").  If the Step C Result is less than $40, all Group Three Claimants will receive a gift card for an amount equal to the Step C Result.  If the Step C Result is greater than or equal to $40, all Group Three Claimants will receive a $40 gift card.

The following chart shows how the formula above operates:

| Formula | Gift Card Amount |
|---|---|
| Step A Result = $7,000,000 / (Group One Claimants + Group Two Claimants + Group Three Claimants). | If Step A Result is less than or equal to $25, all Claimants receive a gift card with a value of the Step A Result. The formula stops. |
| | If Step A Result is greater than $25, Group One Claimants receive a gift card of $25, and the formula continues to determine the value of the gift cards for Group Two and Group Three Claimants. |
| Step B Result = ($7,000,000 – (Group One Claimants x $25)) / (Group Two Claimants + Group Three Claimants). | If Step B Result is less than or equal to $33, all Group Two and Group Three Claimants receive a gift card with a value of the Step B Result. The formula stops. |
| | If Step B Result is greater than $33, Group One Claimants receive a gift card of $25, Group Two Claimants receive a gift card of $33, and the formula continues to determine the value of the gift card for Group Three Claimants. |
| Step C Result = ($7,000,000 – ((Group One Claimants x $25) + (Group Two Claimants x $33))) / Group Three Claimants. | If Step C Result is less than or equal to $40, all Group Three Claimants receive a gift card with a value of the Step C Result. |
| | If Step C Result is greater than $40, Group One Claimants receive a gift card of $25, Group Two Claimants receive a gift card of $33, and Group Three Claimants receive a gift card of $40. |

Further, the Settlement Agreement provides that Lowe's has assumed financial responsibility for providing notice of the Settlement Agreement to Class Members and administration of the Settlement Agreement.

6.  If the case were to proceed without the Settlement Agreement, the possible resulting trial would be complex, lengthy, and very expensive. The Settlement Agreement eliminates a substantial risk that the Class Members would walk away "empty-handed" after the

conclusion of such appeals and/or trial. Absent the Settlement Agreement, because of the resulting motion practice, trial, and appeals, it could be years before Class Members would see any benefit whatsoever, even if they were to prevail on the merits, which might not produce a better recovery than they have achieved in this Settlement Agreement. *S.C. Nat'l Bank v. Stone*, 139 F.R.D. 335, 340 (D.S.C. 1991). The Court is satisfied that the provisions of the Settlement Agreement are of benefit to the Class Members.

7. The Court finds that there were 4 objections filed to the Settlement Agreement and that those objections were without merit.

8. In addition to finding the terms of the proposed Settlement Agreement to be fair, reasonable, and adequate, the Court determines that there was no fraud or collusion between the parties or their counsel in negotiating the Settlement Agreement's terms, and that all negotiations were made at arm's-length. Furthermore, the terms of the Settlement Agreement make it clear that the process by which the Settlement Agreement was achieved was fair. Finally, there is no evidence of unethical behavior, want of skill, or lack of zeal on the part of Class Counsel.

9. This Order shall be binding on all Settlement Class Members. All Settlement Class Members hereby release and discharge Lowe's, Lowe's Affiliates, GE Money Bank, and the Released Parties (as defined in the Settlement Agreement) from all "Released Claims," where "Released Parties" is defined herein and in the Settlement Agreement preliminarily approved by this Court in its Order of Preliminary Approval [Dkt. Nos. 47 and 51] as:

> any and all claims or causes of action of any nature whatsoever, including but not
> limited to any claim for violations of federal, state, or other law (whether in
> contract, tort, or otherwise, including without limitation statutory, common law,
> property, and equitable claims), and also including Unknown Claims, that have

-8-

been or could have been asserted against the Released Parties in the Lawsuit, or in any other complaint, action, or litigation in any other court or forum based upon or in any way relating to the Lawsuit.

Further, this release and discharge also includes:

any and all claims that Plaintiff and the Settlement Class do not know or suspect to exist at the time of the release, which if known, might have affected Plaintiff's and the Settlement Class' decision to enter into the release, Plaintiff and the Settlement Class shall be deemed to relinquish, to the extent it is applicable, and to the full extent permitted by law, the provisions, rights, and benefits of Section 1542 of the California Civil Code. Plaintiff and the Settlement Class shall be deemed to waive any and all provisions, rights, and benefits conferred by any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to California Civil Code Section 1542.

10.     All Class Members are hereby barred and permanently enjoined from asserting any of the Released Claims against Lowe's, Lowe's Affiliates, GE Money Bank, and the Released Parties in any court or forum whatsoever, and the Lawsuit is dismissed on the merits, with prejudice and without costs to any party, except as provided herein.

11.     The Court finds that the law firms preliminarily approved as Class Counsel in its prior Order of Preliminary Approval [Dkt. Nos. 47 and 51], are competent and experienced attorneys and have adequately and aggressively represented the interests of the Class Members. The Court therefore certifies and appoints the law firms of Bock & Hatch, LLC, LakinChapman, LLC, and Anderson + Wanca to serve as Class Counsel on behalf of the Class.

12.     The Court hereby certifies Plaintiff Masters as Class Representative of the Class

defined herein. The terms of the Settlement Agreement provide that Lowe's will pay an incentive award to Plaintiff, and the Court hereby awards the named Class Representative an incentive award of $2,500.

13.     The Court hereby awards Plaintiff's counsel $1,724,000.00 in attorneys' fees and expenses.

14.     The Court finds that there is no just reason to delay the enforcement of or appeal from this Final Approval Order.

15.     Without affecting the finality of this Final Approval Order, the Court reserves continuing and exclusive jurisdiction over all matters relating to the administration, implementation, effectuation, and enforcement of the Settlement Agreement.

**DONE AND ORDERED** in the Southern District of Illinois on July 14, 2011.


s/ J. Phil Gilbert

UNITED STATES DISTRICT JUDGE

Honorable J. Phil Gilbert